Exhibit A

THE STATE OF SOUTH CAROLINA
In The Supreme Court

RECEIVED

Sep 07 2022

S.C. SUPREME COURT

APPEAL FROM SPARTANBURG COUNTY
Court of Common Pleas
J. Mark Hayes, II, Circuit Court Judge

Appellate Case No. 2022-000434

Daniel W. Spade ................................................................Respondent- Petitioner,

v.

State of South Carolina, .......................................................Petitioner-Respondent.

## PETITION FOR WRIT OF CERTIORARI

E. Charles Grose, Jr.
S.C. Bar Number 66063
The Grose Law Firm, LLC
404 Main Street
Greenwood, SC 29646
(864) 538-4466
(864) 538-4405 (fax)
Email: charles@groselawfirm.com

***Attorney for Respondent-Petitioner Daniel W. Spade***

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ......................................................................................................... iii

Questions Presented ...........................................................................................................1

Statement of Case ..............................................................................................................2

Statement of Facts .............................................................................................................4

Standard of Review ...........................................................................................................7

Arguments

    I.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to object to improper bolstering and vouching for the credibility of the child, which violated appellate court decisions existing at the time of his jury trial? .........................................................8

    II.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to consult expert witnesses and call those witnesses during pre-trial hearings and to testify before the jurors? ...............12

    III.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel not only failed to object to the trial judge instructing the jurors that their role is to "search for the truth" and make sure "justice is done" and when the prosecutor embraced this language during the opening statement, but also adopting that language in Mr. Spade's opening statement and closing argument, thereby diminishing and shifting the burden of proof? ...............................................................................................................15

    IV.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to call Alexandria Wolf, the Guardian ad Litem, in the Family Court Action? .........................................................17

    V.    Did the State commit prosecutorial misconduct when it failed to disclose statements by the child that established venue was not proper in Spartanburg County, failed to timely disclose medical records that established venue was not proper in Spartanburg County, failed to correct testimony implying venue was proper in

Spartanburg County, failed to disclose the DSS records, and failed to disclose exculpatory emails involving the Special Prosecutor? ...................................................18

VI.     Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to request a ruling on whether the Private Prosecutor, N. Douglas Brannon, was unqualified to serve as a special prosecutor because the Solicitor failed to produce a governor's commission pursuant to S.C. Code Ann. § 1-7-470? ...........................................................21

VII.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to demonstrate that Spartanburg County was not the venue of the alleged crime? ..........................................23

Conclusion ............................................................................................................................25

Certificate of Service ...........................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Ard v. Catoe*, 372 S.C. 318, 642 S.E.2d 590 (2007) ................................................................ 17

*Bagwell v. State*, 410 S.C. 259, 763 S.E.2d 630 (Ct. App. 2014) .............................................. 18

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................. 20, 22

*Briggs v. State*, 421 S.C. 316, 806 S.E.2d 713 (2017) .............................................................. 11

*Brown v. Butler*, 811 F.2d 938 (5th Cir. 1987) ...................................................................... 24

*Cobbs v. State*, 305 S.C. 299, 408 S.E.2d 223 (1991) .............................................................. 18

*Cornell v. Kirkpatrick*, 665 F.3d 369 (2d Cir. 2011) ............................................................. 24

*Council v. State*, 380 S.C. 159, 670 S.E.2d 356 (2008) ........................................................... 18

*Dawkins v. State*, 346 S.C. 151, 551 S.E.2d 260 (2001) .......................................................... 11

*Freiburger v. State*, 413 S.C. 243, 775 S.E.2d 391 (Ct. App. 2015) ........................................... 7

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) ................................................................ 14

*Gibson v. State*, 334 S.C. 515, 514 S.E.2d 320 (1999) ............................................................ 20

*Gomez v. Beto*, 462 F.2d 596 (5th Cir. 1972) ........................................................................ 15

*Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517 (4th Cir. 2016) ................................ 15

*Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) ........................................................................ 18

*House v. Balkcom*, 725 F.2d 608 (11th Cir. 1984) ................................................................. 14

*Ingle v. State*, 348 S.C. 467, 560 S.E.2d 401 (2002) ................................................................ 7

*Jones v. Richards*, 776 F.2d 1244 (4th Cir. 1985) ................................................................. 22

*Kyles v. Whitley*, 514 U.S. 419, (1995) ............................................................................... 21

*Mangal v. State*, 421 S.C. 85, 805 S.E.2d 568 (2017) ........................................................... 7, 8

*Matter of Brannon*, 428 S.C. 644, 837 S.E.2d 488 (2019) ........................................................ 2

*McKnight*, 378 S.C. 661 S.E.2d (2008) ............................................................. 14, 17

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................. 7

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007) ........................................... 14

*Riddle v. Ozmint*, 369 S.C. 39, 631 S.E.2d 70 (2006) ......................................... 18

*Smalls v. State*, 422 S.C. 174, 810 S.E.2d 836 (2018) .......................................... 7

*Smith v. State*, 386 S.C. 562, 689 S.E.2d 629 (2010) ...................................... 11, 12

*State v. Adams*, 430 S.C. 420, 845 S.E.2d 217 (Ct. App. 2020) .......................... 15

*State v. Beaty*, 423 S.C. 26, 813 S.E.2d 502 (2018) ........................................... 16

*State v. Brisbon*, 323 S.C. 324, 474 S.E.2d 433 (1996) ...................................... 24

*State v. Daniels*, 401 S.C. 251, 737 S.E.2d 473 (2103) ...................................... 16

*State v. Douglas*, 380 S.C. 499, 671 S.E.2d 606 (2009) ................................... 9, 11

*State v. Dunbar*, 356 S.C. 138, 587 S.E.2d 691 (2003) ...................................... 23

*State v. Durant*, 430 S.C. 98, 844 S.E.2d 49 (2020) .......................................... 21

*State v. Jennings*, 394 S.C. 473, 716 S.E.2d 91 (2011) ...................................... 11

*State v. Jones*, 343 S.C. 562, 541 S.E.2d 813 (2001) ......................................... 23

*State v. Kromah*, 401 S.C. 340 ...................................................................... 11, 12

*State v. Whitner*, 399 S.C. 547, 732 S.E.2d 861 (2012) .................................... 9, 11

Strickland v. Washington, 466 U.S. 668 (1984) ................................................. 7, 14

*Teamer v. State*, 416 S.C. 171, 786 S.E.2d 109 (2016) ...................................... 16

*Thompson v. State*, 423 S.C. 235, 814 S.E.2d 487 (2018) ................................. 7, 11

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................... 21

*Von Dohlen v. State*, 360 S.C. 598, 602 S.E.2d 738 (2004) ............................... 14

*Walker v. State*, 407 S.C. 400, 756 S.E.2d 144 (2014) ...................................... 17

iv

*Wiggins v. Smith*, 539 U.S. 510 (2003)................................................................................... 14

*Youngblood v. W. Virginia*, 547 U.S. 867 (2006) ...................................................................... 21

**Statutes**

S.C. Code Ann. § 1-7-470................................................................................................... 2, 1, 21

**Rules**

Rule 59(e), SCRCP ................................................................................................................... 4

Rule 5, SCRCrimP .......................................................................................................... 20, 22

Rule 60, SCRCP ...................................................................................................................... 2

Rule 801(d)(1), SCRE........................................................................................................... 20

# QUESTIONS PRESENTED

I. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to object to improper bolstering and vouching for the credibility of the child, which violated appellate court decisions existing at the time of his jury trial?

II. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to consult expert witnesses and call those witnesses during pre-trial hearings and to testify before the jurors.

III. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel not only failed to object to the trial judge instructing the jurors that their role is to "search for the truth" and make sure "justice is done" and when the prosecutor embraced this language during the opening statement, but also adopting that language in Mr. Spade's opening statement and closing argument, thereby diminishing and shifting the burden of proof?

IV. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to call Alexandria Wolf, the Guardian ad Litem, in the Family Court Action?

V. Did the State commit prosecutorial misconduct when it failed to disclose statements by the child that established venue was not proper in Spartanburg County, failed to timely disclose medical records that established venue was not proper in Spartanburg County, failed to correct testimony implying venue was proper in Spartanburg County, failed to disclose the DSS records, and failed to disclose exculpatory emails involving the Special Prosecutor?

VI. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to request a ruling on whether the Private Prosecutor, N. Douglas Brannon, was unqualified to serve as a special prosecutor because the Solicitor failed to produce a governor's commission pursuant to S.C. Code Ann. § 1-7-470?

VII. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to demonstrate that Spartanburg County was not the venue of the alleged crime.

1

## STATEMENT OF CASE

Following a hearing on June 29-30, 2009, the Honorable Georgia C. Anderson dismissed Heather and David Jolley's Family Court petition to terminate Dany Spade's parental rights on January 13, 2010 and issued a supplemental order on June 29, 2010. Heather Jolley filed another Family Court Action on November 23, 2010.

On May 3, 2011, Investigator Nikki Cantrell and officers of the Prince William County Police Department arrested Mr. Spade at his home in Virginia, charging him with first-degree criminal sexual conduct with a minor involving his daughter ("child").

On January 9, 2012, the Jolleys amended the November 2010 Family Court complaint to petition to terminate Mr. Spade's parental rights and to allow David Jolley to adopt the child. N. Douglas Brannon represented the Jolleys. Kenneth P. Shabel represented Mr. Spade. Alexandria Wolf was the guardian ad litem. Beginning on October 15, 2012, the Honorable James F. Farley, Jr. convened a hearing in the Family Court for Spartanburg County. Judge Farley ultimately terminated Mr. Spade's parental rights and allowed Mr. Jolley to adopt the child.[1] A. 2256-2447.

The State tried Mr. Spade before the Honorable R. Keith Kelly and a jury on February 24-26, 2014. A. 1-346. Barry J. Barnett, Jennifer A.J. Jordan, Kimberly L. Leskanic, and Mr. Brannon represented the State. Mr. Shabel and Shawn M. Campbell represented Mr. Spade. On February 26, 2014, the jurors found Mr. Spade guilty of first-degree criminal sexual conduct with a minor. A. 342. Judge Kelly sentenced Mr. Spade to thirty-five years imprisonment. A. 345.

---

[1] Proceedings on Mr. Spade's Rule 60, SCRCP motion are still pending in the Family Court Mr. Spade filed the Rule 60 Motion *pro se*. Undersigned counsel subsequently entered an appearance. Mr. Brannon continued to represent the Jolleys but subsequently withdrew because of a conflict of interest. *Matter of Brannon*, 428 S.C. 644, 837 S.E.2d 488 (2019). Scott F. Talley currently represents the Jolleys.

Mr. Spade appealed to the Court of Appeals. A. 421-1003. C. Rauch Wise and Mr. Shabel represented Mr. Spade. On February 11, 2016, the Court of Appeals convened an oral argument.[2] On July 6, 2016, the Court of Appeals affirmed Mr. Spade's conviction and sentence. *State v. Spade*, (S.C.Ct.App. Op. No. 2016-UP-352) (Filed July 6, 2016). A. 984-32. On August 18, 2016, the Court of Appeals denied Mr. Spade's petition for rehearing. A. 993-1003. On October 6, 2016, Mr. Spade filed a petition for writ of *certiorari* in the South Carolina Supreme Court. A. 1004-33. Mr. Wise represented Mr. Spade. On June 16, 2017, the Supreme Court denied Mr. Spade's petition for a writ of *certiorari*. A. 1062.

On July 13, 2017, Mr. Spade filed a *pro se* PCR application. A. 1064-73. With the assistance of undersigned counsel, Mr. Spade amended his PCR application on October 2, 2017 (A. 1084-94), December 24, 2018 (A. 1067-78), and May 14, 2019 (A. 1079-89). From May 15-20, 2019, the Honorable J. Mark Hayes, II Court convened an evidentiary hearing. A. 1241-72). By written order dated May 20, 2019, Judge Hayes ordered the South Carolina Department of Social Services ("DSS") provide the Court with "a complete copy of the DSS file regarding [the child], Daniel W. Spade (father), and Heather Smith a/k/a Heather Smith Jolley." A. 2678-79. Judge Hayes released a copy of the DSS file to the parties by written order dated August 16, 2019. A. 2688-89.

By written order dated May 7, 2020, Judge Hayes made findings of fact, denied Mr. Spade post-conviction relief, and instructed the Attorney General's Office to prepare a formal order. A. 2755-64. On July 7, 2020, Mr. Spade served his objections to the Attorney General's proposed order and proffered a copy of the Attorney General's proposed order. A. 2830-3027. By written

---

[2] While the decision was still pending, Mr. Shabel joined Mr. Brannon's law firm and, accordingly, moved to be relieved as counsel, because of the conflict of interest, by petition dated March 11, 2016.

Order dated October 8, 2020, the Court dismissed Mr. Spade's PCR application. A. 3028-91. On October 19, 2020, Mr. Spade filed his 59(e), SCRCP motion. A. 3092-3111. The State responded on January 13, 2021. A. 3112-47, and Mr. Spade replied on March 30, 2021. A. 3148-67. Following a hearing on March 29, 2021 (A. 3168-3263), Judge Hayes issued an order granting Mr. Spade post-conviction relief, in part, and ordering a new trial. A. 3263-90. On November 29, 2021, the State filed a Rule 59(e), SCRCP motion. A. 3291-3318. On January 24, 2022, Mr. Spade responded. A. 3318-22. On March 11, 2022, Judge Hayes denied the State's motion. A. 3323-28.

On April 11, 2022, the State noticed this appeal. Subsequently, on April 11, 2022, Mr. Spade noticed the cross-appeal. This cross-petition for a writ of certiorari follows.

## STATEMENT OF FACTS

During opening statements, the Solicitor informed the jurors they would have to determine whether Mr. Spade molested his biological daughter at a motel in Spartanburg County. The Solicitor explained the child disclosed the allegations to her grandmother, Kim Rosborough (the child's therapist) referred the child to the Children's Advocacy Center where Tabitha Webber conducted six interviews, and Mr. Webber notified the Spartanburg County Sheriff's Office who assigned Investigator Nikki Cantrell. The Prosecutor explained the jurors would hear from the child and the counselors. A. 117-21.

The child's direct testimony is only five pages of the 346-page trial transcript. She spent time with Mr. Spade at "his house and a hotel." The State asked, "And did you stay in a hotel with him here in South Carolina?" She relied, "Yes." The child testified Mr. Spade 'stuck his private part in my mouth . . . . [a]t the pool. . . . [i]n the bathroom." The State asked, "At the motel in South Carolina?" The transcript reflects, "Shaking head yes." She claimed Mr. Spade threatened not to take her home if she did not comply. Ms. Leskanic concluded the direct examination by

4

asking, "Do you remember anything else happening at the motel in South Carolina?" The child responded, "No." A. 135-40.

The prosecution relied on three experts. The trial court qualified Ms. Rosboroough as an expert in "child abuse therapy and treatment." Ms. Rosborough saw the child ten to twelve times and treated her for panic attacks and temper tantrums with the goal of "helping her with her anxiety and some of the separation anxiety and the symptoms she had developed after beginning visitation with her biological father." Ms. Rosborough recommended a joint therapy session with the child, Mr. Spade, and the child's mother. Within three days of this recommendation, this child allegedly disclosed sexual abuse. After the child alleged sexual abuse, Ms. Rosborough referred the child to the Children's Advocacy Center. Ms. Rosborough explained "Coaching would be, in this particular example, would be if someone encourages the child to say something that's not true. If you tell the child something that didn't happen, you give them information and you ask or pressure them to say that it happened when it did not." When the State asked Ms. Rosborough, "Did you see any signs of coaching in" P.J., the trial judge sustained trial counsel's objection to "bolstering." Ms. Rosborough also explained disclosure, partial disclosure, and the Child Sexual Abuse Accommodation Syndrome. This child never disclosed sexual abuse to Ms. Rosborough. A. 196-217.

Even though the prosecution never intended to introduce the five videotape interviews of the child (Tr. 41-42), the State called Ms. Webber, who conducted the interviews at the Children's Advocacy Center. After reviewing her expert qualifications, Ms. Webber explained the center "provides treatment for children," does "assessments when there has been allegations of sexual abuse" and provides medical exams by a forensic pediatrician." Ms. Webber testified the child disclosed sexual abuse at a hotel with a pool in South Carolina. Ms. Webber contacted law

5

enforcement and referred the child to counseling. Trial counsel did not cross-examine Ms. Webber. A. 246-50.

The trial court qualified Meredith Thompson-Loftis, a licensed professional counselor as an expert in "family counseling and child therapy." She also testified about partial disclosure, delayed disclosure, and coaching. Ms. Thompson-Loftis saw the child for seventy-one therapy sessions prior to trial. She testified the child disclosed the sexual abuse at a location in South Carolina. Trial counsel cross-examination is only twelve lines of the transcript. A. 250-71.

At the PCR hearing, Mr. Spade presented the expert witness testimony of Dr. Maggie Bruck (A. 1296-1424, 2462-78) and Dr. Michael Lamb (A. 1497-1616, 2479-2636). The PCR court found these experts "have the highest credentials in their areas of expertise," "can be considered experts of the highest esteemed," and "both appeared credible on the witness stand." Both experts "explained what are the 'best practices' for obtaining information for a child in a forensic interview," "how the forensic interviews in this case deviated from the 'best practices,'" and were "critical of the prior sworn testimony of the forensic interviewer when that testimony was compared to what is reflected in the video interviews." A. 2758.

At the PCR hearing, Mr. Spade presented the testimony of Alexandria Wolf, the guardian ad litem during the family court litigation. She explained how the Jolleys blocked her access to the child during the Family Court proceedings. A. 1718-98. The PCR court "easily concluded the GAL felt strong hostility from the mom and soon-to-be adoptive father," and "the conduct and attitude towards the GAL materially interfered with her work as GAL for the minor." A.2757-60.

Other PCR testimony included trial counsel, Mr. Wise, Ms. Thompson-Loftis, Solicitor Barnette, and Ms. Webber, and character witnesses.

## STANDARD OF REVIEW

Under the first prong of *Strickland v. Washington*, a defendant "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." 466 U.S. 668, 688 (1984). "The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (internal quotations omitted). "If the State contends the alleged deficiency resulted from a strategic decision made at trial, counsel must articulate a valid reason for employing a certain strategy." *Freiburger v. State*, 413 S.C. 243, 247, 775 S.E.2d 391, 393 (Ct. App. 2015); *cf. Ingle v. State*, 348 S.C. 467, 560 S.E.2d 401 (2002).

The second prong of *Strickland* requires a defendant establish this deficiency prejudiced him. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "In determining whether the applicant has proven prejudice, the PCR court should consider the specific impact counsel's error had on the outcome of the trial." *Smalls v. State*, 422 S.C. 174, 188, 810 S.E.2d 836, 843 (2018)[3] (citing *Strickland*, 466 U.S. at 695-96 (explaining that the court must analyze how individual errors of counsel affect the important factual findings in a particular case)).

This Court's "standard of review in PCR cases depends on the specific issue before" it. *Mangal v. State*, 421 S.C. 85, 91-92, 805 S.E.2d 568, 571 (2017) ("*Mangal I*"). This Court will

---

[3] *See also Thompson v. State*, 423 S.C. 235, 245, 814 S.E.2d 487, 492 (2018) (adhering to *Smalls*).

"defer to a PCR court's findings of fact and will uphold them if there is any evidence in the record to support them." *Id.* This Court will "not defer to a PCR court's rulings on questions of law." *Id.* "Questions of law are reviewed de novo, and [this Court] will reverse the PCR court's decision when it is controlled by an error of law." *Id.*

## ARGUMENTS

During the PCR hearing, Daniel Spade presented new evidence in the form of emails showing the Jolleys conspired with his former fiancé. A. 2076-. This now evidence also showed the child has "always been an anxious child" (A. 2091) and "is a very stubborn child and when she gets upset or scared, she sometimes makes things up for the extra attention" (A. 2093)—which undermined the prosecution's theory at trail that the child had anxiety and panic attacks because she suffered from sexual abuse. The PCR hearing also developed additional evidence from the Family Court Guardian ad Litem and DSS records. The DSS records contain a previously undisclosed medical report from Dr. Henderson contradicting the child's allegations that Mr. Spade used his penis to penetrate her mouth. Suppl. A. 153-68. For the reasons set forth below, this Court should grant the writ and consider the questions presented.

**I.     Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to object to improper bolstering and vouching for the credibility of the child, which violated appellate court decisions existing at the time of his jury trial?**

The State called three expert witnesses during Mr. Spade's jury trial: Kimberly Roseborough, who was the child's therapist prior to the allegations of sexual abuse (A. 196-217), Tabitha Webber, who conducted five interviews of the child at the Children's Advocacy Center (A. 246-50), and Meredith Thompson-Loftis, who was the child's therapist after the allegations of sexual abuse (A. 258-71).

Ms. Roseborough defined the term "coaching," and the trial court sustained an objection, as improper bolstering, when the State asked her whether she saw any signs of coaching in" the child. A. 205-206. The State was not deterred by the trial court's ruling. Despite this Court's warning in *State v. Douglas*, 380 S.C. 499, 671 S.E.2d 606 (2009), the prosecution questioned Ms. Webber about her expert qualifications, and she explained her center "provides treatment for children" and does "assessments when there has been allegations of sexual abuse, physical abuse, or a child has witnessed a violent crime." Trial counsel did not object to either. The State did not introduce any of the videotaped interviews of the child and, therefore, lacked a legitimate reason to call Ms. Webber as a witness, let alone go into her expert qualifications. Testimony by the Child Advocacy Center interviewer should be "for the limited purpose of laying the proper foundation for the admission of the videotape." *State v. Whitner*, 399 S.C. 547, 559, 732 S.E.2d 861, 867 (2012). Ms. Webber, nonetheless, testified the child disclosed sexual abuse to her. Based on the interviews, which were not introduced into evidence, Ms. Webber contacted law enforcement and recommended the child begin therapy. Trial counsel did not object to this testimony. Nor did he cross-examine Ms. Webber. Based on Ms. Webber's description of the role of the child advocacy center and her purported expertise regarding "[l]ots of issues surrounding children," the jurors undoubtably concluded Ms. Webber believed the child's allegations of sexual abuse, which led her to recommend therapy and contact law enforcement. A. 247-50.

Ms. Thompson-Loftis, who is "a licensed professional counselor in private practice in Greenville, was the last witness to testify at trial. The prosecutor questioned her about her training, education, experience, the nature of her practice, whether part of her practice includes making "diagnoses," and that treatment and therapy follows a diagnosis. She testified:

Being that a majority of my clients are trauma victims, or have been in the past, I have quite an extensive amount of forensic and sexual abuse training, Post-Traumatic Stress training.

The prosecution offered her as an expert in "child abuse diagnosis, treatment, and therapy." The trial judge qualified her as an expert in "Family counseling and child therapy." A. 250-58. After qualification as an expert witness, the following exchange occurred:

Q. Okay. Is [the child] one of your clients?

A. She is.

Q. When did you first meet [the child]?

A. [The child] first came to my office back in May of 2011.

Q. Okay. Do you have any idea how or why she appeared in your office? Was she referred there?

A. She was.

I used to work for the Children's Advocacy Center in assistance, which means I treat people who qualify for victim services. And since I took that, Ms. Webber referred [the child] to see if I could provide therapy for her under victim assistance and I agreed, and [the child] was brought for her session, first session, in May of 2011.

Q. Okay. And so the lady who just testified before you, Tab Webber, is the one who referred [the child] to you, is that correct?

A. Yes.

[Leading question objection overruled.]

Q. All right. Now, in cases where there is abuse of any kind, is it typical for a child after the Children's Advocacy Center interviews to change therapists?

A. I think once a determination has been made or a recommendation has been made, I typically see most forensic interviews results in therapy or further therapy, and I don't think it's unusual for someone to be referred to a different therapist, based upon the type of treatment they provide, or based upon the types of insurance panels there are on. There could be a number of reasons.

Q. Okay. So what this jury already knows is that [the child] was seeing Kim Roseborough. [The child] then went to the Children's Advocacy Center, and then [the child] came to see you. Is that unusual in the typical case of abuse?

A. No, not at all.

Q. Okay. Thank you.

A. 258-60. Ms. Thompson-Loftis next testified about "partial disclosure" (including the role a child's age and personality plays in a "partial disclosure"), "delayed disclosure," "coaching," and that the child was still in treatment. She testified about the child's symptoms, treatment, and disclosure of sexual abuse. Trial counsel's cross-examination is less than one page in the record and confined some of the prosecution's themes about young children. A. 260-71.

This opinion testimony was improper under this state's precedent existing at the time of Mr. Spade's jury trial. *See, e.g., State v. Kromah*, 401 S.C. 340, 37 S.E.2d, (2013), *State v. Jennings*, 394 S.C. 473, 716 S.E.2d 91 (2011), *State v. Whitner*, 399 S.C. 547, 559, 732 S.E.2d 861, 867 (2012) ("Admittedly, we have confronted instances where the State has abused the statute and sought to have the forensic interviewer, improperly imbued with the imprimatur of an expert witness, invade the province of the jury by vouching for the credibility of the alleged victim."); *Smith v. State*, 386 S.C. 562, 689 S.E.2d 629 (2010), *State v. Douglas*, 380 S.C. 499, 671 S.E.2d 606 (2009), and *Dawkins v. State*, 346 S.C. 151, 551 S.E.2d 260 (2001). *See also Briggs v. State*, 421 S.C. 316, 325, 806 S.E.2d 713, 718 (2017) and *Thompson v. State*, 423 S.C. 235, 243, 814 S.E.2d 487, 491 (2018). The jurors understood that Ms. Webber determined the child was a victim of child sexual abuse and referred to her to Ms. Thompson-Loftis for treatment "under victim assistance." Despite having objected to Ms. Rosborough offering an opinion about whether she saw evidence the child was coached, trial counsel failed to object to Ms. Thompson-Loftis telling the jurors that Ms. Webber determined child sexual abuse occurred and she "provide[d] therapy

for [the child] under victim assistance." Trial counsel were deficient for not objecting to these opinions. *Smith,* 386 S.C. at 568, 689 S.E.2d at 633 ("we can discern no defensible basis for trial counsel's failure to challenge the forensic interviewer's objectionable testimony"); *see also, e.g., Kromah*, *Douglas,* and *Dawkins.*

Although unclear whether the State raised this issue in its Rule 59(e) motion, the PCR court observed the State requested footnote 18 be removed from the order dated November 12, 2021. Order (3/11/22), at 3, n. 5. The PCR court reaffirmed footnote 18, reminded the "issue of bolstering [as to Thompson-Loftis and Weber] is a close call," and observed, "For clarity purposes, [the PCR] Court found prejudice existed in the event [the PCR] court was incorrect that Trial Counsel should have objected to the presentation of either or both of these witnesses." *Id.*

Although finding prejudice, the PCR court erred as a matter of law on the deficient performance prong of *Strickland.* This Court should grant the writ and consider the question.

**II.    Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to consult expert witnesses and call those witnesses during pre-trial hearings and to testify before the jurors.**

At the PCR evidentiary hearing, Mr. Spade presented the expert witness testimony of Dr. Maggie Bruck (A. 1296-1424, 2462-78) and Dr. Michael Lamb (A. 1497-1616, 2479-2636). The PCR court found:

> Again, the forensic interviews were material to the PCR. PCR counsel was successful at discrediting the forensic interviews in this case. As part of the review process, the interviews were reviewed by this Court. Certain sections of the video interviews were reviewed several times. The PCR hearing testimony of the Applicant's two expert witnesses and the testimony of the forensic interviewer were all considered. The audio recording of the PCR testimony was also reviewed by this Court post-PCR hearing.
>
> The expert witnesses called by [Mr. Spade] have the highest credentials in their areas of expertise. They both can be considered experts of the highest esteemed. Also, they both appeared credible on the witness stand. Together, they explained

what are the "best practices for obtaining information for a child in a forensic interview. They both explained how the forensic interviews in this case deviated from the "best practices." They were also critical of the prior sworn testimony of the forensic interviewer when that testimony was compared to what is reflected in the video interviews.

\*\*\*

In reaching the conclusion that the applicant['s] PCR counsel was successful in discrediting the video interviews, this Court notes, again, that no witness challenged the credentials of the applicant's expert nor the validity of their methodology. Based on the information presented to this Court, these two witnesses presented the highest levels of expertise in their respective fields. They appeared extremely credible during the hearing, after viewing the videos and applying the standards offered by these experts, *this Court agrees with their assessment that the forensic interviews were suggestive.*

A. 2758 (emphasis added).

Dr. Bruck also reviewed the records of the seventy-one counseling sessions Ms. Thompson-Loftis had with the child and opined the techniques utilized were suggestive. A. 1387-85.

Based on this expert testimony, Mr. Spade alleged he was denied the right to effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution during the guilt/innocence phase of his jury trial for failing to call available expert witnesses that would have established the unreliability of the child's allegations, failing to move to exclude the testimony of the child complaining witnesses because her testimony was tainted, unreliable, and inadmissible because of the improper techniques used to obtain the testimony, and failing to cross-examine witnesses presented by the State to demonstrate to the jurors that the testimony of the child complaining witnesses was tainted and unreliable because of the improper techniques used to obtain the testimony. A. 1079-89.

Trial counsel has an obligation to conduct a substantial investigation into each plausible defense. *Strickland* 466 U.S. at 681. "Pretrial investigation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation." *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984). "Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of "strategy"—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007). Despite Mr. Spade urging his attorneys to retain expert witnesses, trial counsel never consulted anyone like Dr. Bruck or Dr. Lamb. A. 2637-45. The State wants to attribute this failure to a strategic decision. "[S]trategic choices made by counsel after an incomplete investigation are reasonable only to the extent that reasonable professional judgment supports the limitations on the investigation." *McKnight,* 378 S.C. at 45, 661 S.E.2d at 360 (2008) (internal quotations omitted) (citing *Wiggins v. Smith,* 539 U.S. 510 (2003) and *Von Dohlen v. State,* 360 S.C. 598, 607, 602 S.E.2d 738, 743 (2004)). *See also Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) (counsel's failure to consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues, and thus enhance his ability to mount an effective cross-examination, was constitutionally deficient performance).

*McKnight* held it was not a valid strategy to call the unfavorable expert and "that substitute and/or additional testimony was needed." 378 S.C. at 44, 661 S.E.2d at 359. Regarding the failure to replace the favorable expert, our Supreme Court held, "in light of counsel's familiarity with the first trial and the relative ease with which counsel could have procured favorable expert testimony at the second trial, we conclude that counsel's decision to call [the unfavorable expert] alone to testify at the second trial was unreasonable." *Id.,* 378 S.C. at 45, 661 S.E.2d at 360.

14

Here, the PCR court found and concluded the child advocacy center interviews were suggestive. A. 2758. Expert testimony supports suppressing the child testimony during a taint hearing. *State v. Adams*, 430 S.C. 420, 428, 845 S.E.2d 217, 221 (Ct. App. 2020) ("the framework of § 17-23-175, which in essence requires a pre-trial taint hearing"). *See also Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 524 (4th Cir. 2016) ("ineffectiveness claim [can be] based on counsel's failure to file a motion to suppress).

Here, given trial counsel's familiarity with the State's Experts from the Family Court proceeding, it was unreasonable for trial counsel not to consult an expert like Dr. Bruck or Dr. Lamb. As trial counsel did not even consult a single expert, the failure to call and expert cannot be justified as a valid, informed strategic decision because "[d]ecisions made in ignorance of relevant, available information cannot be characterized as strategic." *Weik*, 409 S.C. at 236, 761 S.E.2d at 768. *See also Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972) ("When a defense counsel fails to investigate his client's only possible defense, although requested to do so by him; and fails to subpoena witnesses in support of the defense, it can hardly be said that the defendant has had the effective assistance of counsel.").

Trial counsel was deficient for not consulting experts like Dr. Bruck and Dr. Lamb and for not calling them to testify during a suppression hearing and, if necessary, at trial. This Court should grant the writ and consider the question.

**III.  Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel not only failed to object to the trial judge instructing the jurors that their role is to "search for the truth" and make sure "justice is done" and when the prosecutor embraced this language during the opening statement, but also adopting that language in Mr. Spade's opening statement and closing argument, thereby diminishing and shifting the burden of proof?**

Mr. Spade alleges his trial counsel were ineffective for "[n]ot only failing to object to the trial judge instructing the jurors that their role is to 'search for the truth' and make sure 'justice is done' and the prosecutor embracing this language in its opening statement, which impermissibly diminishes and shifts the burden of proof, but also adopting that language in Mr. Spade's opening statement and closing argument, thereby diminishing and shifting the burden of proof." A. 1079-89. The PCR court agreed with Mr. Spade "that 'the trial court's statement and his attorney's statement crossed into the [*State v. Beaty*, 423 S.C. 26, 813 S.E.2d 502 (2018)] sphere of improper statements'" because "these statements 'shifted the jury's focus away from the State's obligation of meeting its burden of proof.'" A. 2762. The PCR court denied Mr. Spade relief because *Beaty* was not decided at the time of his jury trial. *Id.* This Court, however, decided *State v. Daniels*, 401 S.C. 251, 737 S.E.2d 473 (2103) prior to Mr. Spades jury trial. *See also Teamer v. State*, 416 S.C. 171, 182-83, 786 S.E.2d 109, 114-15 (2016) (recognizing *Daniels* decided this issue). The PCR court further concluded, "[B]ecause trial counsel failed to object to the trial court's use of a 'search for the truth' terminology and because trial counsel erred in using the same terminology when explaining the purpose of a criminal trial, the significance or weight of the Special Prosecutor's improper closing argument when performing a *Smalls* analysis, increased the prejudicial effect of the improper closing argument." *Id.*, at 13, n. 14. The PCR court ultimately found and concluded, "[T]he presentation of evidence in the trial was 'bookended' with unconstitutional statements that altered the jury's role from being an impartial factfinder when determining if the State had met its constitutional obligations of proving guilt." *Id.*, at 27.

Even though finding prejudice from the burden shifting instructions and argument, the PCR court failed to recognize that *Daniels* and *Teamer* decided this issue prior to *Beaty*. This Court should grant the writ and consider the question.

IV. **Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to call Alexandria Wolf, the Guardian ad Litem, in the Family Court Action?**

Alexandria Wolf's PCR testimony is evidence that was not presented to Mr. Spade's jurors, even though it was available at the time of Mr. Spade's trial. The PCR Court found Ms. Wolf credible. During the Family Court case, Ms. Wolf listened to recordings of calls between the child and Mr. Spade, none of which contained a sense of fear by the child. Prior to Ms. Rosborough recommending a joint counseling session with the child, Mr. Spade, and the child's mother, the Jolleys were "120 percent" cooperative with Ms. Wolf. After that recommendation, the Jolleys provided "zero" cooperation, despite Ms. Wolf's efforts. In August 2012, when the Family Court hearing was approaching, Ms. Wolf wanted to conduct a home visit. When Ms. Wolf made the home visit, "Mr. Jolley was hypervigilant, clearly uncomfortable when [she] tried to speak with the child." When Mr. Jolley was present, "he answered all of [Ms. Wolf's] questions for" the child, including "[s]illy questions like what's the name of the bunny rabbit. Everything he had an answer for. And he would not let [Ms. Wolf] pursue anything further." During her investigation, Ms. Wolf did not personally observe any fear by P.J. of Mr Spade. A. 2442-44.

Trial counsel has "an obligation to conduct thorough **and independent** investigations." *Ard v. Catoe*, 372 S.C. 318, 332, 642 S.E.2d 590, 597 (2007) (emphasis supplied by court). A new trial is warranted when trial counsel's failure to investigate prejudices and accused. *See, e.g., Walker v. State*, 407 S.C. 400, 756 S.E.2d 144 (2014) (trial counsel's failure to interview accused's former girlfriend as a potential alibi witness warranted a new trial); *McKnight*, 378 S.C. at 46, 661 S.E.2d at 360 (trial "counsel was ineffective in failing to investigate medical evidence

contradicting the State's experts' testimony); *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) (trial counsel ineffective for failing to call any witnesses).[4]

Although finding Ms. Wolf credible, the PCR court erred as a matter of law by concluding trial counsel was not deficient for failing to call her as a witness. Ms. Wolf provided valuable testimony supporting the defense theory that the Jolley's coached the child to make false allegations. This Court should grant the writ and consider the question.

**V. Did the State commit prosecutorial misconduct when it failed to disclose statements by the child that established venue was not proper in Spartanburg County, failed to timely disclose medical records that established venue was not proper in Spartanburg County, failed to correct testimony implying venue was proper in Spartanburg County, failed to disclose the DSS records, and failed to disclose exculpatory emails involving the special prosecutor?**

Trial counsel correctly pointed out the child did not testify that the sexual abuse occurred in Spartanburg County. Trial counsel was also aware that Mr. Spade stayed with the child at hotels other than the one in Duncan, South Carolina. The prosecutors cleverly crafted questions for the child Tabatha Webber, and Meredith Thompson-Loftis alleging the sexual assault occurred in South Carolina, but they did not ask any of these witnesses whether the abuse occurred in Spartanburg County. A. 135-40, 246-50, 258-71. Ms. Thompson-Loftis' records confirmed venue was not proper in Spartanburg County. A. The prosecution did not correct any of this misleading testimony. *Riddle v. Ozmint*, 369 S.C. 39, 631 S.E.2d 70 (2006) (State was obligated to correct co-defendant's false testimony at trial).

---

[4] *See also Council v. State*, 380 S.C. 159, 670 S.E.2d 356 (2008) (Trial counsel's failure to adequately investigate and present mitigating evidence during penalty phase was deficient performance); *Cobbs v. State*, 305 S.C. 299, 408 S.E.2d 223 (1991) (defendant convicted of forgery and burglary was denied effective assistance of counsel due to defense counsel's failure to investigate possible defenses); *Bagwell v. State*, 410 S.C. 259, 266, 763 S.E.2d 630, 634 (Ct. App. 2014) ("trial counsel's failure to conduct DNA testing on the glass prior to trial constituted ineffective assistance of counsel").

The prosecution was aware of the DSS records, which contained information relevant to venue, confirming the Jolley's lack of cooperation, and an exculpatory medical report, but the State did not disclose those records. This lack of cooperation with DSS corroborated the new evidence presented through Ms. Wolf's testimony. In addition to the lack of cooperation and parental alienation, the DSS records contained the Child Maltreatment Protocol,[5] completed by Dr. Nancy Henderson on April 29, 2011, at the Spartanburg Child Advocacy Center documented that the child's mother provided a materially false medical history, leading Dr. Henderson to document, "Negative pertinent social history." Suppl. A. 153-68.

The ongoing domestic litigation and evidence of parental alienation certainty qualify as a significant social history. The PCR court noted it was "troubled that the legal history of this case includes private parties being encouraged to be uncooperative and thereby frustrate the work of the DSS and a family court GAL." A. 2758. Concealing from Dr. Henderson this social history is material to Mr. Spade's defense. Dr. Henderson also documented the child "was unable to separate from mom to be interviewed, which is relevant to Mr. Spade's defense that the child was coached to make the allegations. Finally, Dr. Henderson also documented the child has "never been great sleeper but worse in last month." This information places the child's increased anxiety symptoms in late March and April 2011 and links the increased anxiety symptoms to the parental alienation, coaching, and presentation of the false allegations against Mr. Spade. It's also contrary to the prosecution's narrative that Mr. Spade was the source of the child's anxiety attacks. Dr. Henderson's medical exam is also significant because her records contradict the child's testimony

---

[5] Dr. Henderson documented a "normal exam." At trial, the Solicitor stipulated the prosecution did not have any medical evidence to support the allegations of sexual abuse. Dr. Henderson's records, however, contained additional information favorable to the defense. Suppl. A. 153-68.

at trial. Although Dr. Henderson's report lists the reason for referral as alleged "Sexual Abuse," the only specific allegation Dr. Henderson documented was "Fondling." Dr. Henderson did not document any "Oral-Genital Contact." Suppl. A. 153-68. Trial counsel, therefore, could have called Dr. Henderson as a witness to testify about the prior inconsistent statement. Rule 801(d)(1), SCRE.

Dr. Henderson's medical exam is extremely significant Because of his role in the Family Court case, the Special Prosecutor was keenly aware of the DSS records but placed his loyalty to his private client above his due process obligations as prosecutor. *See* Section VI, *infra.* At the hearing on Mr. Spade's discovery motion, the Special Prosecutor claimed his private Family Court file was privileged and not subject to discovery under Rule 5, SCRCrimP and *Brady.*[6] A.1074-77, 1085-44. Even after the circuit court ruled Mr. Spade is entitled to any *Brady* material, it remains unclear whether the Special Prosecutor complied. Compare Ex. 40 (A. 2674), disclosing one email, with Ex. 39 (A. 2671), Special Prosecutor stating multiple emails were subject to the discovery order.

"A *Brady* claim is based upon the requirement of due process." *Gibson v. State*, 334 S.C. 515, 524, 514 S.E.2d 320, 324 (1999). "*Brady* is based on a sense of fairness, and a belief that society gains when a defendant is accorded a fair trial. The focus is not on the misconduct of the Prosecutor, but on the fairness of the procedure." *Id.*, 334 S.C. at 528, 514 S.E.2d at 326-27. "A *Brady* violation occurs when the evidence at issue is: 1) favorable to the accused; 2) in the possession of or known to the prosecution; 3) suppressed by the prosecution; and 4) material to

---

[6] *Brady v. Maryland,* 373 U.S. 83 (1963).

the defendant's guilt or punishment." *State v. Durant*, 430 S.C. 98, 107, 844 S.E.2d 49, 53 (2020).[7]

"*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. W. Virginia*, 547 U.S. 867, 869-70 (2006) (internal quotations omitted) (citing *Kyles v. Whitley*, 514 U.S. 419, (1995))."Such a violation is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. For determining when a *Brady* violation is material, *Durant* adopted the standard articulated in *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."). However, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Youngblood v. W. Virginia*, 547 U.S. at 870 (internal quotations omitted) (citing *Kyles,* 514 U.S., at 434).

This Court should grant the writ and consider the multiple *Brady* violations.

**VI. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to request a ruling on whether the Private Prosecutor, N. Douglas Brannon, was unqualified to serve as a special prosecutor because the Solicitor failed to produce a governor's commission pursuant to S.C. Code Ann. § 1-7-470.**

S.C. Code Ann. § 1-7-470 provides:

The circuit solicitor of the seventh judicial circuit may appoint a competent attorney, who is a resident of Spartanburg County, as assistant solicitor. He shall perform any and all of the duties and functions now or hereafter imposed by law upon the circuit solicitor in Spartanburg County, as the solicitor of the circuit shall authorize, designate and direct. The assistant solicitor shall be appointed by the solicitor of the seventh judicial circuit and shall after appointment be commissioned by the Governor; *provided, however,* the solicitor of the seventh judicial circuit shall have the right to remove the assistant solicitor from office at his pleasure, and

---

[7] Although this Court decided *Durant* after Mr. Spade's trial, *Durant* is not a new statement of the law. Rather, it is the latest application of firmly established law regarding a *Brady* violation.

in no event can the assistant solicitor be appointed for a period beyond the term of office of the circuit solicitor. The assistant solicitor shall receive from Spartanburg County as compensation for his services such sum per year as may be provided by the General Assembly, payable the first and fifteenth of each month, and eight hundred dollars per year for travel.

The assistant solicitor shall appear and represent the State in magistrates' courts when requested by the sheriff's department or the highway patrol located in Spartanburg County. He shall further prosecute appeals from magistrates' courts in that county.

As seen above, Mr. Brannon represented the Jolleys in Family Court. Because of this relationship, the Solicitor appointed Mr. Brannon as Special Prosecutor.[8] Prior to trial, the Solicitor did not produce documentation showing that Mr. Brannon was "commissioned by the Governor." The Court of Appeals deemed this issue not preserved on appeal because trial counsel did not obtain a ruling from the trial judge. At the PCR hearing, the Solicitor testified he never obtained the commission from the Governor. A. 984-92, 1477-96.

At the hearing on Mr. Spade's discovery motion, the Special Prosecutor claimed his private Family Court file was privileged and not subject to discovery under Rule 5, SCRCrimP and *Brady*.[9] A.1074-77, 1085-44. Even after the circuit court ruled Mr. Spade is entitled to any *Brady* material, it remains unclear whether the Special Prosecutor complied. Compare Ex. 40 (A. 2674), disclosing one email, with Ex. 39 (A. 2671), Special Prosecutor stating multiple emails were subject to the discovery order.

---

[8] This court should consider propriety of appointing the attorney who represented the complaining witness family as a special prosecutor in a connected criminal action. *See, e.g., Jones v. Richards*, 776 F.2d 1244, 1247 (4th Cir. 1985) ("we think that the use of private prosecutors who are also representing plaintiffs in civil actions against the criminal defendant should be discouraged").

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

"In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge. Issues not raised and ruled upon in the trial court will not be considered on appeal." *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003). The Court of Appeals did not consider this issue during the direct appeal because trial counsel did not obtain a ruling. Evidence developed during the PCR proceedings revealed the Special Prosecutor placed his duty of loyalty to the Jolleys above his due process obligations as a prosecutor. *See, e.g., State v. Jones*, 343 S.C. 562, 578, 541 S.E.2d 813, 822 (2001) ("We again remind prosecutors that they are ministers of justice and not mere advocates. Their special responsibility carries with it specific obligations to see the defendant is accorded procedural justice" (internal citations and quotations omitted)).

Trial counsel, accordingly, was deficient for not preserving this issue for appellate review. Mr. Spade was prejudiced by the Special Prosecutor's biased advocacy, failure to disclose Brady material, knowledge of the exculpatory medical records contained in the DSS file, and closing argument. This Court should grant the writ and consider the question.

## VII. Was Daniel Spade denied effective assistance counsel—in violation of the Sixth Amendment to the United States Constitution and Article I, Section 14 of the South Carolina Constitution—when his trial counsel failed to demonstrate that Spartanburg County was not the venue of the alleged crime.

Trial counsel correctly pointed out the child did not testify that the sexual abuse occurred in Spartanburg County. Trial counsel was also aware that Mr. Spade stated with the child at hotels other than the one in Duncan, South Carolina. The prosecutors cleverly crafted questions for the child, Tabatha Webber, and Meredith Thompson-Loftis alleging the sexual assault occurred in South Carolina, but they did not ask any of these witnesses whether the abuse occurred in Spartanburg County. A. 135-40, 246-50, 258-71. Ms. Thompson-Loftis' counseling records

document the child alleged that the oral sex happened in a bathroom at a pool of a hotel in Greenville. A. 893.

Trial counsel had the information available to them that established venue was not proper in Spartanburg County. This Court has held:

> Although an accused has a right to be tried in the county in which the offense is alleged to have been committed, this right is not jurisdictional. Venue in a criminal case need not be affirmatively proved if there is sufficient evidence from which it can be inferred. Evidence of venue, though slight, is sufficient in the absence of conflicting evidence and may be proved by circumstantial as well as direct evidence. Where acts essential to the offense are committed in different counties, the accused may be tried in either county.

*State v. Brisbon*, 323 S.C. 324, 327, 474 S.E.2d 433, 435 (1996) (internal citations omitted).

In this case, the prosecution presented evidence of alleged a single sexual battery occurring at a hotel. Ms. Thompson-Loftis' counseling records are "conflicting evidence" sufficient to rebut the inference applied by the trial judge to allow the case to proceed to the jury. Although *Brisbon* holds the prosecution need not prove venue by proof beyond a reasonable doubt, the prosecution still has to prove venue. In this case, the prosecution did not prove venue by even the preponderance of the evidence.

Trial counsel was deficient for not citing this evidence in the motion for a directed verdict and for not requesting a jury instruction on venue. *Cornell v. Kirkpatrick*, 665 F.3d 369 (2d Cir. 2011) (counsel's failure to object to improper venue was objectively unreasonable performance); *Brown v. Butler*, 811 F.2d 938 (5th Cir. 1987) (failure to advise about venue defense is ineffective assistance of counsel). This Court should grant the writ and consider the question.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Spade's cross-petition for a writ of certiorari and consider the questions.

Respectfully Submitted,

By s/*E. Charles Grose, Jr*

E. Charles Grose, Jr.
S.C. Bar Number 66063
The Grose Law Firm, LLC
404 Main Street
Greenwood, SC 29646
(864) 538-4466
(864) 538-4405 (fax)
Email: charles@groselawfirm.com

**Attorney for Daniel W. Spade**

September 7, 2022.
Greenwood, South Carolina

25

Exhibit B

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
) FOR THE SEVENTH JUDICIAL
COUNTY OF SPARTANBURG ) CIRCUIT
)
Daniel W. Spade, SCDC #358974 ) Case No.: 2017-CP-42-02372
)
Applicant )
) SCRCP Rule 59(e) Order
vs. ) Modifying in Part the Order of Dismissal
) Dated October 8, 2020
State of South Carolina, ) And
) Granting a New Trial[1]
Respondent )
)

     This is a post-conviction relief (PCR) case. The matter is presently before this Court on the Applicant's SCRCP Rule 59(e) Motion. Applicant's 59(e) motion timely challenges this Court's prior order (Order of Dismissal) dated October 8, 2020, dismissing his application. As will be explained herein, the motion is granted to the extent that this Order modifies this Court's prior order. If not modified by this Order, the Order of Dismissal is unchanged. Based on this Court's modifications, the application for post-conviction relief is granted and a new trial is ordered.

<u>General Background</u>

     While the PCR case arises from the Applicant's 2014 conviction for first degree criminal sexual conduct with a minor, and his subsequent efforts of direct appeal, the record in this PCR case also involves a bitterly fought private Family Court dispute, a Department of Social

---

[1] The granting of a new trial in a post-conviction relief (PCR) case is not a judicial conclusion that an Applicant is guilty or innocent of the crime he is accused. A post-conviction relief proceeding is a collateral challenge to the underlying criminal case that examines the constitutionality of the underlying proceeding. Typically, a PCR challenges the underlying process by raising issues related to the adequacy of trial counsel's representation, improper actions of the prosecutor or other aspects of the underlying criminal case. PCR matters are authorized by statute S.C. Code § 17-27-10, et al.

1

Services (DSS) investigation, and law enforcement investigations in two states; South Carolina and Virginia.[2]

The PCR, the criminal case, the family court dispute and the DSS investigation arise from the same factual background. This chronological and factual background began in early 2006 with a brief relationship between the Applicant and the minor child's mother. As a result of the brief relationship, the minor child's mother became pregnant, and the victim in the criminal case was born. As early as 2007, Applicant's attorney/client relationship with his trial attorney, Ken Shabel, began when he was hired to assist Applicant with obtaining visitation with his daughter. At that time, Applicant lived in Virginia (with Cara Lintner, the mother of his other children). His daughter lived in South Carolina with her mother and step-father. Initially, Applicant's lawyer was successful with his representation of Applicant. He obtained visitation rights for Applicant with his daughter. Months later, however, the child's mother brought a Family Court action to terminate Applicant's parental rights (TPR). After a trial, Mr. Shabel was again successful stopping the effort to terminate Applicant's parental rights and, subsequently, visitation with his daughter was restored.[3]

After a sexual abuse report between the Applicant and his daughter was made in 2011, Mr. Shabel continued to represent Applicant. Mr. Shabel served as Applicant's attorney in the

---

[2] The record in this PCR case is voluminous. In comparison to other non-capital PCR cases, the present record is substantial in size. As will be discussed herein, once the PCR hearing concluded in May of 2019, the DSS file (which previously could not be located) was produced and made part of the record of this case. Subsequently, briefing of the DSS issue was made part of the record. Once a preliminary ruling was issued by this Court and circulated, comments and objections were presented by the parties (pre-SCRCP Rule 59 submissions). After the formal Order of Dismissal was issued, additional briefings were submitted into the record. Prior to the issuance of this Order, Applicant's counsel submitted information concerning collateral but related complaints for disciplinary actions involving three (3) of the attorneys and the investigating law enforcement officer.

[3] The factual nexus and overlap with the Family Court proceedings and the criminal case was also explored by the South Carolina Supreme Court in In the Matter of Kenneth Philip Shabel, Opinion No. 28059 (Filed September 22, 2021).

subsequent Family Court matter brought to terminate his parental rights (basis for termination was the sexual abuse allegations with the minor).[4] Mr. Shabel also served as his attorney through various governmental investigations involving allegations of sexual abuse in South Carolina and Virginia. Additionally, he represented Applicant during the General Session criminal trial that resulted in Applicant's 2014 conviction of first-degree criminal sexual conduct with a minor. Applicant was prosecuted and convicted on a single act of placing, as the child described, "his private part in my mouth" in a bathroom close to a hotel pool located in South Carolina. (Trial pp. 141-142).

After the appeals[5] were exhausted, the present PCR followed. Prior and subsequent to the 2019 PCR evidentiary hearing, extensive briefing was presented. The DSS file was not located until after the May 2019 PCR hearing. On May 7, 2020, this Court's initial/informal ruling was issued. Further comments were received from the parties. The formal Order of Dismissal was issued on October 8, 2020. Subsequently, the Applicant's present Rule 59(e) motion was timely filed. Additional briefings followed.

Oral arguments were received remotely by the Court on March 29, 2021. E. Charles Grose, Jr., Esq., presented the arguments on behalf of the Applicant. Megan Harrigan Jameson Esq., Senior Assistant Deputy Attorney General, presented the arguments for the State.

---

[4] The record indicates Mr. Brannan (referred to as Special Prosecutor in the criminal case) became involved shortly before the TPR action that was based on the abuse allegations.

[5] Mr. Shabel withdrew as Applicant's attorney during the appeal process when he changed jobs to work for a new law firm. His new job potentially created a conflict of interest with his work for the Applicant. He became a member of the private law firm belonging to the lawyer that the Solicitor designated as a "Special Prosecutor" to prosecute the criminal case against the Applicant.

3

After considering the arguments and reviewing the extensive record, this Order was issued modifying the Order of Dismissal and granting the Applicant's relief of a new trial.

### PCR Specific Background

This PCR seeks to set aside the Applicant's 2014 jury conviction of first-degree criminal sexual conduct with a minor and the resulting thirty-five (35) year prison sentence. Direct appellate review was exhausted in 2016. In 2017, the initial PCR application was filed pro se. Numerous amendments to the application were filed and accepted up to the date of the PCR hearing. The PCR evidentiary hearing was conducted on May 15 through May 20, 2019. Even though the evidentiary hearing was lengthy, as mentioned, it did not end the development of the record for this PCR.

Significantly, after the evidentiary hearing, a consent order was issued on May 20, 2019, requiring DSS to produce a copy of its investigative file concerning the minor, the Applicant, and minor's family members. This Court was previously advised the DSS investigative file could not be located.[6] It was anticipated that the consent order would merely serve as a means of clarifying the record that the DSS investigative file no longer existed. Surprisingly, the DSS file was produced. An in-camera review of the investigative file was conducted. With the consent of DSS, the investigative file was ordered released to the attorneys. Additional briefing concerning the DSS file was subsequently received. With the cooperation and consent of DSS and the PCR

---

[6] Given the substantial effort by law enforcement and DSS to investigate the allegations in both South Carolina and Virginia, the fact the file was lost was very disturbing.

parties, a redacted version of the DSS investigative file was submitted/filed under seal and made part of the record of this PCR.[7]

After the evidentiary hearing, this Court undertook an extensive review. After reviewing the DSS investigative file, the trial transcript of the criminal trial, the criminal trial's exhibits, and the PCR hearing exhibits (including multiple reviews of five (5) forensic interviews contained in video discs), this Court issued its preliminary ruling on May 7, 2020. The preliminary ruling was contained as part of a SCRCP Form 4C. This Court's ruling included a request that the Attorney General submit a proposed formal order. After reviewing and editing the proposed order, a final order denying the application was signed and filed on October 8, 2020. The present SCRCP Rule 59(e) motion before this Court followed.

<u>Decision</u>

After considering the arguments presented by the parties and an extensive review of the entire record, this Court's prior Order of Dismissal dated October 8, 2020, is modified as set forth herein. The October 8, 2020, Order of Dismissal is incorporated by reference. Unless modified as set forth herein, the provisions of the October 8, 2020, Order of Dismissal, along with this Order, are the final ruling of this Court on the Applicant's request for post-conviction relief. For the reasons stated herein, the application is granted and a new trial is ordered.

---

[7] Subsequent to being notified by the State and Applicant that the redacted DSS file was not in the Clerk's file, this Court secured from DSS a redacted file. The DSS file is now part of the Clerk of Court's file.

Discussion

Threshold Matter[8]

Applicant raised what he termed a "Threshold Matter" wherein he asserted this Court denied him his statutory and constitutional right to have a judicial officer make findings of fact and conclusions of law because the Court asked one of the attorneys to submit a proposed final order. This Court disagrees. A PCR trial court's requesting one party to submit a proposed order does not create a statutory or constitutional violation. See, Fishburne v. State, 427 S.C.505, 832 S.E.2d 584 (2019)[9].

While the exact effort by this Court in reaching its rulings is not documented in the record, the effort was substantial. Additionally, this Court employed the same order preparation process stated in Fishburne. In issuing its prior ruling, this Court finds no basis to support the proposition that Applicant's procedural, statutory, or constitutional rights have been breached or violated or compromised because of the method used to prepare its' prior formal order in this PCR.

This Court finds no violation of S.C. Code Section 17-27-80, no violation of Article I, Section 8 of the South Carolina Constitution, and no violation of SCRCP Rule 52. Also, see Hall v. Catoe, 360 S.C. 353, 601 S.E 2d 335 (2004). The sections of the formal Order of Dismissal

---

[8] The headings contained within the discussion section are intended to mirror the headings used by Applicant in his 59(e) motion.

[9] The Supreme Court has never prohibited a PCR trial judge from requesting a proposed order. This is especially true in a non-capital case. A court requesting a proposed order is only part of the process of issuing a statutorily and constitutionally proper final order. See, Fishburne, where the majority noted that the attorney preparing the proposed order is obligated to be "meticulous in doing so", the opposing attorney "should bring to the attention" of the judge omissions, and the judge is obligated to "carefully review" the order prior to signing a final order. Even after the first formal order is signed, a PCR Applicant has, as further noted in Fishburne, the right to file a SCRCP Rule 59(e) motion to alter or amend or raise issues not properly ruled upon. Id.

referenced by Applicant as being "identical" to proposed order offered by the Attorney General are identical because they are a correct statement of this Court's opinion and decisions in this matter. The sections of the proposed order that differed from the formal Order of Dismissal were altered because this Court felt they needed to be altered to properly reflect this Court's rulings. Again, this Court views Applicant's arguments that the processes used by this Court in finalizing its prior order violated Applicant's rights meritless.[10]

### Footnote 2

In his 59(e) motion, Applicant claims that the Family Court matters stated in Footnote 2 of the Order of Dismissal were overlooked as a consideration on the issue of trial counsel's need to consult expert witnesses and to present a more vigorous defense. After considering the arguments, this Court finds no need to alter or amend the Order of Dismissal for the reasons asserted by the Applicant.

Trial counsel's participation as the Applicant's attorney in the Family Court litigation was explored in the prior order. His service as the Applicant's lawyer for six (6) to seven (7) years preceding the 2014 criminal trial provided trial counsel access to critical and detailed factual information about the criminal allegations. His long-time service as Applicant's attorney provided him access to extensive information about the motivation of the minor child's family. Because of this prior work, trial counsel was aware of factual details that supported his proposed narrative against the child's family he desired the jury to hear.

---

[10] This Court notes that the <u>Fishburne</u> informal PCR order preparation process was used and expanded by the Applicant and State in this case as a "formal" process similar to the Rule 59(e) process. In their respective Rule 59(e) filings, general references were made to the order writing process when addressing substantive issues and new positions were asserted. In this case, <u>Fishburne</u> was used by the attorneys as a "formal" pre-59(e) review before the 59(e) motion was filed.

Trial Counsel's prior involvement and representation of the Applicant in the various Family Court matters were broadly successful until the disclosure of abuse was reported by the grandfather. Counsel had secured visitation rights with the child and stopped the efforts to terminate his parental rights. Applicant eventually secured unsupervised visitation with the child and the right to have the child visit him in Virginia. Due in part to trial counsel's success in the Family Court, an independent therapist eventually recommended a global family (including Applicant) counseling approach to better incorporate Applicant into the minor child's life. Three days after recommending the Applicant, as part of a family therapy, the child's grandfather left a phone message with the child's treating therapist stating "would like to talk to you about a situation they've uncovered." (Trial p. 215). These facts and narrative were presented during the criminal trial. Trial counsel was also aware that the initial disclosure did not result in an immediate report to DSS or law enforcement. But rather, the initial report outside the family was a hearsay report of abuse by the minor child's grandfather to the Family Court guardian ad litem and treating counselor. Nevertheless, because of trial counsel's knowledge that a disclosure was made, trial counsel's broad strategy significantly changed to include defending the Applicant from the potential of a criminal liability. During the PCR hearing, trial counsel explained the differing burdens of proof between a Family Court trial and a criminal trial in General Sessions. He also explained his effort to minimize the negative effects of the Family Court proceeding upon his defense of his client in the criminal trial.

Because of his involvement in the Family Court litigation, trial counsel had unquestionable knowledge of the family's efforts to prevent access to the child by the guardian ad litem. As mentioned previously, he had knowledge of the DSS investigation into both the South Carolina and Virginia allegations. Moreover, because of his involvement with the Family

Court matter, trial counsel was able to make strategic decisions in the Family Court litigation that limited its effect on the criminal case. Critical factual matters were known by trial counsel when he made his decisions to not present the forensic video interviews to the jury. Obviously, these same facts were known to counsel when he did not consult with expert witnesses about the forensic interviews.[11]

This Court notes that Applicant's trial attorney knew of the DSS investigation prior to the criminal trial but did not have access to the DSS investigative file until after his PCR evidentiary hearing. After performing an in-camera review of the DSS file and considering the position of the parties about the content of the DSS, this Court finds no need to alter its prior order.

<u>Weik v. State</u>

Applicant also asserts that the prior order did not address the <u>Weik v. State</u>, <u>Ard v. Cateo</u>, and <u>Edwards v. State</u>, decisions. Applicant asserts that this Court failed to properly consider these cases in deciding the issues of what constituted a "reasonable investigation" by trial counsel. Applicant believes that trial counsel should have consulted with and retained expert witnesses. He asserts that not retaining/consulting with experts, trial counsel never learned how experts may help with defending the Applicant.

---

[11] Applicant's PCR theory includes that his lawyer was constitutionally deficient in his representation because he did not consult and call experts at trial to discuss the forensic interviews and present the forensic videos to the jury. While this Court believes the Order of Dismissal is correct, to clarify, this Court's opinion remains that counsel did not err in presenting the forensic interviews to the jury. The value of the videos of the forensic interviews to either the state or defense is, as a factual matter, questionable and debatable. Previously, this Court noted the confusing nature of the child's conduct and her words. Viewing the videos was critical and material to forming this Court's opinion. If the videos had been presented at trial as incriminating evidence, most likely expert testimony would have been needed to explain, among other things, to the jury the child's conduct, her inconsistent and exculpatory statement about Danny D (the Applicant), the interviewer's methodology of questioning, and the child's statements about the inappropriate conduct of the male child from her class. Nevertheless, the risk to the defense of presenting the child's forensic interviews to jury is high. Again, the videos were not presented by either the State or the defense to the jury. This Court's opinion remains that no error was made by trial counsel for not presenting the forensic interviews to the jury.

Weik, Ard and Edwards are instructive for analytical purposes. Broadly, they represent points of law already considered in the Order of Dismissal. A significant difference in these cases to the present one is that trial counsel, due to his prior involvement representing Applicant for many years in Family Court, possessed the factual information that formed his strategic decisions when preparing his defense. Did Applicant's trial attorney know the contents of the forensic video? Yes, he did. Was he aware of the factual background of that proceeded and followed the making of the videos? Yes, he was. The desire to not have the jury view the minor child's forensic interviews was a strategic decision based on counsel's knowledge of the content within the videos. This Court cannot find Applicant's trial attorney's decision to be unreasonable or based on a lack of factual knowledge. After reviewing these cases and considering the arguments, the Order of Dismissal requires no alteration.

### Expert Witnesses & Child Advocacy Center Interviews

Applicant raises the analysis in the Order of Dismissal that involved the decision to not publish the minor's forensic interviews to the jury and to not call expert witnesses to discredit the minor child's testimony and methodology of the Child Advocacy Center when conducting the interviews. In reading his motion, Applicant appears to approve of this Court's findings of the suggestiveness of the forensic interviews and of this Court's favorable view of the Applicant's PCR experts' testimony, including their establishing best practices for conducting child forensic interviews. While Applicant asserts that this Court's rulings require a conclusion of unreliability of the minor's testimony, this assertion was not presented to the trial judge and not specifically requested in the PCR hearing.

As this Court also referenced in its Order, the Child Advocacy Center's forensic interviewer asserted her methodology and interview tactic were proper. During the PCR hearing,

10

her demeanor was adamant in support of her position. If the videos had been presented during

the criminal trial, this Court reasonably infers her testimony would have reflected a similar

passion for her work and opinions. (See supra, note 11). She agreed with the Applicant's PCR

position that the minor's interviews should have been published to the jury. She asserted, as trial

counsel feared, the jury would conclude from viewing the videos a young child having

knowledge of and talking about age-inappropriate sexual matters. Whether the videos reflect

what was asserted by the forensic interviewer would have been a question of fact for the jury, if

the videos had been published to the jury. The videos also support the factual conclusions

offered by Applicant's experts that the forensic interviewer's methodology was improper and that

the child was led by the interviewer into giving certain answers. Again, whether the jury

accepted Applicant's experts' conclusions would have been a factual matter for the jury to

decide.

     The interpretations of the child's conduct and statements contained in videos were factual

matters and arguments trial counsel avoided by not publishing the videos to the jury. For PCR

purposes, the decision to publish (or not) the videos to the jury is viewed by this Court through a

Strickland analysis that examines trial counsel's decision that determines if counsel's

performance fell below an objective standard of reasonableness. This Court does not view the

decision to not publish the videos to the jury as unreasonable when applied to the Strickland

standard. Also, see Thompson v. State, 423 S.C. 235, S.C. S.E.2d 487 (2018). Applicant has

not met his burden of proof on this issue.

     Even if trial counsel had convinced the trial judge to allow him to present the videos to

the jury and to allow competing experts to testify as to the content of the videos, this Court

cannot rule that the jury would have rejected or accepted the opinions of either the Applicant's

11

experts or of the forensic interviewer.  For PCR purposes, this Court views its prior opinions sufficient.[12]

### Special Prosecutor

Applicant raises; again, the Special Prosecutor issues in his 59(e) motion.  In the motion, he references that this Court expressed its opinion about an email taken from the Special Prosecutor's records that the private family court matter was a higher concern over the criminal prosecution.  This Court's opinion has not changed.[13]  After, once again, reviewing the nature of the alleged initial disclosure of abuse reported in the DSS investigative file, the trial testimony and the PCR hearing testimony, this Court finds no need to alter the Order of Dismissal.  Also, as stated in the Order of Dismissal, pg. 23, footnote 11, the issue of the appointment of the Special Prosecutor was addressed in In the Matter of N. Douglas Brannon, Op. No. 27933 (filed Dec. 18, 2019).  Thus, this Court finds Applicant is not entitled to relief of any claim pertaining to the appointment of a Special Prosecutor.

### State v. Daniels

In his 59(e) motion, Applicant acknowledges this Court rejected the analysis offered by the Attorney General concerning State v. Daniels, 401 S.C. 251, 737 S.E.2d 473(2013). Applicant disagrees, however, with this Court's opinion that trial counsel did not err by not

---

[12] Applicant seems to contend this Court was required to conduct a separate hearing about the reliability of the victim's testimony; a taint hearing (Reply brief p.3).  Applicant asserts factors from S.C. Code Section 17-23-175(B) should have been applied by this Court to determine the child's testimony was unreliable.  No such hearing was previously requested to trial judge or to this Court.

[13] This Court's opinion is supported further because the record indicates that the referral to the Child Advocacy Center for the forensic video interviews was not made by the Sheriff's Office investigator, but rather privately. See, S.C. Code Section, 63-7-310, Persons Required to Report.  Thus, the motivation for the referral was not related to the law enforcement's investigation.  63-7-310 requires certain persons to make reports to law enforcement when the person has "reason to believe" a child has been subject to abuse.

12

objecting to the initial jury instruction and this Court's opinion that Applicant failed to establish prejudice.

As stated in the Order of Dismissal (p.29), Applicant was correct that "the trial court's statement and his attorney's statement crossed into the Beaty sphere of improper statements." This Court agreed these statements "shifted the jury's focus away from the State's obligation of meeting its burden of proof." To clarify, the better practice would have been for trial counsel to object to the trial court's statement. Likewise, trial counsel's use of the "truth seeking" comments should not have been made to the jury. Under South Carolina jurisprudence that exists today, trial counsel should definitely object to a trial court's use of the "search for truth" terminology and it would be clearly as error for trial counsel to argue such terminology to the jury. See, State v. Beaty, 423 S.C. 26, 813 S.E.2d 502, which was not issued by the Supreme Court until April of 2018. Nevertheless, the remaining parts of the Order of Dismissal on this issue are correct. Also, see Infra, State's Closing Argument, analysis of the prejudice element related to trial Counsel's failure to object to Special Counsel's closing argument. To the extent this clarification amends or alters the Order of Dismissal, it is so ordered.[14]

<u>Meredith Thompson-Loftis and Footnote 13</u>

In his Rule 59(e) motion, Applicant also questions the Order of Dismissal pages 32-37, involving trial counsel's failure to move for a continuance to have an expert review the records of

---

[14] This Court notes that notwithstanding the above, because trial counsel failed to object to the trial court's use of a "search for the truth" terminology and because trial counsel erred in using the same terminology when explaining the purpose of a criminal trial, the significance or weight of the Special Prosecutor's improper closing argument when performing a Smalls analysis, increased the prejudicial effect of the improper closing argument. (See, infra pp. 20-23).

18

Meredith Thompson-Loftis. This Court's opinion is that the Order of Dismissal is correct. While the late production of some of Ms. Thompson-Loftis's records is concerning, Applicant's trial attorney properly raised the issues with the trial judge (Trial pp 24-29). Pages 32 – 37 of this Court's prior order provided a detailed statement of trial counsel's efforts to object to the late production of the records, the arguments presented by both sides, and the trial court's rulings.

In regard to footnote 13 on page 36, this Court adds that the DSS records confirmed this Court's opinion of Cara Lintner's potential hostility toward the Applicant that existed at the time of the criminal trial. Even though Ms. Lintner was investigated by law enforcement, she was never charged with any crime that involved her conduct with the child. For clarity purposes, nothing in the record before this Court suggests that Ms. Lintner's conduct was opined as criminal. Even though she may not have assisted the State in their prosecution, Ms. Lintner, once again as reflected in DSS files, was potentially hostile towards Applicant.

To the extent the above items clarifies the Order of Dismissal, it is so ordered. Otherwise the Order of Dismissal as it relates to the Thompson-Loftis and Footnote 13 issues remains.[15]

### Improper Bolstering

Applicant also takes issue with the Order of Dismissal as it relates to his assertion that trial counsel allowed improper bolstering to occur with certain witnesses: the forensic interviewer, Webber, and the counselors, Roseborough and Thompson-Loftis.[16]

---

[15] The relatedness of Footnote 13 to the Meredith Thompson-Loftis testimony was not clear to this Court. Nevertheless, Applicant is correct that this Court's use of the words "inconclusive and speculative" in referencing Ms. Lintner's involvement with the minor child suggests some doubt remains that Ms. Lintner committed or was involved with an act of sexual abuse with the minor. No such evidence exists in the present record that Ms. Lintner committed, participated, knew, or otherwise condoned any act of abuse.

[16] Roseborough (pre-disclosure) and Thompson-Loftis (post-disclosure) were counselors who treated the child. Even though a medical doctor did not testify at trial, the State represented to the Trial Court as a pre-trial matter that, after a physical examination of the child by a doctor, no physical or medical evidence of abuse was found. (Trial pp. 34-38).

14

This Court notes that in its prior analysis, the testimony about Ms. Webber was referenced as not necessary. This Court did not make the same, "not necessary" observation as to Ms. Roseborough[17] or Ms. Thompson-Loftis. The "not necessary" observation related solely to the introductory comments concerning Ms. Webber's background. Since Webber was presented as a fact witness, her credentials were not necessary and counsel should have objected to them being presented to the jury. In isolation, his failing to object was not prejudicial to Applicant. Ms. Webber made the initial report to law enforcement. Thus, a valid factual reason for her testimony existed. In addition, the testimony of these three witnesses could not be considered "improper" bolstering under South Carolina jurisprudence existing at the time of Applicant's trial when their qualifications were presented. See State v. Anderson, 413 S.C. 212, 776 S.E.d 76 (2015). See, State v. Perry, 410 S.C. 191, 763 S.E.2d 603 (Ct. App. 2014) (Few, C.J., concurring in part and dissenting in part, where bolstering is explained).

To the extent improper bolstering occurred with the testimony of Ms. Thompson-Loftis' qualifications as an expert, trial counsel did object. Trial counsel properly objected when she was offered as an expert in "child abuse diagnosis" and the trial judge limited her qualifications to a "family counseling and child therapy" expert. Nevertheless, Applicant notes that she went on to testify to, without objection, to the following:

**Special Prosecutor:** When did you first meet [the child]?

**Thompson-Loftis:** [The child] first came to my office back in May 2011.

---

[17] Ms. Roseborough was the child's initial treatment therapist. Her treatment resulted in the recommendation that all parties, including the Applicant, join in therapy for the child's benefit. The child did not make a disclosure of abuse to her. Within a few days after joint therapy with the Applicant was requested by Roseborough, the grandfather called Roseborough's office to report "a situation they uncovered." (Trial p. 215). Her trial testimony was that, after consulting with the family's then private attorney, her treatment services ended and she referred the child on to the Child Advocacy Center. (Trial pp. 203-204). The record does not indicate the grandfather's report resulted in a report to DSS or law enforcement.

45

**Special Prosecutor:** Okay, Do you have any idea how or why she appeared in your office? Was she referred there?

**Thompson-Loftis:** She was...I used to work for the Child's Advocacy Center in Spartanburg, so I also do a tremendous amount of victim assistance, which means I treat people who qualify for victim services. And since I took that, Ms. Webber referred [the child] to see if I could provide therapy for her under the victim's assistance and I agreed, and [the child] was brought for her session in May 2011.

**Special Prosecutor:** Okay, And the lady who just testified before you, Tab Webber, is this the one who referred [the child] to you, is that correct?

**Thompson-Loftis:** Yes.

Xxxx

**Special Prosecutor:** ...Now, in cases where there is abuse of any kind, is it typical for a child after the Children Advocacy Center interviews to change therapists?

**Thompson-Loftis:** I think once a determination has been made or a recommendation has been made, I typically see most forensic interviews resulting in therapy or further therapy, and I don't think it's unusual for someone to be referred to different therapist, based upon the type of treatment they provide, or based upon the types of insurance panels they [sic] are on. There could be a number of reasons.

**Special Prosecutor:** Okay, so what this jury already knows is that [the child] then went to the Children's Advocacy Center, and then [the child] came to see you. Is that unusual in the typical case of abuse?

**Thompson-Loftis:** No, not at all. (Trial p. 259 – 260).

Ms. Thompson-Loftis subsequently testified generally to define "partial disclosure", "delayed disclosure", and "coaching." She further testified as to her working with the child "seventy-one times." She bolstered the child generally when she stated, among other things, she had seen a lot of "transformation" in the child from her therapy. (Trial p. 270). She referred to the child as remarkable. See <u>Anderson</u> and <u>Makin</u>, <u>Infra</u>, for Supreme Court's warning against use of such expert witnesses for dual purposes. She was also questioned about the child's disclosure of sexual abuse.

16

**Special Prosecutor:** At any time during your treatment of [the child] up through December 30, 2013, did she make a disclosure of sexual abuse to you?
**Thompson-Loftis:** Yes, she did. (Trial p. 270).

Applicant asserted the above established a link between Ms. Webber, who contacted law enforcement and recommended therapy for the child to the testimony of Ms. Thompson-Loftis who accepted the child for therapeutic treatment under "victim services." Applicant also supports his improper bolstering position by referencing Ms. Thompson-Loftis' testimony, "being that a majority of my clients are trauma victims, or have been in the past, I have quite an extensive amount of forensic and sexual abuse training, Post-Traumatic Stress training." Applicant also notes that trial counsel felt the testimony of Ms. Webber and Mrs. Thompson-Loftis had the effect of vouching for the child's credibility. (Reply pp 11-14).

This Court's opinion is that trial counsel was not constitutionally deficient based on South Carolina jurisprudence that existed at the time of his trial for not objecting to the testimony Applicant asserts. Our Supreme Court has made it clear, trial counsel should object to this type of testimony when it is presented before a jury as a means to indirectly bolster testimony. State v. Anderson was not decided until 2015. 413 S.C. 212, 776 S.E.2d 76. State v. Anderson, set forth better practice to be used by prosecutors. The better practice is not to have the individual who treated the alleged victim testify, but rather to call an independent expert as a "blind" expert. Also, see State v. Makin, 433 S.C. 949, 860 S.E. 2d 666 (2021) where the Supreme Court explained that an expert who testifies as a treating expert and an expert as to general characteristics of abuse is not per se improper. However, the Supreme Court warns against the practice.[18]

---

[18] As in the Makin case, the present PCR is a close call on the bolstering issue. In the event this Court's decision on this issue is reversed, based upon State v. Douglas, 380 S.C. 499, 505, 671, S.E.2d 606, 610 (2009) (Pleicones, J., dissent) and infra the Smalls analysis of State's Closing Argument, trial counsel's failure to object to improper

<u>DSS Records</u>

The Applicant also takes exception to the Order of Dismissal's finding that Applicant failed to establish the State (the solicitor's office) was in possession of the DSS file or that the file had material information not already known to counsel. This Court finds that the Order of Dismissal is proper.

Nevertheless, this Court continues to be troubled by the investigating officer's change in testimony at the evidentiary hearing. Applicant references the cases of <u>State v. Pulley</u>, 423 S.C. 371, 85 S.E. 2d 461 (2018); <u>Cotheran v. Brown</u> 357 S.C. 210, 592 S.E. 2d 629 (2009); <u>McMaster V. Dewitt</u>, 411 S.C. 138, 767 S.E. 2d 451 (Ct. App. 2014); and <u>State v. Durant</u>, 430 S.C. 98, 844 S.E. 2d 49 (2020) (citing <u>Brady</u>, 373 U.S. 83 (1963)), in an effort to persuade this Court that the investigating officer's testimony was "sham" and that a Rule 5 discovery violation occurred. This Court continues to not be persuaded. Applicant has not met his burden of proof to establish a Rule 5 violation occurred. This Court's concerns relate to the officer's inconsistent testimony as to her role in making, or not, a referral of the case to the Child Advocacy Center, regarding her involvement in the investigation, and the whereabouts (misplacement or loss) of the DSS file.

What happened to the DSS file remains a mystery to this Court. No explanation was offered. The file seems to have simply vanished for a period of time that is material to this matter. The evidence before this Court does not rise, however, to the level of prosecutorial misconduct or a discovery violation.[19]    Additionally, having reviewed the DSS file on several

---

bolstering would meet the <u>Strickland</u> standard of prejudice. Again, this Court notes that no physical evidence was presented to establish guilt.

[19] Even though this Court was made aware that the officer is no longer employed with the Spartanburg County Sheriff's Office, the issue of her employment status was not presented to this Court. Nevertheless, very similar to the suggestion Ms. Lintner was involved in abuse, the record before this Court does not support a link between the reason for the officer no longer being employed by the Sheriff's office and her involvement in the underlying matters.

18

occasions, the Applicant has not established the element of prejudice. The material evidence in the DSS file appears to have been known to trial counsel or was not explained to this Court. Notwithstanding, this Court is disturbed by the mystery behind the loss or unexplained misplacement of the DSS file and its unavailability.[20]

### State's Closing Argument

Applicant also takes exception with the Order of Dismissal's ruling concerning the State's closing argument. This Court's prior ruling was that trial counsel was not constitutionally ineffective for failure to object to the State's closing argument that included an emotional narrative (Trial pp. 305-308) that ended with the jury being told it "takes care of good" (Trial p. 308) people. This Court noted that during the hearing, trial counsel testified he did not believe the closing was objectionable and, accordingly, did not object. After further review and reconsideration, this Court alters its original decision to find that Special Prosecutor's argument was improper and trial counsel erred by not objecting to the argument. Applying the Strickland standard, an objection should have been made by trial counsel.

As referenced by Applicant in the present motion, this Court expressed concerns as to the constitutionality of certain statements made by the Special Prosecutor during the closing argument. The overall emotional tenor of the prosecutor's argument was to define the Applicant as different from the members of the jury because he was a "bad" person.[21] Since the jury was told "you" are "good" people, "you" take care of "good" people and the child was also a "good" person, the accused was not worthy of the jury's obligation of reviewing the evidence objectively

---

[20] This Court also notes that its opinions and conclusions about the DSS file and its contents were made without the benefit of live witnesses. The DSS file was not produced, even though subpoenaed, until after the PCR hearing.
[21] The child was quoted as calling the Applicant as bad. For clarity, quoting the child's comment is not unconstitutional. Multiple times, however, the Special Prosecutor stated the Applicant was a "bad" guy, and the jury was told "the police, they arrest the bad people." (Trial pp. 303-304).

and fairly. (Trial p. 306).[22]  The constitutional problem with the Special Prosecutor's closing

argument is not that grown men who commit a sexual battery on children are not bad.  The

argument unconstitutionally negates the presumption of innocence.[23]  It is also constitutionally

impermissible for a solicitor to argue to a criminal jury that simply because a man is "accused"

or "arrested", no matter how serious a charge, that he is a "bad person" and thus, unworthy of

fair review of the State's evidence to establish his guilt.[24]

In the Order of Dismissal, this Court referenced that the Special Prosecutor

acknowledged during the PCR hearing that his motive in making this type of argument was to

appeal to the jury's sympathies.  His motives were also to appeal to jury's emotions.  The Special

Prosecutor's words and demeanor at the PCR hearing were candid and clear that the he had the

intent to appeal to and invoke the passions or the emotions of the jury. An unofficial version of

the PCR transcript reflects the following colloquy between PCR Counsel and the Special

Prosecutor.

> **PCR Counsel**: You are familiar with case law about closing arguments that
> prohibit making an emotional appeal to jurors to decide the case on something
> other than the elements of the crime?
>
> **Special Prosecutor**:  Yes sir, I am aware of that but I know that I have tried
> cases for years and saw [the solicitor] stand in front of the box with people in

---

[22] This phrasing beseeches the jury to become an advocate for the victim, thus asking them to depart from their constitutional duty to consider the facts of the case impartially.

[23] See supra, note 21 and 22.

[24] When a prosecutor asks the jury to put themselves in the place of the victim, or to speak for the victim, such argument is improper and constitutes reversible error. Brown v. State, 383 S.C. 506, 680 S.E.2d 909 (2009); State v. Gilstrap, 205 S05 S.C. 412, 32 S.E.2d 163 (1994).  State v. McDaniel, 320 S.C. 33, 462 S.E.2d 882 (Ct. App. 1995). Such arguments ask the jurors to become advocates for the victim.  Such arguments ask the jury to ignore their obligation to exercise calm and reasonable judgment.  State v. Reese, 359 S.C. 260, 597 S.E.2d 169 (Ct.App. 2004), reversed in part; affirmed on this ground, 370 S.C. 31, 633 S.E.2d 898 (2006).  Such argument, which suggests to jurors to put themselves in the shoes of one of the parties, is generally impermissible because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.  See 75A Am.Jur.2d Trial § 650 (1991) as referred in Reese.

20

tears and telling that story[25] so yes, I am aware of that case law but I am also aware of what happens in the courtroom on a daily basis.

**PCR Counsel**: Did you ever object *** when he made that argument?

**Special Prosecutor**: Dozens of them [arguments]. I did not.

**PCR Counselor**: Did you think it was objectionable?

**Special Prosecutor**: It might have been but that's not for me to um. It might have been but I knew that I had gone and been just as passionate as him or I was about to go and be more passionate than him so I mean those are [...] for trial strategy. [The solicitor] is a passionate trial lawyer and I try to be one myself.

**PCR Counselor**: Right and you started to say it's not for you to decide whether it would be appropriate or not?

**Special Prosecutor**: I would believe that would be correct.

Again, this Court notes, the Special Prosecutor's comments were candid. He spoke honestly. This Court views Special Prosecutor's candid comments during the PCR hearing as evidence respecting the judicial process.

Thus, in this case, the PCR hearing establishes that Special Counsel had the intent of making an appeal to the jury's emotions or passions when he made his argument.

This Court's prior decision was based on a flawed analysis. The objectionable statements made by Special Counsel were unconstitutional, even without knowing Special Counsel's intent, because they shifted the role of the jury away from being fair and impartial arbitrators of the facts. Additionally, the statements were crafted to have the jury view the

---

[25] Presumably the "story" contained in the closing argument is one where he explains to his young daughter that juries take care of "good" people. The closing argument contains no other "story." (Trial pp. 307-307).

21

evidence through an unconstitutional lens. This Court concludes and finds that these statements should not have been made to the jury. These statements were constitutionally improper. Trial counsel should have objected. The acknowledgement during the PCR hearing that Special Counsel's intent was to present a closing argument that invoked the emotions and passions of the jury further supports the conclusion that the arguments were improper and that an objection should have been made by trial counsel.

Since trial counsel did not object, the record contains no argument by trial counsel or curative instruction from the trial judge to the jury that corrected the argument. Because no objection was made, the trial record also does not reflect an independent warning as part of the judge's charge on the law to the jury that their verdict must not be based on passion or emotions.

Our Supreme Court has long held that in its closing, a solicitor has the right to state his/her version of the testimony and to comment on the weight to be given such testimony. Vasquez v. State, 388 S.C. 447, 698 S.E.2d 561 (2010). A solicitor's closing argument must not, however, appeal to the personal biases of the jurors nor be calculated to cause the juror's passions or prejudices, and its content should stay within the record and reasonable inferences to it. Simmons v. State 331, S.C. 333, 503 S.E.2d 164 (1998). A solicitor's closing argument must be carefully tailored so as not to appeal to the personal biases of the jury. The State's closing argument must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence. Vasquez, citing State v. Copeland, 321 S.C. 318, 468 S.E.2d 620 (1996). A solicitor's closing argument is bound to the rules of fairness, as was explained in Vasquez when the Supreme Court quoted State v. Northcott, 372 S.C. 207, 641 S.E.2d 873 (2007), quoting State v. Linder, 276 S.C. 304, 278 S.E.2d 335 (1981); a solicitor should prosecute vigorously, the closing argument must be carefully tailored so as not to appeal to

22

personal bias of the juror nor be calculated to arouse the juror's passion or prejudice.  Vasquez at 458.

This Court's prior analysis was too narrow and, thus, flawed.  The prior order narrowly measured the constitutionally improper sections of the argument against other sections of the argument that were legally and factually correct.  Upon reconsideration, this limited and narrow analysis is not consistent with South Carolina's Strickland case precedent.  See, Smalls and Thompson.  Additionally, this Court's prior analysis was wrong because it could be read as condoning constitutionally improper closing arguments that are calculated to alter the jury's constitutional role away from a neutral fact finder.[26]

Having found Counsel erred by not objecting to the argument, this Court is required to address the second prong of Strickland ----- prejudice.  To satisfy the prejudice prong of Strickland, an Applicant must demonstrate there is a reasonable probability that, but for Counsel's errors, the results of the trial would have been different.  Smalls v. State, 422 S.C. 174, 810 S.E.2d 836 (2018) and Thompson v. State, 423 S.C. 235, 814 S.E.2d 487 (2018).  In examining Strickland prejudice, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. Id.  A

---

[26] A solicitor's closing argument must be carefully tailored so as not to appeal to the personal biases of the jury.  Von Dohlen v. State, 360 S.C. 598, 609, 602 S.E.2d 738 (2004) (citing State v. Copeland, 321 S.C. 318, 324 S.E.2d 324, 468 S.E.2d 620, 624 (1996) and State v. Linder, 276 S.C. 304, 278 S.E.2d 335 (1981)).  Our Supreme Court "strongly disapproves" of closing argument calculated "to improperly arouse the passions and prejudices of jurors, urging them to abandon their sworn role as fair and impartial arbiters of the facts and view the evidence from an improper perspective." Id.  The argument must not be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences that may be drawn therefrom. Id.  The effect of such argument is potentially to cause jurors to decide a case based on passion and prejudice instead of a reasoned, impartial consideration of the evidence presented to them. Id.  State v. White, 246 S.C. 502, 144 S.E.2d 481 (1965), to explain that such an argument "tends to completely destroy and nullify all sense of impartiality in a case of this kind."

23

reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Id. Based on the following, this Court makes such a finding.

In Smalls and Thompson, the Supreme Court has provided additional clarity to longstanding rules and provided guidance to trial courts when applying the Strickland prejudice analysis to PCR cases. In determining whether an Applicant has proven prejudice, a PCR court should consider the specific impact that Counsel's error had on the outcome of the trial. See Smalls citing Strickland at 695 – 96 explaining that the court must analyze how individual errors of counsel affect the important factual findings in a particular case. Smalls at 174.

> [I]n addition, the PCR court should consider the strength of the State's case in light of all the evidence presented to the jury...In deciding whether [the Applicant] was prejudiced, we must bear in mind the strength of the government's case..., and we must consider the totality of the evidence before the jury. In general, the stronger the evidence presented by the State, the less likely the PCR court will find the Applicant met his burden of providing prejudice. See Strickland, 466 U.S. at 696... (stating "a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.")

In the context of the required Smalls analysis, the record of the present PCR does not establish that the State's case at trial consisted of "overwhelming evidence of guilt" as defined by Strickland and Smalls. At trial, the only evidence of the Applicant's guilt was the testimony of minor victim. (Trial pp 135 – 140 direct testimony, pp. 141 – 148 cross examination, pp.148 and pp. 149 redirect).[27] As the State indicated to the trial judge, there was no medical or physical evidence of abuse to present to the jury. (Trial p. 35). There also was no DNA evidence or other physical evidence to establish the Applicant's guilt. See Smalls citing Ford v. State, 314 S.C. at 247-48, 442 S.E. 2d at 605-06. There were not multi-witnesses as to the events. Id., citing

---

[27] Solicitor Leskanic's examination of the child and trial counsel's cross examination appears proper. No challenge was offered in this PCR to Solicitor Leskanic's or trial counsel's examinations of the child.

24

Huggler v. State, 360 S.C. 627, 634-35, 602 S.E. 2d 753, 757 (2004). The Applicant's guilt was established at the trial only from the testimony of the minor child.[28]

Our Supreme Court has ruled that to be "overwhelming" the evidence must include something conclusive such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the Strickland standard of "a reasonable probability --- the fact finder would have had "a reasonable doubt cannot possibly be met." Smalls. Even though a finding of "overwhelming" evidence does not exclude an applicant from establishing prejudice, a finding of overwhelming evidence, or a lack thereof, does affect a court's Strickland analysis.

Not finding "overwhelming" evidence of guilt in the trial record, the analysis turns to the specific impact of trial counsel's failure to object to the solicitor's improper argument to determine if Applicant has met his burden of proving prejudice; i.e., a reasonable probability the result of the trial would have been different without counsel's error. This Court finds that trial counsel's failure to object to the solicitor's improper closing argument was prejudicial to the Applicant and there exists a reasonable probability the trial would have been different without counsel's error. This Court finds counsel's error undermines confidence in the outcome of the trial and that a reasonable probability exists for a different outcome.

---

[28] Since the victim did not testify before this Court during the PCR hearing, Supreme Court rules limit this Court's ability to weigh the total effect of her testimony. Her testimony and the other trial witnesses can only be viewed from the written trial transcript if they do not also testify during a PCR hearing. As referenced in Thompson, since the victim did not testify during the PCR hearing, this Court lacks the opportunity to judge the credibility of the victim's statement outside of the written trial transcript. As directed by Thompson, this Court lacks the ability to comment on the victim's credibility, favorably or not, beyond what is found in the trial transcript. Id. 247. The transcript reads that trial counsel raised issues related to issues to the child's credibility. (Trial pp. 141-148).

25

More specific, in the trial, the evidence of the Applicant's guilt was from the minor child's testimony. Therefore her believability was central to the State's case. Likewise, trial counsel's strategy in defending the Applicant from the allegations also weighed significantly on the believability of the child. Moreover, once the Applicant asserted his Fifth Amendment right, the jury's role as an impartial fact finder became magnified. Also, with the State being successful in limiting any evidence of alternative causes for the child's anxiety other than the allegations of abuse, the credibility of her allegations of guilt magnified even further. The jury could not weigh the credibility of one part of testimony against another part of her testimony. Thus, the jury would not be evaluating the evidence of guilt based on competing evidence.

Therefore, the closing argument altering the jury's constitutional role had an even greater prejudicial effect when applying <u>Strickland</u>. The solicitor's closing argument unconstitutionally shifted the jury role away from being an impartial arbiter of the facts. Therefore, Applicant's trial counsel's error in allowing the argument to go unchallenged was prejudicial.[29] By not objecting, the trial record is void of the trial judge being given any opportunity to correct the error through his ruling on the objection. Also, because no objection was raised, the trial judge was denied an opportunity to instruct the jury against the improper influence of emotion and passion when evaluating the evidence.

---

[29] The record of this PCR contains no evidence to suggest that the child was nothing other than a good person. The difficulty this Court has with its decision to grant a new trial is due to the great empathy it has for the child. The stress of testifying in a trial before a jury is a stressful event. The stress of the moment is no doubt greater for a seven (7) year old child. This Court can infer courage and bravery to the child when offering her testimony. There is no better example of the stress placed on the child than the decision to provide the child with an emotional support prop of a teddy bear to hold while on the witness stand before the jury. (Trial p. 148).

Notwithstanding, the Supreme Court's longstanding rule is that a trial jury, no matter the seriousness of the charge, is to be an impartial arbiter of facts. Without such a jury, a constitutionally fair trial is impossible. (<u>See supra,</u> note 26).

26

As stated previously, in the State v. Daniels portion of this Order (supra, pp 12 – 13), the prejudicial weight of the improper argument and of counsel's error by not objecting increased because of the improper statements concerning a jury's role that occurred at the beginning of the trial. Thus, the presentation of the evidence in the trial was "bookended" with unconstitutional statements that altered the jury's role from being an impartial fact finder when determining if the State had met its constitutional obligations of proving guilt. The weight of counsel's error significantly increased the prejudicial element under Strickland since the jury was presented unconstitutional references as to their role as impartial fact finders.

Compounding and intensifying the prejudicial harm caused by trial counsel's failure to object to the Special prosecutor's argument, trial counsel used the prohibited Beaty "seeking the truth" and "search for the truth" language when he began his closing argument. Moreover, he concluded his closing with the same prohibited "search of the truth" language. (Trial. p. 314).

Based on the above, the prior Order of Dismissal is modified as reflected herein. With the Applicant having met his burden of proof, his application is granted.

Therefore, the present application for Post-Conviction Relief is granted and a new trial is ordered.

27

IT IS SO ORDERED.

Circuit Court Judge J. Mark Hayes II
Presiding Judge for the Seventh Circuit

November 12, 2021
Spartanburg, South Carolina

28

*State v. Chavis*, 412 S.C. 101 (2015)

(requiring that in order to ensure the reliability
of an expert witness, there must be "some
evidence demonstrating that the individual expert
is able to draw reliable results from the procedures
of which he or she consistently applies".).

"These Courts do not protect you."

→ How many people have you accused of <u>sexual or physical</u> abuse?

Main factors in decision:
   - sexually conviction in SC ←
   - abuse of Ms. Lintner ← WRONG!

collusion concealing crimes
↓
informant

Exhibit C



STATE OF SOUTH CAROLINA                )    IN THE COURT OF GENERAL SESSIONS
                                       )
COUNTY OF SPARTANBURG                  )    SEVENTH JUDICIAL CIRCUIT
                                       )
STATE OF SOUTH CAROLINA,               )
                                       )
Vs.                                    )         ORDER ON
                                       )    DEFENDANT'S MOTION TO COMPEL
                                       )
DANIEL WILLIAM SPADE,                  )     Indictment Number:
                          Defendant.   )     2011-GS-42-04171

                                             M 126199

    This matter was before the Court on February 15, 2013 pursuant to a Motion to Compel filed by the Defendant on January 2, 2013. The Defendant's attorney, Kenneth P. Shabel, filed a Brady request for discovery on November 20, 2012 seeking various items in discovery. The State was represented by this hearing by Solicitor Barry Barnette and Assistant Solicitor Amy Goulding.

    On the Defendant's motion as to the specific items requested, and on other ancillary issues, the Court rules as follows:

1. The State shall turn over all audio recordings of the Defendant in its possession (including jail conversations in both Virginia and South Carolina) within ten days of this Order.

2. The State shall turn over its one video recording of the Defendant – a video from an interrogation in Virginia – within ten days of this Order.

3. The State is not in possession of any medical records from Eastside Pediatrics and cannot be compelled to release them; however, upon proper Motion served upon the alleged victim's Mother, the Court may address the Defendant's requests to obtain such medical records.

4. The State shall not be required to turn over any mental health records of the alleged victim from Meredith Thompson Loftis at this time; however, if the State intends to call her as a witness in their case, they must turn over all such records within a reasonable time prior to the trial of the case.





Indictment No. 2011-GS-42-04171

5. The State shall turn over the full investigative file of the Spartanburg County Sheriff's Office and Detective Nikki Cantrell within ten days of this Order. The Defendant has ordered a transcript of a Family Court hearing from October 2012, and after receiving that transcript the Defendant may renew this portion of his Motion if he believes based upon the transcript that there has not been full release of this file.

6. The State shall turn over copies of all text messages obtained from the Defendant's cell phone within ten days of this Order. The State has asserted that no photographs were taken from the cell phone.

7. At this time, there is no forensic report from the search of the Defendant's computer. If the State intends to use the computer (or its search of the computer) as evidence at trial, it must provide copies of all reports generated and documents obtained from that computer within a reasonable time prior to the trial of the case.

8. The case shall be removed from the docket for the week of February 25, 2013. It shall be placed back on the docket no sooner than June 1, 2013 but may be placed on the docket sooner upon the Defendant's receipt of the transcript from the October 2012 Family Court proceedings with consent of both he State and the Defendant.

AND SO IT IS ORDERED this 22 day of _____, 2013.

J. MARK HAYES, II
PRESIDING CIRCUIT COURT JUDGE
SEVENTH JUDICIAL DISTRICT
Circuit

Spartanburg, South Carolina

M. HOPE BLACKLEY

2013 FEB 26 PM 4:48

FILED
CLERK OF COURT

- 4 -

Indictment No. 2011-GS-42-04171

Exhibit D

September 1, 2022

John S. Nichols
Disciplinary Counsel
P.O. Box 12159
Columbia, S. C. 29211

Jeffrey I. Silverberg
Assistant Disciplinary Counsel
P.O. Box 12159
Columbia, S. C. 29211

**Re: Formal Request for Investigation into Violations of the Rules of Professional Conduct**
**(Attorney Jennifer Jordan)**

Dear Counsel Nichols:

I hope this submission finds you well. As the Head Watchmen of the integrity of this States Bar, your continued supervisory leadership is accomplishing the commission set out by our High Court to clean up our Justice System. Counsel Silverberg has spent extensive time investigating the procedural and discovery-related issues within the matter of Kimberly Leskanic--and given a substantial portion of Leskanic's RPC violations mirror claims against Attorney Jordan documented herein--he is in an informed position to properly investigate this present matter.[1]

These two attorney/assistant solicitors were the prosecutors directly involved in my criminal case.[2] This travesty of justice--that is an erroneous conviction at the hands of prosecutors' misconduct--is highly probative to my over-arching assertion that these government prosecutors **set out a strategy** and **plan** to utilize unethical/unprofessional tactics to deny my Constitutional right to a fair trial in order to "win at all costs". Such behavior by *Officers* of the Court is incomprehensible in a democracy.

This Honorable Office has been commissioned by the High Court to actively weed these bad actors out. Specifically, prosecutors—imbued with immense power—who willfully taint our sacred system of justice. As case history indicates the ODC—prior to your leadership-- has largely *avoided* equality in discipline upon government prosecutors (see "Summary"), the Supreme Court has recently made it very clear the level of frustration with *prosecutorial misconduct* and the urgency in disciplinary accountability to thwart it. (see Justice Few's vocal directive involving the ODC discussed in "Preamble")

---

[1] allowing ODC Silverberg to duly handle this present matter would also eliminate the possibility that a different investigator could come to a conflicting conclusion on the same and/or substantially similar conduct.

[2] Notably, my conviction was *overturned* recently—by the Honorable J. Mark Hayes II—due to **prosecutorial misconduct(!)**

Thank you in advance for your time and attention to this matter bearing on the *fair administration* of justice.

Respectfully Submitted,

Daniel W. Spade, CP

*Wrongfully Convicted* Innocent

"A prosecutor has <u>special responsibilities</u> to do justice and is held to the **highest standards** of professional ethics."

-*State v. Quattlebaum*, 338 S.C. 441 (2000)

## Preamble:  Supreme Court's Recent and Clear Stance on Prosecutorial Misconduct

It is axiomatic that a solicitor wields immense power and influence over the accused. In the realm of criminal prosecution, many times people's very *lives* are at stake. Within these cases, when an assistant solicitor such as Attorney Jordan makes a conscious decision to utilize improper/unethical tactics before and during such criminal trial, tragic consequences and injustices can occur. Thus, the Rules of Professional Conduct properly hold an individual in such a position of trust and power to an even *higher* standard of integrity and accountability. *See Rule* 3.8. Special Responsibilities of a Prosecutor ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). The reasons for this are simple: not only are defendants denied their sacred rights under the Constitution, but our fundamental system of justice is betrayed by the very officers of the court sworn to uphold it. Such conduct in our inviolable courts of truth is untenable in a democracy.

As an arm of the Supreme Court, this Honorable Counsel receives input and direction from the rulings/holdings of its Justices. Within a litany of appellate decisions over the last 30+ years, our Supreme Court has attempted - *unsuccessfully*- to bring to an end solicitors' ongoing and strategic attempts to improperly vouch/bolster the testimony of their key witnesses in the eyes of the jury.[3] This underhanded tactic of witness bolstering, which has the causal effect of denying the defendant his/her Constitutional right to a *fair* trial, has been widely and repeatedly used in CSC cases with a continued and brazen lack of adherence to this Court's direction/warnings.[4] Amidst numerous recent rulings on this issue, the *present* Justices of the Supreme Court have continued to warn solicitors to end this practice. Specifically, amidst the recent oral argument in *State v. Makins*, every single Justice expressed their tiring of the State tactic to improperly bolster/vouch their witnesses and Justice Few asserted to the presiding Attorney General that the Court may have to "begin reporting individual solicitors [who use the tactic] directly to the Disciplinary Counsel".[5] Chief Justice Beatty remarked that the Court is "getting bothered by continually telling [solicitors] not to do that".

It is with these decades-long High Court warnings in mind- on this precise form of impropriety- that this Counsel should take heed to the exhaustive efforts at dissuading prosecutorial misconduct and hold Attorney/Solicitor Jordan accountable for her **willful** and **repeated** violations of her ethical/professional obligations as a "minister of justice" under the Rules of Professional Conduct. *Berger v. United States*, 295 U.S. 78, 55 S.C. 629 (1935) ("It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.")

---

[3] it is this specific misconduct that serves as the crux of this complaint.

[4] see *Vaughn v. State*, 362 S.C.163,169, 607 S.E.2d 72,75 (2004) (Solicitors may not vouch for a witness's credibility, as doing so improperly invades the province of the jury & places the government's prestige behind the witness); *State v. Kromah*, 401 S.C. 340, 737 S.E.2d 490 (2013) (holding that allowing witnesses--through the carefully-crafted questioning by *solicitors* to vouch for or offer opinions on the credibility of others--"runs afoul of evidentiary rules and a defendant's constitutional rights".)

[5] found at **http://media.sccourts.org/videos/2020-000024.mp4**

**Incident #1**

**Bond Hearing Evidentiary Suppression**

It is beyond controversy that guidance and compliance can and should be garnered from Supreme Court *disciplinary* precedent. Such is the discovery-related case brought against an assistant solicitor in the matter of *In re: Humphries*, 354 S.C. 567, 582 S.E. 2d 728 (2003). Though the circumstances are different, the underlying factual findings of prosecutorial "delay in disclosure" conduct are eerily similar. *id.* (Supreme Court imputing the *delay in disclosing material Rule 5 evidence* to the prosecutor despite not technically a seeing evidence until it was delivered by an investigator for the Sheriff's Department.) (emphasis added.) [6] Critical to the proper adjudication of the case(s) at hand, in Humphries this Honorable Counsel held that "Respondent either knew or **should have known** of the existence of the videotape as early as March" [7] and "as an officer of the court, he had an obligation to take affirmative action…and a further obligation to notify both counsel and the Court of General Sessions…" Alternatively, in the present disciplinary matter Assistant Counsel seemingly takes a contradictory stance on the same inherent duty and obligation of a prosecutor. A responsive defense by Jordan that she was ignorant to the exculpatory findings must fail because they had a duty as a Government Attorney to pro-actively contact the Computer Forensic Examiner (Mr. Marquez) and /or the Virginia Detective (R.L. Hyatt) prior to the first Bail Hearing in late May 2011 and to certainly do so prior to the second Bail Hearing in mid-June 2011. Judge Roger Couch placed her on notice to do so at the first hearing(!) This attorney was keenly aware or should have been aware that a delay in communicating the exculpatory findings to Judge Couch--findings received by "the end of May"--forced complainant to remain incarcerated and separated from his resources. Additionally, failure of her--as the lead prosecutor on this case--to do so lends credence to a conspiracy of "willful ignorance" so as to unjustly extend complainant's incarceration knowing his release on Bail--as clearly conveyed by Judge Roger Couch at the very first hearing-- *hinged* on the exculpatory findings of the computer/phone forensic examination.

---

[6] complainant perceives Solicitor Jordan similarly claimed as a response to this allegation that they were not put on notice of the exculpatory findings because Det. Cantrell failed to inform them prior to their respective appearances and conveyances to the Circuit Court

[7] compare to the findings via "Exhibit A" of the Honorable R. Keith Kelly that the Solicitors had knowledge of initial findings by "the end of May [2011]".

**Incident #2**

**Obstruction of Court-ordered Duties of GAL**

It is beyond dispute that GAL Alexandria Wolf, through the appointment and investigative powers given her by the Honorable James F. Fraley, was a quasi-judicial court official at the time of the allegations of abuse in early 2011.  Additionally, Attorney Jordan was the Assistant Solicitor assigned to the criminal case from the outset.[8]  It is also beyond dispute that Ms. Jordan knew very well that no court official had a closer rapport with the complainant's child—as well as first-hand insight into the years of visitation/custody battles over that child—than the GAL, Ms. Wolf.

Shortly after the accusations of abuse (and subsequent criminal charges), the Jolley's (accusers) filed a second TPR.  In the fall of 2012, a hearing on the TPR/Adoption filings was held.  During direct examination, David Jolley gave *sworn* testimony that shortly after the allegations surfaced, he was <u>instructed</u> by the case "solicitor" to **not cooperate with the *Court-appointed* Guardian ad litem(!)** (see copy of testimony labeled "Exhibit B").  Later in direct examination he asserted yet again--thus leaving no room for a question of mistake or confusion--that it was the **<u>solicitor</u>** who instructed him to obstruct the GAL. (see also "Exhibit B").  The Jolley's--emboldened by the "blessing" and directive of a state solicitor--immediately cut off all communication with Ms. Wolf and denied her numerous attempts to access her child client in the critical timeframe after the purported disclosure of abuse.  This amounted to a Government prosecutor--obligated to ensure fairness and uphold integrity--giving a legal directive to a party in a Family Court matter to not only stifle but completely *obstruct* the Court-delegated function and right of the Official of the Court to gain access to her child client.

Recently, amidst complainant's post-conviction evidentiary hearing, additional details came to light.  Ms. Wolf was subpoenaed to testify and detailed these events and its stifling effect on her ability to carry out the Court's investigatory directive.  Ms. Wolf testified to the cooperation of the Jolley family coming to an abrupt halt in "April 2011"--notably the month of the accusations and complainant's subsequent arrest--the writing of a letter to the Jolley's family attorney (Andrea Moore) regarding her efforts, and her great concern with the lack of cooperation. (see "Exhibit C").  Little did she know, at the time, that a Spartanburg County *solicitor* had direct involvement in instructing the Jolley's to terminate communication with the GAL let along cooperate with the rightful access to her child client.  Additionally--and of great worth to the deduction of the actual solicitor with "unclean hands" here--a prior ODC investigator has already exculpated Assistant Solicitor Amy Goulding in this misconduct. (per findings/conclusions of Kelly Arnold).  Thus, other than Head Solicitor Barry Barnette, only Jennifer Jordan--who was the lead prosecutor on this case from the very beginning--would have been directly involved in such a directive to the Jolleys, her key witnesses.

---

[8] See Public Index/Spartanburg County Case Records ("Parties")

## **Application of Conduct to the Rules**

The Rules of Professional Conduct delineate that an attorney shall not "unlawfully *obstruct* another party's access to evidence" nor "*counsel* or *assist* another person to do any such act." (Rule 3.4(a). As a government prosecutor, Attorney Jordan had "special responsibilities" to *protect* privileged relationships yet she chose to use the imprimatur of her government position to not only handicap but eviscerate the work of a Court Official. (see Rule 4.4 [comment 1](though "it is impractical to catalogue all such rights, they include...**unwarranted intrusions into privileged relationships**...".) Though very aware of Judge Fraley's order, Ms. Jordan directed the Jolley's to ignore it. See Rule 3.4(c)(A lawyer shall not knowingly disobey an obligation under the rules of the tribunal..."). Notably, Rule 3.4 specifically details "prohibitions against destruction or concealment of evidence, improperly influencing witnesses"[9] and other obstructive tactics". Rule 3.4[comment [1]]. Lastly, complainant asserts that the violations discussed above--along with the additional obligations to fairness carried by a government prosecutor--substantiate a finding of Misconduct under Rule 8.4, RPC. "It is professional misconduct for a lawyer to : (a) violate or attempt to violate the RPC, knowingly *assist* or *induce* another to do so, or do so *though the acts of another*." Additionally, "it is professional misconduct for a lawyer to: (e) engage in conduct that is ***prejudicial to the administration of justice.***"

When a government attorney--an Officer of the Court--willfully directs a private party to thwart the work of an Official of the Court, such action not only thwarts the fundamental rule of the official but also serves as willful ***contempt*** of an Order of the Court. This form of intentionally obstructive conduct warrants special condemnation. *In re: Markowitz*, 222 N.W. 2d 504 (1974) (find attorney's failure to be truthful with a court official warranted a one year suspension). To not effectuate direct and special condemnation of such corrosive behavior would be to send the message to other government prosecutors--already imbued with immense power over the accused--that they have free reign to disrupt and outright obstruct the duties and obligations of Court Officials with impunity. Such a message would undermine the judicial system's very foundations. *Markowitz* supra. ("To deceive the court is to undermine its very foundations, for it is a tenet of our judicial system that lawyers are officers of the court."); *see also In re: Disciplinary Action against Michael*, 836 N.W. 2d 753 (2013) (finding attorney's communication with guardian ad litem knowingly ignored court order which violated the rules on disobeying an obligation under the rules of a tribunal and conduct prejudicial to the administration of justice).[10]

---

[9] Both the child *and* Ms. Jolley were key witnesses at the Family and Criminal Court Trials
[10] Having considered extensive evidence documenting the above at the PCR hearing, the Honorable J. Mark Hayes, II expressed his own stern concern for the treatment of GAL Wolf and its impropriety. (see "Exhibit D")

**Incident # 3**

**Discovery: "Mystery" of the DSS Files/Records**

Solicitor Jordan, along with every other government prosecutor within this State, has/had a professional duty to turn over exculpatory *or impeaching* evidence that is favorable to a defendant prior to his/her criminal trial. (*See Rule 5;'Brady', 'Giglio', etc.)* Failure to ensure this evidence is both discovered and turned over in time for a defendant to utilize in preparation for trial is misconduct. *See In re Humphries,* 354 S.C.567,582 S.E.2d 728 (2003) (Supreme Court held that a one-year suspension was warranted for attorney's conduct as assistant solicitor in failing to provide defense counsel with a copy of Rule 5 discovery.) And failure to obtain this info is not imputed to the defendant; our Supreme Court has made it clear such inaction is imputed to the solicitor. *State v. Durant,* 430 S.C. 98, 844 S.E.2d 49 (2020) (holding "we believe the better approach is to hold the State responsible for fulfilling its prosecutorial duties, including the duty to disclose under *Brady*".)

Given the clarity of law on this issue, complainant turns Counsel's attention to the facts supporting misconduct. Five years after complainant's trial, amidst postconviction proceedings-the Honorable J. Derham Cole ordered a rare opportunity for discovery due to the State's potential Rule 5/*Brady* discovery violations. Upon counsel's motion at the PCR hearing for the acquiring of specific never-turned-over DSS Investigation records, the Honorable J. Mark Hayes II sought the existence of the key files. (*See Hayes'* form 4 findings labeled "Exhibit E"). DSS provided the Court with the files/report which included impeaching evidence against a state witness at trial *and* exculpatory and contradictive disclosures of the child accuser that went to the very heart of the case: credibility. This critical evidence was never turned over to defense counsel, prior to trial, for the proper preparation of complainant's defense. (despite formal Rule 5/*Brady* requests *and* a Motion to Compel Hearing precipitated by the solicitor's delaying disclosure of other key discovery items(!)). Additionally, two years prior to the criminal trial, a member of the prosecutorial team--Lead Detective Nicky Cantrell--testified at the TPR trial to the existence of DSS files and having turned them over *to the Solicitor's Office, (see testimony labeled* "Exhibit F").

Attorney Jordan failed to ascertain, acquire, and turn over this key discovery either before or after complainant's criminal trial. It is incontrovertible that complainant-- or *any* defendant for that matter-- should have been given a copy of the file for potential *impeachment* evidence (against multiple state witnesses to include the key accuser) at trial. Solicitor Jordan utterly failed to fulfill this critical obligation. The fact that Jordan had **three years** to obtain and/or disclose the file leading up to complainant's trial weighs heavily against any attempted excuse for such a fundamental prosecutorial responsibility. *Humphries, supra.* (Assistant Solicitor "acknowledged [under Rule 5] he was further obligated to have aggressively sought to have determined whether the rumored existence of the [discovery] was correct and if so, to have promptly notified counsel...and to have promptly provided them with a copy of the [discovery].")

## Incident #4

### Discovery:  *Suppression* of the Notes of Dr. Nancy Henderson

The next incident involves yet another form of strategic *manipulation* of important discovery records -- this manipulation led to suppression of critical exculpatory evidence left unknown to complainant until PCR proceedings. Within a week or two of the child accuser's purported "disclosure(s)" of sexual abuse to a CAC interviewer, the child was seen for a physical examination by Dr Nancy Henderson. The CAC interviewer "had reported that the child had disclosed vaginal, oral, and even anal penetration.[11] Upon completion of her exam, however, Dr. Henderson found no physical signs of any sexual abuse. When complainant's trial counsel filed motions of discovery to obtain these records, the Solicitor's office fought the disclosure. Moreover, the child's mother and adoptive father refused to turn over the medical file. A hearing was held and the State agreed that in lieu of turning over Dr. Henderson's exam records they would stipulate that there was no physical evidence supporting the criminal allegations of sexual abuse.

In 2019- *eight* years after the State leveled the criminal charges and the five years after trial--the Honorable J. Mark Hayes II, ordered the production of all records pertaining to the DSS Investigation. These files were never turned over to complainant at any time prior to trial. In and of itself, this was a complete failure of these solicitors to both ascertain and obtain these files for turning over to the defendant complainant. *see In re Humphries*, 354 S, C. 567 (2003) (finding that a one-your suspension was warranted for attorney's conduct as assistant solicitor in failing in his obligation to "have aggressively sought" Rule 5 discovery and turn over to defense counsel.) This is clearly conduct *detrimental* and *prejudicial* to the administration of justice. Yet, the strategic manipulation went deeper than just never-seen-before DSS files.

Within the DSS file, the examination records of Dr. Nancy Henderson were discovered. This allowed complainant's PCR counsel to inspect/ review them for the first time. PCR counsel, Charles Grose, discovered a notation by Dr. Henderson that during the examination the child accuser then contradictively disclosed to her that at most "fondling" occurred--*not* sexual penetration. (see Attorney Grose's specific Henderson briefing/documentation of notations labeled "Exhibit G"). This assertion was highly probative to the defense as it was made after purported "disclosures" involving multiple forms of sexual abuse. Even more importantly, though, the child's assertion to Dr. Henderson was *exculpatory* to the CSC 1st Degree indictment for which the State had charged complainant as the elements of this charge required a form of actual penetration(!) Our Supreme Court has ruled a conviction was improper given substantially the same evidence. see *Pauling v. State*, 331 S.C. 606 (finding counsel deficient for failing to call as defense witness *triage nurse whose notes indicated that victim stated that her vagina was not penetrated)*.  It goes without saying just *how* this evidence could have been used -- if Attorney Jordan had properly shared its existence under her sacred duties and obligations as government

---

[11] erroneous "findings" which world-renowned experts in the field of forensic interviewing--and Judge Hayes-- found to be a result of this interviewer's improper usage of leading/suggestive questioning.

prosecutor- the evidence would have both *impeached* and potentially *exonerated* complainant(!) Jordan had over **three years** to share this information with complainant's trial counsel and simply chose not to do so in order to further her chance at conviction -- her responsibilities to *integrity* and *fairness* be demned.[12] Solicitor Jordan clearly knew the damage to her case if this *'Brady'* evidence was turned over and/or just shared with complainant. As our Supreme Court found, "given the only evidence of a sexual battery was the victim's testimony... there was no corroborating physical evidence of penetration or any physical evidence of a sexual assault", the notes of Dr. Henderson would have been crucial, both as evidence to impeach the child accuser's credibility but more importantly that a sexual battery did not occur "and, therefore, there was no CSC". *Pauling,* supra.

---

[12] notably, if not for Judge Hayes' Order of Discovery post-- PCR, these notes would likely have *never* been discovered--the clear hope of these solicitors all along

**Incident #5**

**Discovery:  Records of Therapist Meredith Thompson-Loftis**

As the Honorable J. Mark Hayes, II documented within his recent Order, "the late production of [the majority] of Ms. Thompson- Loftis' records *is concerning*". (Rule 59(e) Order Granting a New Trial, pg. 14, ll / 1-2). This incident again involves apparent manipulation of the disclosure of key discovery.  The following factual background is without dispute: 1) the child accuser received "therapy" sessions between 2011-2014 with Therapist Meredith Thompson-Loftis; 2) Reports of every 70+ sessions with Loftis were a critical piece of discovery; 3.) at some point in 2012/early 2013, Attorney Jordan actively took over the prosecution of complainant and subsequently represented the State at trial; 4.) trial was initially set for early November 2013 but was continued by request of defense counsel (per Ken Shabel's testimony at complainant's PCR hearing) due primarily to remaining *undisclosed* discovery[13]; two days before the November trial, Jordan only turned over *one-third* of the key therapy session reports.

At the actual trial in February 2014, the last-minute disclosure of the remaining reports, in addition to legibility issues, hampered the opportunity to hire an expert--in *advance* of trial--to review/ascertain the second set of records.  Complainant was convicted.  In preparation for PCR, complainant's counsel hired Dr. Maggie Bruck, PhD. of Johns Hopkins University--a nationally recognized expert in child psychology and forensic interviewing of children.  Upon thorough review of *all* of the reports, Ms. Bruck expresses concern that the very first session report- within the batch of files not turned over to defense counsel until the last-minute – contained crucial findings that the child had started accusing *several other individuals* of sexual abuse to include complainant's then-fiancé, Cara Lintner. (see enclosed copy of report labeled "Exhibit H"). [14] Additionally, the second set of records, which were just as readily available as the first set Jordan turned over (3) months prior to the 2014 trial, also contained numerous claims by the child of inculpatory photographs and video having been taken of her. ▬▬▬▬▬▬▬▬▬▬ However, Complainant had been released on bond in July of 2011 based on an exculpatory forensic examination of all his computer/phone/camera equipment.  Moreover, the actual computer forensic examiner (Mr. Marquez) was present at trial to attest to the above and the State conceded his report determined nothing had been deleted thus further exculpating complainant.  Clearly, this evidence of the child's assertions within these reports-- thereafter proven erroneous-- was also *critical* to the proper and full preparation for trial and went to the most important aspect of the entire trial: credibility.

---

[13] this was even *after* Judge J. Mark Hayes' discovery directives to the State within his Order on defendant's 'Motion to Compel Discovery' filed in late 2012(!)

[14] if known, Ms. Lintner could have been subpoenaed to testify at trial that this allegation was untrue – evidence *impeaching* the child accuser on the most important facet of the case: credibility.  Notably, Ms. Lintner was later cleared of any abuse--despite the child's assertions to the contrary--by the same corrupt Detective who charged/arrested complainant based primarily on the forensic examiner's now de-bunked and tainted finding that the child had made allegations of abuse.



It is upon these facts that this Honorable Counsel should further consider this Attorney's deceptively strategic conduct amidst a criminal trial, her other discovery- related failures, and ask itself the following questions. Out of almost *three years'* worth of therapy reports, was it just uncanny coincidence that the first set of reports were "cut off" right **before** the session report where the child disclosed key evidence that impeached her credibility? Did the coincidence extend to the corresponding sessions of evidence, all within the batch turned over to the defense on the eve of trial, so critical to further impeachment of Jordans key witness: Jordan was able to acquire and turn over the first batch of reports--notably, also turned over on the eve of the initial scheduled trial in November 2013--so any responsive attempt at an excuse as to why she did not also turn over the sessions spanning 2012 and 2013 must fail. Complainant asserts the evidence, coupled with a healthy batch of investigative common sense, convincingly show Jordan turned over the first batch of reports--one report shy of the first impeachable evidence going to the heart of the case--due to them containing no real information helpful to defense counsel. Then, though she possessed or could/should have possessed and turned over the remaining records *with* the first set in November 2013, she strategically withheld them to delay the revealing of the impeaching/exculpatory evidence until right before trial. There was simply no other **legitimate** reason to do so other than to hamper, even eviscerate, its discovery and usage. Sadly, she was successful. This amounts to patent abuse of the truth-seeking process so tantamount to a fair trial and "institutional values". *See In re Humphries,* 345 S.C. 567, 582 S.E. 2d 728 (2003) (Supreme Court holding that a one-year suspension was warranted for attorney's conduct as assistant solicitor in failing to promptly provide defense counsel with Rule 5 discovery). In doing so, she violated Rule 5, fairness to opposing counsel, special obligations of a prosecutor, failure to make a reasonable diligent effort to comply with a legally proper discovery request by an opposing party (pretrial) and conduct prejudicial to the administration of justice.

**Incident #6**

**Discovery:  _Five_ Solicitors Involved in Case…Three Years to Obtain/Turn Over all Discovery…and the Lead Detective's Critical Investigative File went UNREVIEWED?!?**

Within Det. Cantrell's important "Investigative Report" (2011), she asserted as fact that it had been discovered that complainant had been *kicked out* of Liberty University for **criminal assault**, and his father had been *kicked out* of the pastoral ministry. Both asserted findings were *completely* **untrue** as complainant graduated from Liberty University with a Bachelor's Degree in Business (with Honors). His father-- the Reverend Rod Spade-- had served his community for over (30) years, was never a recipient of *any* type of discipline (let alone criminal allegations), and remains a beloved pillar in his community. Det. Cantrell had received these erroneous accusations from Detective Robin Hyatt in Virginia where both officers had met to coordinate and effectuate the arrest of complainant at his home.  Disturbingly, Cantrell decided to factualize these inculpatory accusations *prior* to Det. Hyatt completing an investigation into their truth. Additionally, Cantrell never supplemented her initial report to reflect the truth. Then, in her testimony to the Honorable J. Mark Hayes II at the PCR evidentiary hearing in 2019, she "doubled-down" on her position--that "I didn't ever receive that." (i.e., notification of her damaging publication stating complainant being kicked out of his alma mater for criminal assault was, in fact, **false**). *see Cantrell's testimony labeled "Exhibit J".*

In December of 2021, as a result of a formal request for investigation into professional and criminal violations by Detective Cantrell, complainant received the disclosure of SLED investigation into numerous instances of Misconduct in Office.  Amidst the findings of the Internal Affairs investigator (S/A Mitchell), he detailed his finding of the enclosed "memo" within Cantrell's criminal file of complainants case, highly material to the above prosecutorial assertions. [15] "(*see "Memo of Cantrell" labeled "Exhibit K")*.  Under Rule 5 and the canons of fairness to opposing counsel covering a prosecutor's discovery-related obligations, Ms. Jordan-- the "Lead Prosecutor" had an ethical *and* professional **duty** to ensure **ALL** available documents/evidence going to a full and proper preparation of complainant's defense were located and turned over to defense counsel. *see Rule 3.4(d)* ("A Lawyer shall not in pretrial procedure… fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party".) Moreover, Det. Cantrell's file--as the *Lead* Detective and a key prosecutorial witness at <u>both</u> the TPR and the Criminal trial(s)--should have been the very *first* file Jordan closely scoured for discoverable material(!) The fact that SLED Agent Mitchell so easily found this pertinent (and *exculpatory*) memo in Cantrell's file further legitimizes a potential situation. where Jordan--for reasons to be given due weight-amidst an analysis of the *cumulative* evidence of deception and/or obstruction submitted to this Counsel--failed to even <u>review</u> her file prior to trial(!)  Any responsive excuses by Ms. Jordan as to her mounting discovery-specific malfeasance fall flat. If she fulfilled her professional obligations and scoured Cantrell's file for

---

[15] the materiality and *impeaching* value of this evidence - likely making this also a "Brady violation - should be clear. If the existence of this memo was known, the defendant could have not just attacked Cantrell's credibility and overall professionalism at trial but could have shown a willful attempt to improperly *slant* her narrative utilizing lies and in so doing *taint* the legitimacy of her <u>entire</u> investigation from its very outset.

discoverable evidence--a possibility disputed by Cantrell herself, at the TPR trial--she violated her duties to turn over Rule 5 *impeaching* evidence. If over the **three years** she had in which to fulfill this key responsibility, she failed to review the critical investigative file, therefore she violated a litany of ethical and professional obligations imbued to a justice seeking government prosecutor. *see In re Humphries*, 354 SC 567

Such a situation--unfathomable in a **professional** Government prosecution where there were at least **four** prosecutors (to include the *Head* Solicitor) representing the State against a single defendant - gains further support via Cantrell's own concession at the 2012 TPR trial. (*see transcripted testimony labeled "Exhibit L")*. Additionally, the prosecution was further put on notice of the need to ensure ALL law enforcement evidence (let alone the <u>main</u> file) was fully and formally reviewed by complainant's "Motion to *Compel* Discovery" hearing in early 2013- a year before the criminal trial(!) Moreover, the fact that Ms. Jordan had over *three* years to ensure Cantrell's file was formally scoured/reviewed (and documents *promptly* turned over) well before complainant's trial further supports a finding of inexcusable, avoidable, and prejudicial professional misconduct. As our Supreme Court has warned: "The integrity of the entire judicial system is called into question by conduct such as that engaged in by the deputy solicitor and investigating officers in this case. *Humphries*, supra. Prosecutors are ministers of justice and not merely advocates. *see* Rule 3.8, Rules of Professional Conduct.

In the criminal case at hand, the defendant --turned--complainant was **wrongfully convicted** partly due to *prosecutorial misconduct*. As the saying goes, "where there is smoke... there's usually FIRE". Unfortunately for *this* complainant, that "fire" eviscerated his sacred due process rights and FREEDOM....

-This Honorable Counsel of Accountability must ask itself:

**Is there collective conduct *more* deserving of the <u>harshest</u> sanctioning?**

"It would be better that 100 guilty persons are set free than for one innocent be made to suffer."

-Benjamin Franklin

**Incident # 7**

**Last-minute Appointment of Special Prosecutor Doug Brannon**

Over a year prior to complainant's criminal trial in early 2014, the 7th Circuit Solicitor, Barry Barnette, asked Attorney Doug Brannon to serve as a Special Prosecutor at said trial.[16] *(see this Counsel's findings of fact within **Matter of Brannon** (2019).* Thus, even though Attorney/Asst. Solicitor Jordan and the rest of the prosecutorial team were/ had been aware of this plan for many months, it wasn't until the day of trial that she/Barnette decided to formally make the defense aware. Defense counsel had served **multiple** requests for all Rule 5/'Brady'/ etc. evidence upon Jordan--to include a formal hearing on a 'Motion to Compel Discovery' in early 2013--many months prior to the start of trial. No records/files associated with Family Attorney-turned-Prosecutor Brannon were turned over to the defense. Complainant was subsequently convicted.

Over three years later--in 2017--evidence surfaced that led complainant's PCR counsel (Charles Grose) to file for postconviction discovery based on potential *impeaching* evidence not disclosed by prosecutors. [17]A hearing was held, and the Honorable J. Derham Cole found that as Special Prosecutor, Brannon's files were discoverable, and any potentially *impeaching/exculpatory* evidence should have been ascertained and turned over--**prior to trial**-- by the solicitors.[18] After a review of Brannon's files, the Attorney General's Office conceded discoverable evidence had not been turned over. *(see enclosed response/concession of AG Megan Jameson labeled "Exhibit M")*

**Counsel should further consider the mounting instances of critical Discovery-related inadherence as a "systematic" abuse of prosecutorial discretion constituting a violation of Rule 3.8 [Comment 1]. Moreover, given this Counsel found that the Solicitor's office--specifically, Head Solicitor Barry Barnette--approached Attorney Brannon about being a "Special Prosecutor" at complainant's TPR trial more than a year prior, Counsel should further consider why then they would wait until the **DAY** of trial to present defense counsel/ complainant with the "Motion of Appointment of Special Prosecutor"…notably, minus the discoverable Rule 5 material within his files(?) Such questionable and prejudicial conduct further corroborates a finding of malicious intent as asserted in the other instances of strategic manipulation of discovery detailed in "Incidents #3-7." Moreover, it provides additional evidence that when considered cumulatively, displays the devastating prejudice to obtaining fairness, truth, and justice. A prosecutor has special responsibilities to do justice and is held **to the highest Standards of professional ethics**," *State v. Quattlebaum*, 338 S.C. 441 (2000). *(emphasis added).*

---

[16] Mr. Brannon had served as the *accusers*/Jolley's Family Attorney in the underlying custody/Visitation/TPR litigation that led to the criminal charges.

[17] this matter of discovery solely/specifically involved Mr. Brannon's Family Court files

[18] *see In re Humphries*, 354 S.C. 567 (2003) (Supreme Court holding that a one-year suspension was warranted for attorney's conduct as assistant solicitor in failing in his obligation to "have aggressively sought" Rule 5 discovery and turn over to defense counsel.)

**Incident #8**

**<u>Asserted Mistruths Amidst Key Pretrial Motion Arguments</u>**

Though a prosecutor enjoys both qualified and absolute immunity in carrying out their duties, they are not to be given a "free pass" to ignore their professional and ethical obligations under the Rules of Professional Conduct. In effect, the RPC holds an attorney who puts on the cloak of a prosecutor to an even *higher* standard of integrity and issues them "special obligations" not required of a private attorney. (Rule 3.8, RPC), Within this framework, complainant turns Counsel's attention to a pretrial motion discussion where critical issues of evidence were hashed out--issues that would play a key role in the trial where complainant faced up to LIFE in prison if found guilty.

One of the key evidentiary items of discovery was *three years* worth of therapist records. Almost four months prior to the start of trial, Ms. Jordan turned over what amounted to **one-third** of the total records but withheld the remaining <u>majority</u> of the discovery.[19] Then, just a couple business days prior to the start of trial, she turned over the bulk of the files.[20] Counsel for complainant argued that these critical records were not turned over within a reasonable time prior to trial and thus she had clearly ignored the prior Order of the Court. Amidst argument on the potential exclusion of her expert witness and the author of these records--Therapist Meredith Thompson-Loftis-- Attorney Jorden stated as fact an assertion that would tend to mitigate the harm and assist her agenda in denying complainant's defense a meaningful opportunity to ascertain the content of the last-minute disclosure of records. *(see copy of transcript labeled "Exhibit N")*:

Ms. Jordan:  Your Honor, he ***did have access*** to the majority of Ms. Loftis' records prior to this.
                                                                                ROA 36, ll 19-20 (emphasis added)

The problem is this assertion was simply **untrue**. Ms. Jordan had actually withheld the <u>majority</u> (nearly **two-thirds**) of the therapist's records until right before trial(!) As delineated within "Incident #5", there was simply no legitimate excuse for not turning over those records at the same time that she turned over the prior records four months earlier(?!?)[21] (November 2013). Ms. Jordan continued with another misleading assertion to the Court:

Ms. Jordan:  [*The child* ] has made ***no new allegations***, as far as the disclosures that came forth.
                                                                                ROA 36, 11 25-37 (emphasis added)

---

[19] the seemingly strategic reason for doing so is detailed under "Incident #5".

[20] this was despite Judge Hayes' 2013 Discovery Order that <u>all</u> the files be turned over "within a *reasonable* time"

[21] after my wrongful conviction, it was discovered just "why" Jordan waited to turn over the majority of the files right before trial as it was discovered <u>within those records</u> the child accuser had since accused at least *three* other people of abuse and made claims of fact--including that pictures and video had been taken of alleged abuse--that could have been shown to be blatantly false via <u>exculpatory</u> electronic forensic reports(!). Such willful manipulation of critical discovery is precisely the egregious misconduct by officers of the court that directly precipate *travesties* of justice and stain our sacred system

This too, was untrue. *see In Re: Rademan*, 65 A.D. 3d 350 (2009) (censuring prosecutor for *untruthfulness to court* in that he "violated the duty owed by every lawyer to be candid and honest and has engaged in conduct that is inconsistent with his obligations as a public prosecutor".) The child accuser --amidst these records--had, in fact, made "new allegations" of abuse against Mr. Spade's fiancé, Cara Lintner, *and* against her own half-brother[22]. And then she continued on with the following mis-representation:

Ms. Jordan:  We had requested the things earlier. We had some issues getting them, as far as the snow and the counselor's schedule.

<div align="right">ROA 37, 10-12 (emphasis added)</div>


Even this assertion to the court was disingenuous--made for the soul reason of minimizing her willful violation of Judge Hayes' 2013 Discovery Order--that the records be turned over <u>within</u> a "reasonable" time of trial which professional courtesy dictates would not be two business days before a trial where the defendant faced up to Life in prison. The disingenuity lies in the fact that her conveyances of "snow" and the "counselor's schedule" failed to explain why the bulk of these records were not turned over **four months earlier**. When the snow and the counselor did not inhibit the release of the rest of the file. (?)

This Officer of the Court then doubled-down to "win" the critical motion by utilizing mistruths:

Ms. Jordan:  <u>I don't know if they had her records back then</u> as to all of that, ***but it's not a surprise what's in these records***.

<div align="right">ROA 39, 11 1-2 (emphasis added)</div>


She knew very well the defense did not have the bulk of the records "back then"--she was responsible for the partial/strategically minimized disclosure four months prior(!)  Unfortunately for complainant, the truth was that there *were* some serious "surprises" *within these* files -- as discussed above -- and these surprises were both **impeaching** (of the key state witness) and **exculpatory**. Yet, Ms. Jordan won the motion. However, in doing so she both tainted the *truth-seeking* process and again disregarded her oath of this office.  And she directly contributed to the willful manipulation of a Court Order whic le d to *highly probative* evidence complainant did not know existed. Where the foundational tenet and expectation of <u>fairness</u> amidst a criminal prosecution is skewed by a government prosecutor held to an even higher degree of dutiful pedigree, tragedies and gross injustices occur. Even minor lapses of ethical judgment can inexorably taint our truth-seeking courts and horribly ruin innocent lives.  Such <u>willful</u> conduct within South Carolina's courts cannot continue to be condoned through proverbial "slaps on the wrist." *see In the Matter of Stein*, 177 P.3d 513, 143 N.M, 462 (2008) (holding that when an attorney is found to have engaged in acts of **intentional dishonesty** there is a presumption that he or she is unfit for membership in the Bar, for purposes of determining appropriate disciplinary sanction).

---

[22] moreover, if Jordan were to respond that she was not referring to other disclosures of abuse, that too must fail because she also had a duty to voluntarily inform the defense of such impeaching exculpatory evidence.

This impropriety amounts to the *eighth* separate showing of a serious lapse of professionalism as an officer of the court. Counsel must consider the sheer amount of misconduct substantiated by this single government attorney-- amidst a single trial/case-- to be held "to the highest standards of professional ethics".  Following our High Court's directive twenty years ago and now, the Supreme Court of South Carolina "**will not tolerate deliberate prosecutorial misconduct**".  *Quattlebaum, supra.*  The carrying out of this clear directive- as Justice Few recently referenced- lies within the province and mission of this Honorable Counsel.

## Summary (for ODC)

**Truth, honesty**, and **fairness** still matter in some places. A courtroom is one of them. For any system of justice, the protection of the sacred truth-seeking process is fundamental. Allowing government prosecutors in this State--Officers of the Court--to receive unspoken partiality and slanted accountability amidst disciplinary investigations has served to *pollute* this system, not protect it. To that end, the line of disciplinary cases against solicitors in this State is disturbingly scant. [23] This only serves, as seen by the emboldened conduct within this complaint, to further ingratiate bad actors.

Our sister State of Maryland--specifically, it's Disciplinary Commission--has sent a strong message to attorneys who display *intentional misconduct* that it will not be condoned, whatsoever. *see Attorney Grievance Commission of Maryland v. Joseph*, 422 Md. 670 (2011) ("Unlike matters warranting a lesser degree of discipline, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse.") *see also Attorney Grievance Commission of Maryland v. Dailey*, 2021 WL 3123105 ("As this [High] Court has emphasized, **disbarment** ordinarily should be the solution for *intentional dishonest conduct.")* (emphasis added). Eight years ago, our Chief Justice Donald Beatty made it very clear that under his watch willful prosecutorial abuse would no longer be given a pass.[24] Just months ago, Justice Few expressed such a degree of frustration to _continued_ prosecutorial misconduct that he (and fellow Justices) would potentially have to begin **directly reporting individual solicitors** to this Counsel. As an Office of the Supreme Court, it is way past time for this Counsel--directed to protect the integrity of the criminal justice system--to heed their ongoing frustration and call...to *action.*

---

[23] In support, during the last decade an estimated total of 550 formally charged disciplinary matters were adjudicated against private attorneys. (*Westlaw "advanced search"*) However, where the Supreme Court has overturned countless cases involving some form of prosecutorial misconduct amidst criminal trials (and reprimanded its usages in more), complainant could only find **two** involving solicitors publicly sanctioned by Counsel. (*In re Nelson*, 406 S.C. 201 (2013); *Matter of Johnson*, 2021 WL 2816736). This amounts to an astounding **0.004%** of total disciplinary matters!

[24] In actuality, he warned that *Bar Licenses* would be taken. Clearly, Jordan ignored that warning...and her ethical obligations.

# Exhibit A

32     Criminal Trial (2014)

(Defense Counsel) MR. SHABEL:  Where we are getting at, though, Your          1

Honor, is Detective Cantrell also testified in a trial          2

fifteen, sixteen months ago that she believed the computer          3

had been wiped.  And I asked then if there was a forensic          4

report about that and she said it's my understanding there          5

was.  Here we are sixteen months later and I just now get          6

that.          7

(Solicitor) MS. JORDAN:  Your Honor, it was my understanding          8

is Mr. Marquez' report does not say it had been wiped.          9

          MR. SHABEL:  Well, that would be contradictory to          10

her sworn testimony.  So if you want to get into that          11

argument --          12

          MS. JORDAN:  Well, I'm not going to pit my          13

witnesses against each other, because that goes to -- that's          14

not within her knowledge.  She's not my computer person.          15

          THE COURT:  No, I understand, but we had those --          16

South Carolina had all that back in May, is that right?          17

          MS. JORDAN:  I don't know the exact date that we          18

came into possession of it, as far as the sheriff's office          19

that logged those text messages on that disk, but we did --          20

I agree with the dates that they were turned over to the          21

defense.  I agree with that.          22

          And I would just ask if they are excluded in our          23

case in chief, that we would be able to use them in reply or          24

cross.          2

# Exhibit B

DAVID JOLLEY-DIRECT BY MS. MOORE

486

1   purpose was?

2   A    No, ma'am. But she indicated to me what her purpose

3   was not. It was a rainy day. And she had been late with

4   another visitation. So when she got to our house, I had,

5   actually, fallen asleep watching TV. And Heather went to

6   the door. And I heard people talking in the kitchen.

7        So when I walked in, I said, Hey, Alex, how are you

8   doing? And she immediately turned and looked at me, she

9   says, I'm fine. I said, I'm sorry I fell asleep. She

10  said, It's okay. You can go back in there and watch your

11  game. This visit has nothing to do with you. I'm here to

12  see Peyton.

13  Q    When you -- and I just want to make sure I'm very

14  clear. When you stopped giving information or

15  communicating updates, status, et cetera, to Alex, was it

16  at the request -- whose request was it at?

17  A    It was by the Solicitor, as well as my counsel.

18  Q    David, do you and Peyton have a parent-child

19  relationship?

20  A    Oh, I think so.

21  Q    What does she call you?

22  A    She calls me daddy.

23  Q    Did you ask her to call you that, or tell her to call

24  you that?

25  A    No, ma'am.

DAVID JOLLEY-DIRECT BY MS. MOORE

482

1    you taking the time to take Peyton to counseling?

2    A    Yes, ma'am.  They've been very supportive.

3    Q    Were your boss, senior pastor, and your immediate

4    supervisor, actually, present in court for a good bit this

5    week?

6    A    Yes, ma'am, they were.

7    Q    Was that to show support for your family?

8    A    Yes, ma'am.

9    Q    David, were you present in court Monday afternoon

10   when Alex Wolf testified initially?

11   A    Yes, ma'am.

12   Q    Why did you and Heather stop cooperating with Alex

13   after this disclosure was made?

14   A    We were told by the Solicitor and our counsel not to

15   have any further contact.  Because we knew of her phone

16   calls to Daniel Spade letting him know before the police

17   were able to get there that they were coming.

18   Q    Did you believe that you had confidentiality with

19   Alex?

20   A    I mean, I had hoped so.  Because I thought that's

21   what we were supposed to have.  But, at that point,

22   absolutely not.

23   Q    Did you trust her?

24   A    No, ma'am.  I believed her role was to be for

25   Peyton's best interest.  I can't imagine how that is in

Exhibit C

507

REDIRECT EXAMINATION OF MS. WOLF BY MR. GROSE

1  previously.  He put his weenie in my face, but I didn't

2  know if that was throwing a hotdog at her or that there

3  had been a fight, I just knew that there was something

4  that made this child upset; therefore, we needed to stop

5  until Kim Rosborough had spoken to her."

6      Q.  Okay.  And when you say "stop", that stopped the

7  process of having the meeting to reunite Danny, correct?

8      A.  Yes, sir.

9      Q.  And to talk, Kim was the therapist and would be

10  an appropriate person to perhaps know how to handle

11  that, correct?

12      A.  Correct.

13      Q.  And are you aware of whether or not Kim

14  Rosborough made a referral to the Child Advocacy Center

15  or a suggestion to the Child Advocacy Center?

16      A.  I was made aware of that several weeks later.

17      Q.  Okay.  Now, can you go to page 175 of the

18  transcript.

19      A.  I'm there.

20      Q.  Okay.  And at line 4 you were asked:  "Prior to

21  March 30th of 2011, describe the level of cooperation

22  you received from the Jolleys in your investigation."

23  What was your answer?

24      A.  "120 percent."

25      Q.  "Since March 30 of 2011, please describe the

REDIRECT EXAMINATION OF MS. WOLF BY MR. GROSE

["Please describe the]

1  level of cooperation you received from the Jolleys in

2  your investigation."  And your answer?

3    A.  "April 2011 through August of 2012, zero."

4    Q.  And then the question was at line 12:  "Did you

5  make efforts?"  And your answer at line 13?

6    A.  "I did."

7    Q.  Question line 14:  "Did you write a letter to

8  their counsel in June of 2011 explaining some of your

9  efforts?"

10   A.  "I did."

11   Q.  At line 17:  "Would you recognize a copy of that

12  letter if you saw it?"

13   A.  "I would."

14   Q.  All right.  And it looks like that they put the

15  letter into evidence at that point; is that right?

16   A.  It appears so.

17   Q.  Okay.  Then over on page 176 -- well, line 9 is

18  where they put it into evidence, 9 through 10.  And then

19  at line 12 Mr. Shabel asked you:  "Ms. Wolf, considering

20  your experience as a guardian ad litem, did the lack of

21  cooperation concern you?"  And what was your answer?

22   A.  "It did."

23   Q.  And the question was:  "Why?"  And your answer at

24  line 16, please?

25   A.  "The timing was a concern.  I had known that Kim

# Exhibit D

*PCR: Findings of Probable*

*Mark Hayes II*

meetings/sessions should begin with the goal of long term association of the applicant with the child. These sessions were to involve all members of the family, including the applicant. Significant to this new evidence was the testimony of the child's family court guardian ad litem (GAL). Part of the GAL's testimony included that she was closed off from the minor by the mom and soon-to-be adoptive father. This Court easily concluded the GAL felt strong hostility from the mom and soon-to-be adoptive father. Their conduct and attitude towards the GAL materially interfered with her work as the GAL for the minor. This new evidence and the timing/link to the family court issues was further supported by the information revealed post-PCR hearing from the DSS file.

This Court was troubled that the legal history of this case includes private parties being encouraged to be uncooperative and thereby frustrate the work of the DSS and a family court GAL. This Court was also troubled that law enforcement made inconsistent factual statements to different courts.

Again, the forensic interviews were material to the PCR. PCR counsel was successful at discrediting the forensic interviews in this case. As part of the review process, the interviews were viewed by this Court. Certain sections of the video interviews were reviewed several times. The PCR hearing testimony of the Applicant's two expert witnesses and the testimony of the forensic interviewer were all considered. The audio recording of the PCR testimony was also reviewed by this Court post-PCR hearing.

The expert witnesses called by applicants have the highest credentials in their areas of expertise. They both can be considered experts of the highest esteemed. Also they both appeared credible on the witness stand. Together, they explained what are the "best-practices" for obtaining information from a child during a forensic interview. They both explained how the forensic interviews in this case deviated from their "best-practices". They were also critical of the prior sworn testimony of the forensic interviewer when that testimony was compared to what is reflected in the video interviews.

The forensic interviewer also testified during the PCR hearing. She strongly defended the techniques she used with the child in this case. While she acknowledged the expertise of the applicant's two expert witnesses and did not discredit their methodology, she advocated for her methodology and defended its application in this matter.

In reaching the conclusion that applicant PCR counsel was successful in discrediting the video interviews, this Court notes, again, that no witness challenged the credentials of the applicant's experts nor the validity of their methodology. Based on the information presented to this Court, these two witnesses presented the highest levels of expertise in their respective fields. They appeared extremely credible during the hearing. After viewing the videos and applying the standards offered by these experts, this Court agrees with their assessment that the forensic interviews were suggestive.

All three witnesses (Applicant's two experts and the forensic interviewer) felt the videos should have been played to the jury. Each felt that if videos had been played to the jury, the publication to the jury would have supported their respective positions. All three encouraged this Court to view the videos. As stated, this Court did so extensively.

# Exhibit E

# Exhibit F

NIKKI CANTRELL-REDIRECT BY MR. BRANNON

374

1    A    Not that I'm aware.  Like I said, I wasn't -- when we

2    got there, he knew about it.  I didn't continue to

3    investigate how he knew about it.

4    Q    Did you speak with Peyton at all?

5    A    Did I, personally, speak with Peyton?  No.  I

6    referred her to the advocacy center due to her young age.

7    Q    And, as far as the information you have, has anybody

8    else other than the CAC interviewed Peyton about what she

9    says happened?

10    A    I'm not sure if Greenville DSS has interviewed her or

11    not.  Sometimes, they do that, and sometimes, they use

12    CAC.

13    Q    Are the Greenville DSS documents in your file, or do

14    you recall collecting anything from Greenville DSS?

15    A    They would be at the Solicitor's Office.  I don't

16    recall.

17    Q    Did you turn over everything you've got to the

18    Solicitor's Office?

19    A    I did that I'm aware of, yes.

20        MS. WOLF:  Thank you very much.

21        THE COURT:  Redirect.

22                    REDIRECT EXAMINATION

23    BY MR. BRANNON:

24    Q    10 days to two weeks before you got there, the

25    computer records indicate it was wiped clean?

# Exhibit G

Investigator Cantrell testified at the Family Court hearing that the Solicitor's Office had the DSS file. Regardless, the prosed order does not apply the correct analysis for a *Brady* violation and overlooks longstanding federal and state court precedent imputing knowledge of information to the State. "A *Brady* claim is based upon the requirement of due process." *Gibson v. State*, 334 S.C. 515, 524, 514 S.E.2d 320, 324 (1999). "*Brady* is based on a sense of fairness, and a belief that society gains when a defendant is accorded a fair trial. The focus is not on the misconduct of the Prosecutor, but on the fairness of the procedure." *Id.*, 334 S.C. at 528, 514 S.E.2d at 326-27. Applying *Gibson*, our Supreme Court recently addressed the standard of review for a *Brady* violation:

> A *Brady* violation occurs when the evidence at issue is: 1) favorable to the accused; 2) in the possession of or known to the prosecution; 3) suppressed by the prosecution; and 4) material to the defendant's guilt or punishment. Such a violation is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. In other words, the government's evidentiary suppression is so serious as to undermine confidence in the trial's outcome. *Brady* applies to both impeachment and exculpatory evidence. Importantly, whether the prosecution acted in good or bad faith is irrelevant in determining whether a *Brady* violation occurred.

*State v. Durant*, No. 2016-001264, 2020 WL 2179248, at 4 (S.C. May 6, 2020) (internal citations omitted).[31] For determining when a *Brady* violation is material, *Durant* adopted the standard articulated in *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."). Applying this *Strickland* standard to a *Brady* violation, *Bagley* modified the holding in *United States v. Agurs*, where the Supreme Court observed:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by

---

[31] Although our Supreme Court decided *Durant* after Mr. Spade's trial, *Durant* is not a new statement of the law. Rather, it is the latest application of firmly established law regarding a *Brady* violation.

> evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evince is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. 97, 112-13 (1976). The Supreme Court "rejected any [] distinction between impeachment evidence and exculpatory evidence." *Bagley*, at 676. "[E]vidence significantly enhancing the quality of the impeachment evidence usually will" meet the standard for materiality. *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009).

Because the *Strickland* standard is relevant to both the ineffective assistance of counsel and prosecutorial misconduct claims, Mr. Spade will discuss both claims in this section, beginning with *Brady*.

The first prong of the *Brady* violation analysis is whether the DSS records are favorable to Mr. Spade. The Form 4 Order resolves this prong in Mr. Spade's favor. The order notes, "The DSS file caused this Court concern." The order recognizes the DSS file support Mr. Spade's "underlying narrative." This finding is consistent with this Court's related finding that Mr. Spade presented new evidence at the PCR hearing through the testimony of Alexandria Wolf, the guardian ad litem in the DSS case. This Court additionally found, "This new evidence and the timing/link to the family court issues was further supported by the information revealed post-PCR hearing from the DSS file." The Form 4 Order also finds, the DSS file contained "new information [that] supported the idea that the family was uncooperative, even with DSS's effort to investigate, by adding factual details to what was presented during the PCR hearing." In his Supplemental Memorandum of Law Regarding DSS Records, Mr. Spade identified the DSS Safety Plan requiring, "Mother and stepfather are not to discuss the allegation in front of child and/or [ask]

child any questions. Parents are to cooperate with DSS investigation and referrals." Although the Form 4 Order does not mention the Safety Plan, it seems the Court would be troubled by the child's mother and soon-to-be adoptive father defying the DSS, just as this Court was "troubled that the legal history of this case includes private parties being encouraged to be uncooperative and thereby frustrate the work of the DSS and a family court GAL." Mr. Spade's supplemental memorandum also pointed to numerous entries in the DSS records of the child's mother and soon-to-be adoptive father not cooperating with the DSS investigation, to wit:

a. Action Date: April 25, 2011, Input Date: May 25, 2011, stating, "Phone call to Ms. Bridges Office. David Jolley has called to complain about worker's attempts to talk to [child] and to his wife. Mr. Jolley requesting a new investigator be assigned to the case."

b. Action Date: April 26, 2011, Input Date May 25, 2011, stating, "After many missing phone calls back and forth with Ms. Holley, a meeting was scheduled for the 27th at 5:00 pm at DSS."

c. Action Date: April 27, 2011, Input Date May 25, 2011, reflecting the child "continued to refuse to talk to Worker."

d. Action Date: February 28, 2013, Input Date February 28, 2013, indicating the child "will not meet with [the DSS worker] alone" and "speaks with [the DSS worker] on in the presence of her mother and father."

e. Numerous other portions of the DSS Case Dictation showing DSS sometimes had difficulty scheduling face to face visits with the child and the Jolleys.

This lack of cooperation with DSS corroborated the new evidence presented through Ms. Wolf's testimony. In addition to the lack of cooperation and parental alienation, the DSS records contained the Child Maltreatment Protocol,[32] completed by Dr. Nancy Henderson on April 29, 2011, at the Spartanburg Child Advocacy Center documented that the child's mother provided a

---

[32] Dr. Henderson documented a "normal exam." At trial, the Solicitor stipulated the prosecution did not have any medical evidence to support the allegations of sexual abuse. Dr. Henderson's records, however, contained additional information favorable to the defense.

materially false medical history, leading Dr. Henderson to document, "Negative pertinent social history." The ongoing domestic litigation and evidence of parental alienation certainty qualify as a significant social history. The Form 4 Order, indeed, noted it was "troubled that the legal history of this case includes private parties being encouraged to be uncooperative and thereby frustrate the work of the DSS and a family court GAL." Concealing from Dr. Henderson this social history is material to Mr. Spade's defense. Dr. Henderson also documented the child "was unable to separate from mom to be interviewed, which is relevant to Mr. Spade's defense that the child was coached to make the allegations. Finally, Dr. Henderson also documented the child has "never been great sleeper but worse in last month." This information places the child's increased anxiety symptoms in late March and April 2011 and links the increased anxiety symptoms to the parental alienation, coaching, and presentation of the false allegations against Mr. Spade. It's also contrary to the prosecution's narrative that Mr. Spade was the source of the child's anxiety attacks.

Dr. Henderson's medical exam is also significant because her records contradict the child's testimony at trial. Although Dr. Henderson's report lists the reason for referral as alleged "Sexual Abuse," the only specific allegation Dr. Henderson documented was "Fondling." Dr. Henderson did not document any "Oral-Genital Contact." Trial counsel, therefore, could have called Dr. Henderson as a witness to testify about the prior inconsistent statement. Rule 801(d)(1), SCRE.

The second and third prongs of a *Brady* violation are whether the information was "in the possession of or known to the prosecution"[33] and "suppressed by the prosecution." *Durant*, at 4. "[W]hether the prosecution acted in good or bad faith is irrelevant in determining whether a *Brady*

---

[33] The State's post-hearing brief argued the DSS file was not in the possession of the State. The Attorney General did not include this argument in the proposed order, thereby abandoning that position. Mr. Spade's objections, however, will address the entire *Brady* violation analysis.

violation occurred." *Id.* During the Family Court termination of parental rights hearing, Investigator Cantrell testified the DSS records "would be at the Solicitor's Office." TPR Tr. 374. Investigator Cantrell's testimony should be sufficient to resolve these two prongs of a *Brady* violation in favor of Mr. Spade.

Even if this Court accepts Investigator Cantrell's convenient PCR testimony that she must have misspoke at the termination of parental rights hearing,[34] the existence of the DSS records is imputable to the Solicitor's Office. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437; *and see Durant*, at 5 ("the better approach is to hold the State responsible for fulfilling its prosecutorial duties, including the duty to disclose under *Brady*").[35] Thus, the prosecution is accountable for discovering and producing all *Brady* material. The Attorney General's proposed finding of fact that the DSS file was not in the possession of the prosecution, accordingly, must be rejected as a matter of law.

---

[34] As seen, the Form 4 Order expressed concern about Investigator Cantrell falsely testifying in Family Court that she made the referral to the Child Advocacy Center. That false testimony conveniently concealed the fact that the referral to the Child Advocacy Center was a private referral made in the midst of the custody dispute. Investigator Cantrell's testimony that the DSS file was in the possession of the Solicitor's Office, as contemplated by the statutory scheme, conveniently bolstered the government's investigation. This Court must consider whether Investigator Cantrell's testimony is guided by what is convenient, at the time, in the courtroom where she happens to be testifying.

[35] *Durant* also provides guidance for determining what information is "in the possession of or known to the prosecution." *Durant* involved the prosecution's failure to disclose the criminal history of one of its witnesses. Our Supreme Court, after citing *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980), reminded the bench in bar that it has long recognized, "[I]nformation known to investigative or prosecutorial agencies may, under certain circumstances, be imputable to the State." *Durant*, at 5 (internal quotations omitted) (citing *State v. Von Dohlen*, 322 S.C. 234, 240, 471 S.E.2d 689, 693 (1996), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019)).

Here, both DSS and Investigator Cantrell were acting on the government's behalf. This fact is confirmed by the statutory scheme and the contents of the DSS file. S.C. Code Ann. § 63-11-310 requires child advocacy centers "coordinate a multi-agency response to child maltreatment and assist in the investigation and assessment of child abuse," "establish memoranda of agreement with governmental entities charged with the investigation and prosecution of child abuse," and provides for sharing of information with law enforcement, DSS, and circuit solicitors. The DSS file contains an initial Inter-Agency Staffing Attendance Sheet, dated June 28, 2011, which indicates participation by Investigator Cantrell, two officials from the Greenville Hospital System, and three representatives of the Child Advocacy Center, thereby establishing law enforcement knowledge of the information favorable to the defense resulting from Dr. Henderson's medical exam. Thus, the second and third prongs of a *Brady* violation must be resolved in favor of Mr. Spade.

The fourth prong of a *Brady* violation is whether the information is material to Mr. Spade's guilt, meaning it undermines the outcome of the trial. Despite finding the DSS file the DSS file "add[ed] factual details to what was presented during the PCR hearing," the Form 4 Order finds the DSS file "cumulative to the information already known to counsel." The Attorney General's proposed order, at 63, asks this Court to find, "This Court finds [Mr. Spade] has failed to establish the State was in the possession of the DSS file or that anything in the DSS file would have had material information not already known to counsel." These two findings are not supported by the record. The information contained in the DSS file paints a picture very different from what the prosecution's witnesses presented at trial. The information in the DSS file is probative on the issue of whether the child was coached to make false allegations. The jurors heard the child's mother

testify their "goal" was to resume visitation with Mr. Spade. Tr. 165, lines 21-25.[36] The DSS file refutes this testimony. The DSS file corroborates the PCR testimony of the guardian ad litem (which the jurors also did not hear). Reasonable jurors would have questioned why the child's caregivers would willfully thwart the DSS investigation and court appointed guardian ad litem. Stated another way, showing the jurors that the child's mother and soon-to-be adoptive father did not cooperate with independent DSS investigation creates a reasonable doubt. Mr. Spade and his trial counsel were completely unaware that the Jolleys were not cooperating with DSS. Mr. Spade and his trial counsel were completely unaware of the impeaching and exculpatory information included in Dr. Henderson's report. The jurors did not hear this impeaching and exculpatory evidence that contradicted the prosecution's narrative. Thus, the DSS records were not merely cumulative to the information already known to the defense. As seen, "evidence significantly enhancing the quality of the impeachment evidence usually will" meet the standard for materiality, *Douglas*, 560 F.3d at 1174, and it does so in this case because the prosecution's case turned on the credibility of the witnesses.

Returning the allegations of ineffective assistance of counsel for failing to obtain the DSS file through a court order, Mr. Spade has satisfied both prongs of *Strickland*. DSS produced the file to this Court in response to a court order. The file was available at the time of Mr. Spade's trial. These facts establish deficient performance. The Form 4 Order found the DSS file "add[ed] factual details to what was presented during the PCR hearing." The new evidence undermined the prosecution's narrative and raised questions about why this family would thwart the DSS investigation and the guardian ad litem. As discussed above, Mr. Spade would have been able to

---

[36] *And see* the after discovered email evidence presented at the evidentiary hearing that further confirms the child's mother and her husband had not intent of resuming visitation with Mr. Spade.

use the newly discovered exculpatory and impeachment evidence to create a reasonable doubt in the minds of the jurors.[37]  Mr. Spade, accordingly, established prejudice.

Once this Court views the evidence contained in the DSS file that was not previously consider by the jurors in the manner discussed above, the need to grant post-conviction relief and order a new trial becomes apparent.

### O. Allegation: "Failing to move to exclude the testimony of the child complaining witnesses because her testimony was tainted, unreliable, and inadmissible because of the improper techniques used to obtain the testimony."

Mr. Spade alleges his trial counsel were ineffective for "[f]ailing to move to exclude the testimony of the child complaining witnesses because her testimony was tainted, unreliable, and inadmissible because of the improper techniques used to obtain the testimony."  Third Amended PCR Application, at ¶¶ 10(a)&11(a)(20).  The Form 4 Order does not address this claim.  The Attorney General's proposed order, at 53-54, begins by discussing our state's jurisprudence regarding competency of witnesses to testify, alleges Mr. Spade has not cited any caselaw for excluding unreliable testimony by children, and proposes this Court find, "Applicant has failed to establish the techniques used by Weber and Thompson-Loftis yielded 'tainted, unreliable, and inadmissible' evidence."  Mr. Spade will address each of these statements in reverse order.

First, the Form 4 Order, applying the testimony of Dr. Maggie Bruck and Dr. Michael Lamb to the child advocacy center interviews, found the interview techniques to be suggestive. Dr. Bruck's testimony found Ms. Thompson-Loftis' techniques unreliable.  The Attorney General's proposed order, accordingly, did not follow this Court's instructions to drafted findings of fact consistent with the Form 4 Order.

---

[37] The Form 4 Order, at 9, states, "The [DSS] file also added to issues which the applicant or his witnesses could have faced on cross examination if character became an issue at trial."  Mr. Spade's character was not placed in issue at trial.  More importantly, the new evidence discussed in this section can be presented to jurors without placing Mr. Spade's character in issue.

# Exhibit H

02/20/14 Page 1

Client Name: ▓▓▓▓▓▓▓▓▓ Date: 2/23/12

Accompanied by: Self/Mom   Custody Status: NC

Attendance: __Punctual __Tardy __No Show __Cancellation __Rescheduled

Session Type: __Individual __Family __Group __Parent __Collateral __Follow up __Phone __Case Mgmt

Problem or Emerging Issues: Sexual Abuse of Child

Diagnosis (DSM-IV): 995.53 - AbdChild, PTSD   Code: 9080_6

Medication: NC

New Information: _____ M.D. _____

Progress: __Meeting Goals __Progressing __No Change __Worse __Other

Recent Distress: __School __Parent __Placement __Friends __Therapy __Other

Explanation: _____

**Appearance:** __Clean __Neat __Unkempt
__Age Appropriate __Other

**Thought Content:** __Age Appropriate
__Obsessional __Impaired __Distorted
__Suicidal __Homicidal __Other

**Mood/Feelings:** __Sad __Happy __Angry
__Confused __Hurt __Worried __Depressed
__Other

**Interaction:** __Warm __Friendly __Anxious
__Fearful __Needy __Aggressive
__Avoidant __Irritable __Guarded
__Other

**Affect:** __Appropriate __Depressed
__Blunted/Flat __Muted/Subdued __Labile
__Other

**Speech:** __Age Appropriate __Hyperverbal
__Hypoverbal __Soft __Loud __Other

**Somatic Symptoms:** __Appetite __Sleep
__Energy __Libido (if applicable)
__Aches/Pains __Other

**Motor/Conduct:** __Age Appropriate
__Withdrawn __Aggressive __Defiant
__Angry __Agitated __Tearful __Distracted
__Compulsive __Tense/Constricted
__Hyperactive __Passive/Aggressive
__Other

**Treatment/Play Themes (if Applicable):**
__Exploratory __Relationship __Expressive
__Power/Control __Helplessness __Sexual
__Aggression __Revenge __Safety/Security
__Nurture __Other

**Treatment Goals:** __Rapport __Resolve Trauma __Reduce Acting Out __Increase Compliance
__Reduce Anxiety __Reduce Depression __Clarify Thought Process __Stabilize __Other

**Treatment Interventions:** __TF-CBT __Tx Alliance __Psycho Ed __Relax __Develop Narrative
__Process Narrative __Feeling ID __Rating __Behavior Mod __Safety __Clarification __Play Tx
__Direct Discussion __Gentle Confront __Observation __Feedback __Other

**Parent Counseling:** __Narrative Review __Nurture/Discipline __Support __Behavior Mod
__Parent Coalition __Other

**Treatment Notes:**

_____

_____

_____

_____

_____

Recommendations: _____

_____ 2/23/12
Meredith _____ MA, LPC                         Date

_____

Pretrial Motion / Criminal Trial (2014)    25

1    and filed on February 27th, 2013.  Present in that

2    in-chambers meeting were myself, Amy Goulding, who at the

3    time was the assistant solicitor in charge of the case, as

4    well as Mr. Barnette.  But, in essence, a couple of things

5    relevant to that particular order.

6              Number one, and I'm reading directly from the

7    order, "the State shall not be required to turn over any

8    mental health records of the alleged victim from Meredith

9    Thompson-Loftis at this time.  However, if the State intends

10   to call her as a witness in their case, they must turn over

11   all such records within a reasonable time prior to the trial

12   of this case."

13             My first motion is to exclude any testimony of

14   Meredith Thompson-Loftis.

Defense Counsel [Ken Shabel]

15 (16)         After this order was issued, I did receive on

16   October 31st of 2013 records from ▓▓▓▓▓▓ counseling with

17   Meredith Thompson-Loftis that spanned May 17th, 2011,

18   through February 16th of 2012.  It was not until Thursday

19   morning of last week, February 20th of 2014, that the State

20   turned over records from February 23rd of 2012, through

21   December 30th of 2013.  No records have been turned over

22   since December 30th -- from dates since December 30th of

23   2013.  But, in essence, Your Honor four days before this

24   trial was to begin they handed over the last twenty-two

25   months of counseling records.  I believe that is

1    contradictory to Judge Hayes' ruling.  I don't believe they

2    turned over her records within a reasonable time.

3    Therefore, I would ask that any testimony of Meredith

4    Thompson-Loftis be excluded under the terms of Judge Hayes'

5    order, which were issued and filed with the court on

6    February 27th of 2013.

7              THE COURT:  Solicitor?

8              MS. JORDAN:  Thank you, Your Honor.

9         Your Honor, as to those we do believe that it was

10   in a reasonable amount of time that these records were

11   turned over to the defense.  He makes it sound like it was

12   twenty-two months worth of records, which it is, but when

13   you look at the documents we turned over last Thursday, it

14   was twenty-five pages of counseling notes.  And I -- if I

15   could pass that up to the court so you could see what the

16   page looks like with the amount of writing that's on there.

17   It was five pages that included some writings and then

18   twelve pages that included drawings.

19        Your Honor, he did have access to the majority of

20   or Ms. Loftis' records prior to this.

21        He also had the ability to cross-examine Ms.

22   Loftis in the Family Court trial back in -- correct me if

23   I'm wrong, back in October of 2012.  He's had the

24   opportunity to cross-examine her as to that.

25        ████████ has made no new allegations, as far as the

1   disclosures that came forth.

2          We do not believe it was un-burdensome what we

3   turned over.  We do believe it was a reasonable amount of

4   time.

5          I have what we turned over last Thursday, if the

6   court would like to look at it, because I think it is

7   different when you say twenty-two months worth of records

8   versus seeing the actual quality of what we did turn over to

9   the defense at that point in time.

10         We had requested the things earlier.  We had some

11  issues getting them, as far as the snow and the counselor's

12  schedule, but we did turn it over as soon as we received

13  possession of it last -- we received it by fax last

14  Wednesday night.  Got into the office Thursday morning and

15  turned it over.

16         MR. SHABEL:  The fax was actually sent to y'all on

17  8:06 p.m. on February 19th.

18         MS. JORDAN:  Excuse me.

19         MR. SHABEL:  From Meredith to y'all.  So I'm not

20  saying that you withheld it.  I don't think that you had it

21  before then.

22         MS. JORDAN:  I don't know if there is an issue

23  with her fax, or what, but I remember getting it on

24  Wednesday night, because I remember trying to get it to get

25  it turned over.

28

1        MR. SHABEL:  That is Wednesday.

2        MR. BARNETTE:  Make it Court Exhibit 1 or 2.

3        THE COURT:  Yeah.  He's saying the same thing.

4   You got it -- you got it the day before, that night.

5        MR. SHABEL:  Yeah.

6        MS. JORDAN:  Yes, sir.

7        If I could, I'll show this to him.  I do need to

8   make a copy of this.

9        THE COURT:  Okay.

10       MS. JORDAN:  Once I pass -- actually I have

11  already made my copy.  I apologize.

12       MR. SHABEL:  Judge, we are looking at just not the

13  volume and what's on there, but the legibility of what's on

14  there, and they are asking you to translate her handwriting

15  in four days.

16       (Counseling Records marked as Court's Exhibit No.

17  1 for identification)

18       MR. SHABEL:  Furthermore, Your Honor, just for the

19  record, it does -- you know, the fact that we got it

20  prevents us from being able to have any experts, should we

21  have wanted to have an expert look it.

22       MS. JORDAN:  Judge, just also for the record, no

23  shock in what Meredith Loftis is going to testify about.

24  They have been there and done that in Family Court, as far

25  as having the opportunity to cross-examine her.  I don't

# Exhibit J

Nikki Cantrell - Cross-examination
By Mr. Grose

1  Q    Now, they asked you some questions about the DSS
2  information, right?
3  A    Yes, sir.
4  Q    And when you testified at the hearing in Family Court,
5  you were specific---
6       MS. JAMESON:  Charles, can you tell me what page
7  please?
8       MR. GROSE:  I'm sorry.  Page 347, Line 6.
9       You were specific about there being a referral to DSS
10 and that being Greenville DSS, right?
11 A    Yes, sir.
12 Q    In your report, you made a statement about Danny
13 getting kicked out of Liberty University.
14 A    I believe so.  I believe that's information I obtained
15 from Virginia.
16 Q    And that turned out to be false, didn't it?
17 A    I didn't ever receive --
18 Q    So you're not aware---
19 A    -- that---
20 Q    You don't remember seeing his diploma on the wall when
21 you went to his house in '13?
22      MS. JAMESON:  Objection.  Relevance.
23      THE COURT:  Well---
24      MR. GROSE:  It's just another---
25      THE COURT:  It's cross-examination.  He, he has leeway.

83

Nikki Cantrell - Cross-examination
By Mr. Grose

1      MS. JAMESON:  Thank you, Your Honor.
2  A    No, sir, I don't recall seeing that.
3  Q    Okay.  You, you never followed up to determine whether
4  or not that information you got from Virginia was accurate
5  or not?
6  A    No, sir.
7      MR. GROSE:  That's all I have.  Thank you, Your Honor.
8      THE COURT:  Any redirect limited to what he went into?
9  REDIRECT EXAMINATION
10 BY MS. JAMESON:
11 Q    You were just asked if you ever saw his -- Mr. Spade's
12 diploma when he went to his house.
13     Did, did you go to his house to serve the search
14 warrants?
15 A    I did go to his house with the search warrants, but I
16 didn't stay and execute the search.  I returned back to the
17 police department to interview Daniel Spade.
18     MS. JAMESON:  No further questions, Your Honor.
19     THE COURT:  Thank you, ma'am.  You may step down.
20     State ready to call your next witness?
21     MS. JAMESON:  I believe so, yes.
22     The State would call Sean Campbell.
23     THE COURT:  Sir, just come right up here.  Place your
24 left-hand on the Bible, and raise your right-hand, and let
25 me swear you in.

84

# Exhibit K



# SPARTANBURG COUNTY SHERIFF'S OFFICE
Chuck Wright, SHERIFF

December 13, 2012

In May 2011, I received a phone call from Detective R. Hyatt in reference to Spartanburg County Case 2011040592. She had received information about Danny Spade and his father. She had not verified that information at that time, which she clearly explained to me. She was going to look into it to see if there was any truth to it. Detective Hyatt did look into the allegations. She did not corroborate the allegations that Danny Spade was kicked out of college for an assault. She also did not corroborate the allegations against Rodney Spade. Therefore, those allegations were not used against Danny or Rodney in any court proceedings in South Carolina.

Detective Nicki Cantrell
Spartanburg County Sheriff's Office
(864) 503-4604 desk
(864) 503-4689 fax

Exhibit L

NIKKI CANTRELL-CROSS BY MR. SHABEL

355

1      MR. BRANNON:  The question has to be relevant.  And

2   this is for no other purpose than priming his argument

3   against the Solicitor's Office.

4      MR. SHABEL:  It's, actually, to assist the witness to

5   verify that the documents, actually, exist, or are in the

6   hands of a third party.

7      THE COURT:  Overruled.

8   BY MR. SHABEL:

9   Q   Have you turned over every document relevant to your

10   investigation to the Spartanburg County Solicitor's Office

11   to assist them in the prosecution of Mr. Spade?

12   A   I know they have my police report.  As far as all the

13   other documents go -- because many documents come from

14   other agencies.  For instance, the Children's Advocacy

15   Center, those go directly to the Solicitor's Office.  We

16   have not sat down and met and compared files to make sure

17   they have everything.

18      And, also, I have sent the things I thought they did

19   not have yet to them.  But, again, without us sitting down

20   and comparing files -- because I don't take it over

21   personally.  It goes through the delivery person at the

22   Sheriff's Office.

23   Q   I understand.  But you're confident the Solicitor's

24   Office has the video of the interrogation?

25   A   Correct.  The one at the -- now, there were multiple

Exhibit M

# Exhibit N

Pretrial Motion / Criminal Trial (2014)      25

```
 1    and filed on February 27th, 2013.  Present in that
 2    in-chambers meeting were myself, Amy Goulding, who at the
 3    time was the assistant solicitor in charge of the case, as
 4    well as Mr. Barnette.  But, in essence, a couple of things
 5    relevant to that particular order.
 6            Number one, and I'm reading directly from the
 7    order, "the State shall not be required to turn over any
 8    mental health records of the alleged victim from Meredith
 9    Thompson-Loftis at this time.  However, if the State intends
10    to call her as a witness in their case, they must turn over
11    all such records within a reasonable time prior to the trial
12    of this case."
13            My first motion is to exclude any testimony of
14    Meredith Thompson-Loftis.
```

Defense Counsel | Ken Shabel
```
15            After this order was issued, I did receive on
16    October 31st of 2013 records from ███████ counseling with
17    Meredith Thompson-Loftis that spanned May 17th, 2011,
18    through February 16th of 2012.  It was not until Thursday
19    morning of last week, February 20th of 2014, that the State
20    turned over records from February 23rd of 2012, through
21    December 30th of 2013.  No records have been turned over
22    since December 30th -- from dates since December 30th of
23    2013.  But, in essence, Your Honor four days before this
24    trial was to begin they handed over the last twenty-two
25    months of counseling records.  I believe that is
```

26

1    contradictory to Judge Hayes' ruling.  I don't believe they

2    turned over her records within a reasonable time.

3    Therefore, I would ask that any testimony of Meredith

4    Thompson-Loftis be excluded under the terms of Judge Hayes'

5    order, which were issued and filed with the court on

6    February 27th of 2013.

7              THE COURT:  Solicitor?

8              MS. JORDAN:  Thank you, Your Honor.

9              Your Honor, as to those we do believe that it was

10   in a reasonable amount of time that these records were

11   turned over to the defense.  He makes it sound like it was

12   twenty-two months worth of records, which it is, but when

13   you look at the documents we turned over last Thursday, it

14   was twenty-five pages of counseling notes.  And I -- if I

15   could pass that up to the court so you could see what the

16   page looks like with the amount of writing that's on there.

17   It was five pages that included some writings and then

18   twelve pages that included drawings.

19             Your Honor, he did have access to the majority of

20   or Ms. Loftis' records prior to this.

21             He also had the ability to cross-examine Ms.

22   Loftis in the Family Court trial back in -- correct me if

23   I'm wrong, back in October of 2012.  He's had the

24   opportunity to cross-examine her as to that.

25             ████████ has made no new allegations, as far as the

-36-

27

1    disclosures that came forth.

2            We do not believe it was un-burdensome what we

3    turned over.  We do believe it was a reasonable amount of

4    time.

5            I have what we turned over last Thursday, if the

6    court would like to look at it, because I think it is

7    different when you say twenty-two months worth of records

8    versus seeing the actual quality of what we did turn over to

9    the defense at that point in time.

10           We had requested the things earlier.  We had some

11   issues getting them, as far as the snow and the counselor's

12   schedule, but we did turn it over as soon as we received

13   possession of it last -- we received it by fax last

14   Wednesday night.  Got into the office Thursday morning and

15   turned it over.

16           MR. SHABEL:  The fax was actually sent to y'all on

17   8:06 p.m. on February 19th.

18           MS. JORDAN:  Excuse me.

19           MR. SHABEL:  From Meredith to y'all.  So I'm not

20   saying that you withheld it.  I don't think that you had it

21   before then.

22           MS. JORDAN:  I don't know if there is an issue

23   with her fax, or what, but I remember getting it on

24   Wednesday night, because I remember trying to get it to get

25   it turned over.

28

1          MR. SHABEL:  That is Wednesday.

2          MR. BARNETTE:  Make it Court Exhibit 1 or 2.

3          THE COURT:  Yeah.  He's saying the same thing.

4  You got it -- you got it the day before, that night.

5          MR. SHABEL:  Yeah.

6          MS. JORDAN:  Yes, sir.

7          If I could, I'll show this to him.  I do need to

8  make a copy of this.

9          THE COURT:  Okay.

10         MS. JORDAN:  Once I pass -- actually I have

11  already made my copy.  I apologize.

12         MR. SHABEL:  Judge, we are looking at just not the

13  volume and what's on there, but the legibility of what's on

14  there, and they are asking you to translate her handwriting

15  in four days.

16         (Counseling Records marked as Court's Exhibit No.

17  1 for identification)

18         MR. SHABEL:  Furthermore, Your Honor, just for the

19  record, it does -- you know, the fact that we got it

20  prevents us from being able to have any experts, should we

21  have wanted to have an expert look it.

22         MS. JORDAN:  Judge, just also for the record, no

23  shock in what Meredith Loftis is going to testify about.

24  They have been there and done that in Family Court, as far

25  as having the opportunity to cross-examine her.  I don't

February 1, 2023

Ericka M. Williams
Interim Disciplinary Counsel
P.O. Box 12159
Columbia, SC 29211

**Re: Newly-discovered S.L.E.D Evidence Substantiating**
      **Violation (s) of the RPC/RLDE (Amy Goulding)**

Dear Counsel Williams:

      Let me start by first congratulating you on your recent appointment to Head Counsel. I trust this "interim" label will soon be dropped for permanency. It is a testament to your hard work and passion for maintaining - - and *increasing* - - the integrity of the Bench/Bar in this state. With such an esteemed position comes great responsibility in ensuring investigative propriety - - as they say the "buck now stops with you."

      In this vein, I recently received a long-overdue response from outgoing Counsel Nichols - - apparently an "audit" – related follow-up due to a lack of response by then – Investigator Kelly Arnold and/or Deputy Counsel Markel - - related to new and material evidence substantiating a claim against Attorney Amy Goulding. Given Counsel Nichols was actively on his way out of the office, I have serious and valid doubts that this new evidence was *properly* and *fully* considered by either him or Markel as it substantiates - - beyond a reasonable doubt, let alone clear and convincing - - that she was dishonest in her factual assertions to Circuit Court Judge J. Mark Hayes II [1] about critical discovery at a key Discovery Hearing in early 2013. Where Ms. Goulding, representing the State as an Asst. Solicitor at the "Motion to Compel Discovery" Hearing in February 2013, conveyed as fact to Judge Hayes that **"there was NO forensic report of defendant's computer"** (see "Exhibit A"), the newly-discovered S.L.E.D. records reflect that in truth <u>multiple</u> reports were completed and thus properly turned over to the Solicitor's Office in May 2011, July 2011, and January 2012. Thus, all reports of forensic findings were made known to Ms. Goulding/Solicitor's Office *many months* before the February 2013 hearing where she lied to Judge Hayes and proclaimed there "was no report." [2] (see "Exhibit B").

---

[1] Judge Hayes also <u>*overturned*</u> my criminal conviction last year for **prosecutorial misconduct** (!)

[2] keep in mind that Ms. Goulding/her office had personally conceded to Judge Couch way back in July 2011, at a Bail Hearing, that an ***initial report*** did not support the criminal charges (!) This is how I got released on Bond. This fact alone shows she was very aware that she was being less-than-truthful to Judge Hayes at the 2013 Discovery hearing.

It's been said that dishonesty by an Officer of the Court - - especially where evidentiary suppression can have tragic consequences as occurred *here* - - is an affront to the integrity of our system of justice and cannot be countenanced. Our Supreme Court Justices have continually - - and recently - - warned solicitors of this kind of horribly damaging - - damaging to the *fair* administration of justice - - conduct and their growing willingness to start <u>directly</u> reporting it to the ODC. Thus, this is a matter of escalated importance and needing proper/through investigation and complete accountability. A simple investigative question - - a single phone call or e-mail - - broached to the computer forensic examiner, Mr. Marquez of the Prince William County (VA) Police Department, requesting the dates he and/or his office sent the reports to the Solicitor's Office in Spartanburg would be determinative of Ms. Goulding's conveyed falsity to Judge Hayes (on a critical *exculpatory* piece of evidence). It appears neither Arnold nor Markel even pursued this basic (but determinative) investigative step (?) For the maintenance of the integrity of this Honorable Counsel, I hope/trust you don't allow this to stand.

Given the above, if you deny this request for further investigation or somehow deem this not to be sufficient evidence of a potential violation of multiple ethical/professional Rules, you will never hear from me again regarding this matter. However, in my humble opinion – and from someone who has been legally – proven to have been *Wrongfully Convicted* due to the **intentional** misconduct of this very team of Solicitors - - this behavior is so damaging to the sacred truth-seeking process that I am honestly considering a novel extraordinary writ to the Supreme Court Justices just to place on display the *level* of prosecutor-bred misconduct in my case. One that rivals, if not overcomes, the improprieties in both the 'Quattlebaum' and 'Elmore' cases. Having said this, given my respect for you and your integrity, as well as your new leadership over the operations of the ODC, I wanted to first give you the opportunity to fix this and properly adjudicate this matter on its merits.

Thank you for your time and consideration of this matter directly reflecting upon the proper and thorough investigation of submitted evidence and accountability for those who flout the ethical requirements of their office.

**P.S.** The Discovery-related manipulation discussed here by Amy Goulding further <u>bolsters</u> and <u>supports</u> the additional *three*, separate Discovery lapses documented in the Jennifer Jordan and Kimberly Lesknic matters currently being investigated by Asst. Counsel Silverberg (!) This amounts to **four** separate Discovery-related issues by these Asst. Solicitors assigned to my case - - in effect *dwarfing* the single Discovery lapse the High Court so severely sanctioned in 'Humphries.'

Respectfully Submitted,


Daniel W. Spade, CP


cc:      File

Exhibit E

PCR: Findings of Honorable J.
Mark Hayes II

meetings/sessions should begin with the goal of long term association of the applicant with the child. These sessions were to involve all members of the family, including the applicant. Significant to this new evidence was the testimony of the child's family court guardian ad litem (GAL). Part of the GAL's testimony included that she was closed off from the minor by the mom and soon-to-be adoptive father. This Court easily concluded the GAL felt strong hostility from the mom and soon-to-be adoptive father. Their conduct and attitude towards the GAL materially interfered with her work as the GAL for the minor. This new evidence and the timing/link to the family court issues was further supported by the information revealed post-PCR hearing from the DSS file.

This Court was troubled that the legal history of this case includes private parties being encouraged to be uncooperative and thereby frustrate the work of the DSS and a family court GAL. This Court was also troubled that law enforcement made inconsistent factual statements to different courts.

Again, the forensic interviews were material to the PCR. PCR counsel was successful at discrediting the forensic interviews in this case. As part of the review process, the interviews were viewed by this Court. Certain sections of the video interviews were reviewed several times. The PCR hearing testimony of the Applicant's two expert witnesses and the testimony of the forensic interviewer were all considered. The audio recording of the PCR testimony was also reviewed by this Court post-PCR hearing.

The expert witnesses called by applicants have the highest credentials in their areas of expertise. They both can be considered experts of the highest esteemed. Also they both appeared credible on the witness stand. Together, they explained what are the "best-practices" for obtaining information from a child during a forensic interview. They both explained how the forensic interviews in this case deviated from their "best-practices". They were also critical of the prior sworn testimony of the forensic interviewer when that testimony was compared to what is reflected in the video interviews.

The forensic interviewer also testified during the PCR hearing. She strongly defended the techniques she used with the child in this case. While she acknowledged the expertise of the applicant's two expert witnesses and did not discredit their methodology, she advocated for her methodology and defended its application in this matter.

In reaching the conclusion that applicant PCR counsel was successful in discrediting the video interviews, this Court notes, again, that no witness challenged the credentials of the applicant's experts nor the validity of their methodology. Based on the information presented to this Court, these two witnesses presented the highest levels of expertise in their respective fields. They appeared extremely credible during the hearing. After viewing the videos and applying the standards offered by these experts, this Court agrees with their assessment that the forensic interviews were suggestive.

All three witnesses (Applicant's two experts and the forensic interviewer) felt the videos should have been played to the jury. Each felt that if videos had been played to the jury, the publication to the jury would have supported their respective positions. All three encouraged this Court to view the videos. As stated, this Court did so extensively.

Exhibit F




Rule 5/ Brady
Disclosure

**ALAN WILSON**
ATTORNEY GENERAL

July 10, 2018

The Honorable M. Hope Blackley
Spartanburg County Clerk of Court
Post Office Box 3483
Spartanburg, South Carolina 29304-3483

> *Re:*  **Daniel Spade, #358974 v. State of South Carolina**
> **2017-CP-42-2372**

Dear Ms. Blackley:

Enclosed please find the original **Response and Affidavit of Service of Discovery Material Pursuant to Court's Order** in the above-captioned case for filing in your office.

Sincerely,

Megan Harrigan Jameson
Senior Assistant Deputy Attorney General

MHJ/lm
Enclosure

cc:  E. Charles Grose, Jr., Esquire

STATE OF SOUTH CAROLINA
COUNTY OF SPARTANBURG

Daniel Spade, SCDC #358974,

                    Applicant,

v.

State of South Carolina,

                    Respondent.

IN THE COURT OF COMMON PLEAS
FOR THE SEVENTH JUDICIAL CIRCUIT

Case No. 2017-CP-42-2372

**RESPONSE AND AFFIDAVIT OF
SERVICE OF DISCOVERY MATERIAL
PURSUANT TO COURT'S ORDER**

By order filed February 8, 2018, the court ordered a review by the counsel of record from Attorney General's Office, the Circuit Solicitor, and Special Prosecutor Brannon of "all relevant files relating to this matter for the purpose of determination as to whether all information which was subject to discovery during the criminal process pursuant to the South Carolina Rules of Criminal Procedure, Brady v. Maryland, and any other applicable rule or case law, has been previously provided to the applicant's trial counsel and, if not, then such shall be provided to applicant's post-conviction relief counsel."

A review of these files pursuant to the court order was conducted by Senior Assistant Deputy Attorney General Megan Harrigan Jameson, Seventh Circuit Solicitor Barry Barnette, and Special Prosecutor Brannon. After a review of these files, the following email is being produced in response:

-Email dated April 23, 2012 from Andrea Moore to Doug Brannon and Libby Ridings. As evidence below by the signature of counsel for Respondent and notarization, this email, attached hereto, was served on counsel for Applicant, E. Charles Grose, Jr.

                                        Megan Harrigan Jameson
                                        Senior Assistant Deputy Attorney General

Sworn to before me this 10 day of July, 2018.

Notary Public for South Carolina
My Commission Expires: 10/1/2025

1 of 1



# Jolley update

**Andrea Moore** <andreaamoore@gmail.com>              Mon, Apr 23, 2012 at 10:48 AM
To: Doug Brannon <doug.tblaw@gmail.com>, Libby Ridings <libby.tblaw@gmail.com>

Kim R's depo went very well.  Mostly very positive for our case, with the only negative being the unfortunate timing of Peyton's disclosure just 3 days after Kim talked to Heather about doing a co-parenting session with Danny Spade.  I ordered a copy of the transcript.

Ken is going to draft a consent protective order for Kim's file, with no dissemination, even to clients, other than in a court proceeding.  He is also going to send us an informal discovery request for some audio tapes our clients made of Peyton and Spade on the phone right before all this broke.  I'll get that to him right away so there will be no argument that discovery should delay setting the trial.

Talk to you soon.

--
Andrea A. Moore
Children First Legal Services, LLC
*mailing address:*
PO Box 324
Fairforest, SC  29336
*physical address:*
503 W. 2nd Street
Spartanburg, SC  29301
office: (864) 576-1920
cell: (864) 237-5790
fax: (864) 752-1015
www.childrenfirstlegal.com
childrenfirstlegal@gmail.com



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF SPARTANBURG | ) | |
| | ) | |
| | ) | 2017-CP-42-2372 |
| | ) | |
| DANIEL SPADE, #358974, | ) | |
| | ) | |
| Applicant, | ) | |
| | ) | |
| vs | ) | AFFIDAVIT OF SERVICE BY MAIL |
| | ) | |
| STATE OF SOUTH CAROLINA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

1.     I am an employee of the Respondent in the above-captioned action.

2.     Regular communication by mail exists throughout the State of South Carolina and that this is a proper circumstance of service by mail.

3.     I have this day served a copy of the **Response and Affidavit of Service of Discovery Material Pursuant to Court's Order** in the above-captioned matter on the following person by depositing same in the United States mail, postage prepaid:

> **E. Charles Grose, Jr., Esquire**
> **Grose Law Firm**
> **404 Main Street**
> **Greenwood, South Carolina 29646**

DATED this the 10th day of July, 2018.

Lindsey McCoy, Legal Assistant
For Respondent

Exhibit G

August 20, 2020

Chief Mark A. Keel
S.C. Law Enforcement Division
P.O. Box 21398
Columbia, SC 29221

**Re: Request for Investigation into Multiple Instances of Misconduct by Officer Nicole "Nikki" Cantrell**

Dear Chief Keel:

May this serve as a formal request that an investigation be initiated into numerous instances of potential Misconduct by the above officer as defined and delineated in Title 23 Section 23-23-150.

The conduct is related to then-Spartanburg Detective Cantrell's lead investigative role in the criminal case against a client of mine- Daniel W. Spade. Each individual incident is detailed herein with supporting documentation. Taken collectively, I am confident the evidence will show this officer is culpable of the following:

- -Abused position of authority
- -Willfully tarnished the sanctity of the Courts
- -Knowingly compromised the truth-seeking process so critical to insuring both equity and justice is upheld.
- -Betrayed the integrity of her office and the public's trust in it.
- -Displayed a disturbing <u>pattern</u> of gross indifference to her ethical, professional, and legal obligations.

Given the present national uproar directly related to officer abuse of power and the fact that Officer Cantrell is presently employed with your agency, I would request that a separate and independent agency be appointed to conduct the investigation. [1] This would avoid any *appearance* of impropriety/preferential treatment and insure full transparency and accountability.

Lastly, the sheer number of substantiated instances of Misconduct by this officer- all perpetuated as Lead Investigator in this single case- should raise serious concerns/questions as to her conduct in other cases in which she was involved.

---

[1] It should be noted that in 2015 and 2016 members of Mr. Spade's family contacted the Spartanburg Sheriff's Department on *multiple* occasions requesting an Internal Affairs investigation into Cantrell's conduct in the case and each time the Dept. **refused** to even hear evidence or make a referral to S.L.E.D. to do so.

Thank you in advance for your prompt attention to this serious matter.

Respectfully Submitted,

E. Charles Grose

Attorney at Law

*"The public holds law enforcement to a high standard and so do I. Police officers are trusted with great power and responsibility to do what is right and to be the wedge between right and wrong. That trust is tarnished when officers are unprofessional...I will not tolerate {it}."*
*Port Barre (LA) Police Chief Don Boudreaux*

Cc: File

### Incident #1

Within then- Spartanburg Detective Cantrell's Investigative Report (2011) in the case against Mr. Spade, she made statements asserting that it had been discovered that Mr. Spade had been kicked out of Liberty University for criminal Assault. (see portion of Investigative Report labeled "Exhibit A") Given she had arrested and charged him with a form of assault (CSC), this information gave the appearance of a propensity and history of assault to numerous prosecutorial/judicial officers. However, this harmful information- conveyed as factual in the report- was in actuality **completely false**. [2] Detective Cantrell acknowledged this for the first time almost a decade after publishing her report at Mr. Spade's PCR hearing in May of 2019. (see transcript of testimony labeled "Exhibit B.")

Despite being made aware of the falsity of the damaging information- via a Detective in Virginia- just a month or two after her initial report, at no time during the next three years leading up to Mr. Spade's criminal trial in 2014 did Cantrell correct/supplement her initial report to accurately and transparently reflect the truth regarding this damaging assertion. Such willful refusal to correct a false/inaccurate criminal assertion of fact can itself be considered a form of both Perjury and Libel. Moreover, the conduct is a clear violation of the high ethical standards required of an Officer of the Law.

**Potential Statutory /Policy Violation(s):**    Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**    Section 16-9-10 (A) (2)
                                            Misconduct in Office (Common Law)

---

[2] Mr.Spade actually graduated from Liberty University with a Bachelor's degree in Business.

## Incident #2

At both Mr. Spade's 1st and 2nd Bond Hearings in Spartanburg General Sessions Court, (in May and June 2011, respectively), Det. Cantrell asserted to the Asst. Solicitor and in turn the Honorable Roger Couch that she was still waiting on the computer forensic report of Mr. Spade's laptop/cell phone from Virginia authorities. It wasn't until the 3rd Bond hearing in mid-July that Cantrell disclosed to the Court that they had finally received the report. As it was exculpatory, Judge Couch released Mr. Spade on bond. Roughly three years later at Mr. Spade's criminal trial, it became known- as discovered and asserted by the Honorable R. Keith Kelly- that Cantrell had actually received the exculpatory initial report in *late May* of 2011. *(see transcript of Judge Kelly's finding labeled "Exhibit C".)*

This finding proved that Cantrell had given false/misleading information- either directly or indirectly- to Circuit Court Judge Couch for the sole purpose of unjustly keeping Mr. Spade incarcerated for almost ***two months*** longer than should have been allowed. This amounts to a form of Officer-initiated and willful unjust imprisonment. Her behavior here violates almost every element of ethical and professional codes of conduct – *truth, fairness, integrity, candor toward a tribunal, etc*. Mr. Spade was left to suffer 30-60 days of unjust and improper extended confinement- forced to live in a small cell with three other grown men and relegated to it for 23 hours a day.

**Corroborating Witness(es):**     Spartanburg Attorney Kenneth Shabel (o: 864-707-2020)
Reverend Rodney Spade (H: 301-866-0859)

**Potential Statutory/Policy Violation(s):**     Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**     Section 16-9-10 (A) (1)
Section 16-9-10 (C)
(procured/persuaded the Asst. Solicitor to testify falsely at Bond Hearings.)
Misconduct in Office (Common Law)
Obstruction of Justice

## Incident #3

The next incident displaying Cantrell's blatant disregard for her oath of office and duties as an Officer of justice occurred at the Family Court TPR Trial in September 2012. Cantrell gave sworn testimony to the Honorable James F. Fraley that the latest computer forensic report in fact revealed/supported her assertion that Mr. Spade had deleted purportedly inculpatory pictures of sexual abuse with his daughter off of his computer. (*see testimony labeled "Exhibit D"*) Detective Cantrell was keenly aware that this extremely damaging information could not be rebutted or even challenged by Mr. Spade during the trial as a copy of the forensic report had not been turned over to his defense counsel through the criminal discovery process. Due in large part to her damaging testimony, Mr. Spade forever lost the parental rights to his daughter- by Order of Judge Fraley – soon after the above trial.

Almost two years later at Mr. Spade's Criminal Trial, the Asst. Solicitor conceded- when confronted with Det. Cantrell's sworn testimony at the TPR trial- that in actuality the computer forensic technician's report **DID NOT** support the assertion that any pictures had been deleted/wiped! (*see transcript labeled "Exhibit E"*)

Such a blatant example of Perjury by an Officer of the Law- sworn to uphold the truth and justice- shows a gross indifference to the sanctity of the Court and her professional obligations.

**Corroborating Witness(es):** Spartanburg Attorney Kenneth Shabel
Spartanburg Attorney Alexandria Wolf (then-GAL)

**Potential Statutory/Policy Violation(s):**      Title 23 Section 23-23-150
**Potential Criminal Code Violation(s)**      Section 16-9-10 (A) (1)
Section 16-9-30
Misconduct in Office (Common Law)

## Incident #4

A second and separate instance of false testimony given while under oath occurred at the Family Court Trial in 2012. Detective Cantrell testified as fact- critical to the background of the criminal accusations against Mr. Spade- that **she** made the referral to the Children's Advocacy Center for the initial forensic interviews of the child to be conducted. This assertion to the Court bolstered the State's case against Mr. Spade in the eyes of the Family Court Judge. *(see testimony labeled "Exhibit F")*

During the Criminal Trial in 2014, Det. Cantrell then testified that she **didn't** make the referral to the CAC and "now I am telling the truth." *(see testimony of Cantrell from Criminal Trial labeled "Exhibit G".)* As Det. Cantrell was the Lead Investigator on Mr. Spade's higher profile, out-of-state arrest case, it goes without saying that she was very aware at the 2012 trial whether or not she referred the child to the CAC.

Recently, the Honorable J. Mark Hayes legitimized the above witness testimony was blatantly false and voiced his concern in being "troubled" over Cantrell's conduct. *(see Hayes' PCR- related findings labeled "Exhibit H")*

| | |
|---|---|
| **Potential Statutory/Policy Violation(s):** | Title 23 Section 23-23-150 |
| **Potential Criminal Code Violation(s):** | Section 16-9-10 (A) (1) |
| | Section 16-9-30 |
| | Misconduct in Office (Common Law) |

## Incident #5

A *third* and separate instance of false/misleading testimony given while under oath occurred at Mr. Spade's PCR evidentiary hearing held in May 2019. At the TPR Trial in 2012, Det. Cantrell had testified as fact that she had obtained a copy of the DSS investigation records and had "turned them over to the Solicitor's office." (*see transcript of TPR testimony labeled "Exhibit I"*) These key records were never turned over to Mr. Spade and will be discussed in more detail in "Incident #6."

SLED Officer Cantrell testified at Mr. Spade's PCR Hearing in May 2019- again while under oath – to a complete opposite set of facts. At the PCR hearing, she testified to the Honorable J. Mark Hayes that she never had a copy of the DSS records and thus never turned them over to the Solicitor's Office. (*see transcript of PCR testimony labeled "Exhibit J"*) In his findings, Judge Hayes again voiced his concern with the mounting instances of false and contradictory testimony at the hands of Officer Cantrell amidst critical court hearings/trials. *(see Exhibit J )*

Here you now have *multiple* instances of false testimony given by this officer of the Law while sworn to the truth. It is such egregious conduct that breeds public mistrust in Law Enforcement. Clearly, Officer Cantrell believed/believes that because she wears a badge she is "above the law" and can perjure herself in this State's Courts with impunity.

**Corroborating Witness(es):**          Honorable J. Mark Hayes (PCR Judge)
                                        Attorney E. Charles Grose (PCR Counsel)
                                        Attorney Kenneth Shabel (Family Court Counsel)

**Potential/Statutory/Policy Violation(s):**     Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**        Section 16-9-10 (A) (1)
                                                 Section 16-9-30
                                                 Misconduct in Office (Common Law)

## Incident #6

The knowing suppression of evidence favorable to a criminal defendant- by an Officer of the Law- is universally recognized as on of the most egregious forms of misconduct. Such actions completely destroy the *fair* administration of justice and can result in tragic consequences. When an Officer of the Law is involved, the rogue action or inaction of the Officer tarnishes the integrity of the <u>entire</u> department/division in the eyes of the public.

As detailed in *"Incident #5"*, it without dispute that Cantrell gave two completely opposite statements of fact to two separate Courts regarding her possession of the DSS records/file. It is also indisputable that the key records were never turned over to Mr. Spade prior to trial as were required by Rule 5 Discovery obligations. Cantrell was ethically and professionally obligated to ensure the evidence was in fact turned over to the Solicitor's Office.[3] Failure to do so amounts to obstruction of justice.

Her willful decision to then thwart the truth-seeking process by giving two different assertions of fact to two different Judge's further cements her gross indifference to the sanctity of the Courts, her ethical responsibilities, and her professional obligations.

**Corroborating Witness(es):**       Honorable J. Mark Hayes
                                     Attorney E. Charles Grose
                                     Attorney Kenneth Shabel

**Potential Statutory/Policy Violation(s):**    Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**       Misconduct in Office (Common Law)
                                                Obstruction of Justice

---

[3] It became known after Mr. Spade's PCR hearing in 2019 upon the Honorable J. Mark Hayes' Order to obtain the DSS file- that it was Det. Cantrell who actually made the initial referral to DSS.

### Incident #7

A citizen of this State will be charged with Obstruction of Justice when they willfully attempt to thwart the efforts of Officers involved in a criminal investigation. Thus, it should also be a form of obstruction when an Officer of the Law instructs a private party to not cooperate and outright *stifle* the efforts of a court-appointed Quasi-judicial Officer (**Guardian ad Litem**) and a State agency. (**DSS**)

At Mr. Spade's PCR hearing in 2019, the Honorable J. Mark Hayes legitimized that Det. Cantrell was likely involved in telling the accusers (Jolley's) to *not cooperate* with the GAL Alex Wolf's attempts to speak with and meet with her client- the child accuser. Additionally, the Jolley's were similarly instructed to *not cooperate* with the independent DSS investigation which ultimately and prematurely ended their efforts. Attorney Kenneth Shabel echoed the same disturbing finding. (see portions of PCR testimony/findings ███████████")

**Corroborating Witness(es):**          Attorney Kenneth Shabel
                                        Asst. Solicitor Jennifer Jordan
                                        Asst. Solicitor Kimberly Leskanic


**Potential Statutory/Policy Violation(s):**   Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**      Obstruction of Justice
                                               Misconduct in Office

## **Incident #8**

As discussed previously, nothing is more devastating to our system of justice than defiling the truth-seeking process with the use of false or Perjured testimony.  When it is committed by an Officer of the Law, or an Officer of the Law allows a *false factual assertion* to stand without correcting is falsity, and he/she does so under oath in a critical hearing-the public's trust and the integrity of law enforcement is betrayed.

At Mr. Spades PCR hearing in 2019, when AG Jameson questioned Cantrell whether Mr. Spade in fact also had sexual abuse charges in Virginia, Cantrell affirmatively responded "Yes," (See Exhibit K).  Cantrell *knew* that Mr. Spade **had never** been charged with any abuse-related criminal ~~related~~ charges in Virginia.  To the contrary, Cantrell has personal investigative knowledge that even the initial DSS investigation in Virginia had been concluded as "UNFOUNDED."  As seen, giving misleading and outright false testimony in this state's sacred courts was/is seemingly second nature to this detective-her ethical and professional duties be damned.


**Corroborating Witness(es):**          Attorney E. Charles Grose
——————————Honorable J. Mark Hayes II


**Potential Statutory/Policy Violation(s):**      Title 23 Section 23-23-150
**Potential Criminal Code Violation(s):**      Obstruction of Justice
                                                                       Misconduct in Office



**South Carolina
Law Enforcement Division**

P.O. Box 21398
Columbia, South Carolina
29221-1398

*Henry D. McMaster, Governor
Mark A. Keel, Chief*

*Tel: (803) 737-9000*

February 18, 2021

E. Charles Grose, Jr., Esq.
404 Main Street
Greenwood, SC  29646

   RE:  OPR File #: CC-21-0001

Dear Mr. Grose:

The investigation has been completed regarding the information you provided the South Carolina Law Enforcement Division (SLED) on December 31, 2020.

SLED is committed to providing law enforcement services that are fair, effective, and impartially applied to all.  In that regard, SLED concluded this investigation has taken the appropriate action.

Due to the confidentiality of administrative investigations regarding personnel matters and requirements relating to employee rights of privacy, SLED will not divulge the findings of any investigation involving an employee nor any actions taken by SLED as a result of an investigation without legal authority or process.

Thank you for your interest in helping SLED serve the public's best interest.

Sincerely,

Wayne A. Mitchell
Office of Professional Responsibility
South Carolina Law Enforcement Division

*CALEA*  *An Accredited Law Enforcement Agency*  

Exhibit H

March 16, 2022

Megan Harrigan Jameson
Office of the Attorney General
Box 11549
Columbia, SC. 29211

Re: Notification of *Additional* Newly-discovered Evidence & Formal Request for Criminal Charges/Equal Accountability under the Law

Dear Ms. Jameson:

I hope this letter and accompanying submission finds you well. Though my post-conviction phase has been finally and fully adjudicated--at least in its county jurisdiction--I thought it prudent to bring this recent finding to your prompt attention.[1] At the PCR hearing, you vehemently argued for the credibility and professionalism of the Lead Detective in my case, Nicole Cantrell. Moreover, where confronted with *multiple* instances of contradictive testimony amidst key trials, you argued to the Honorable J. Mark Hayes II that Ms. Cantrell was either simply confused or mistaken.[2] In this vein, you may find this latest discovery *specifically pertaining to her sworn testimony at the PCR* of great interest to your stance-- additional misconduct at the hands of Cantrell that runs completely counter to truth, professionalism, and any semblance of credibility she may have left.

At our PCR hearing, Cantrell testified to Judge Hayes and Mr. Grose that she had never "heard" or received "any" investigative findings from Virginia regarding the factual assertion within her Investigative Report that I had in, fact, expelled from Liberty University due to a ***prior criminal assault***. (*see* PCR Transcript of Testimony labeled "Exhibit A"). As she had arrested/charged me with a form of assault, this assertion gave prosecutors/Judges/grand jury the *false* impression that I had a history or proclivity to violent assaults.

As you are also aware via the copy Mr. Grose sent to the Court a few months ago, S.L.E.D. investigated former Officer Cantrell last year for *numerous* instances of "Misconduct" in Office as delineated in Code 23-23-150. Mr. Grose and I eventually gained access to those investigative records. Just recently I finished a close dissection of the content. As part of the S.L.E.D. investigation, Ms. Cantrell's criminal files on my case had been promptly retrieved and reviewed by the S.L.E.D. investigator, sitting within her file was the attached memo. (*see* "Exhibit B").

---

[1] Attorney Grose has been slammed in back-to-back criminal trials.

[2] As it specifically pertains to the obligatory duties in ensuring that the D.S.S. records were turned over, these assertions of mistake or inadvertence were seemingly adopted by Judge Hayes even though Cantrell initiated the investigation with D.S.S., met with them in at least one multi-disciplinary meeting, and clearly had shared access to their D.S.S. records on the case. He imputed no level of impropriety to her regarding how the D.S.S. records never got turned over to my defense and "mysteriously" disappeared.

Clearly, not only did Ms. Cantrell give false testimony amidst key hearings/trials <u>prior</u> to the [truth]-seeking PCR Hearing (*see* findings of Judge Hayes), it is now incontrovertible that she then blatantly *lied* to the Honorable Court *at* the PCR(!) This finding begs the question; with over *5* Spartanburg solicitors assigned and/or involved in my prosecution over the three years leading up to my criminal trial (to include two Assistant Solicitors and the Head Solicitor at my trial), how is this impeaching/exculpatory evidence-- going directly to the professionalism and credibility of Cantrell's investigation--<u>still</u> sitting "undiscovered" by 5 solicitors **10 YEARS** after its placement into her file.(?) [3]

Frustratingly, it goes without saying that if Judge Hayes -- again, by duty of the *State*-- would have been made privy to this latest act of brazen deception/manipulation of pertinent Rule 5 and/or 'Brady' material, his finding exculpating Cantrell as to her role in the convenient "disappearance" of the D.S.S. records may have altered his conclusion on that important facet of my PCR case. The only solace I take in this *latest* sad example of willful and taintive misconduct within our sacred courts--and seemingly at all levels of this prosecutorial machine--is that one day soon Spartanburg-bred Chief Justice Beatty and the Supreme Court of this State will have it *all* placed before them.[4]

In closing, though she clearly believed herself to be, Ms. Cantrell was not above the law. She should be held to the same criminal code of conduct as every other citizen in this State. Especially when a man, who has professed his complete innocence of these false allegations from the very beginning, was unjustly sent to prison for the better part of a *decade* as a result of it. Your Office has an ethical and professional obligation to ensure equal accountability under the law. [5] I ask that your office bring formal criminal charges against this former rogue Officer of the Law in the near future. As the victim of her multiple instances of **Perjury** and **Obstruction of Justice,** I will await your/your Offices' response on this front.

---

[3] suppression and/or denial of <u>more</u> key evidence which was important, under the Constitution, to the full and fair preparation of my defense.

[4] as conveyed in the recent oral argument of *State V. Makins,* the High Court has become so frustrated with cases of repeated prosecutorial misconduct within criminal trials--specifically referencing acts of *improper bolstering* --that they will apparently begin directly reporting solicitors to the Office of Disciplinary Counsel for sanctioning. (Justice Few asserting).

[5] If former Representative Jim Harrison can be charged by this Office and ultimately sentenced for acts of *Perjury*, surely a former Spartanburg County Detective who made a brazen habit of tarnishing the sanctity of its' Courts, should be held similarly accountable.

Thank you for your attention to these serious matters of Justice. Respectfully submitted.

_____

Daniel W. Spade, CP

-Wrongfully Convicted Innocent

cc: Honorable J. Mark Hayes II

cc: Attorney E. Charles Grose

file

# EXHIBIT A

Nikki Cantrell - Cross-examination
By Mr. Grose

1  Q    Now, they asked you some questions about the DSS
2  information, right?
3  A    Yes, sir.
4  Q    And when you testified at the hearing in Family Court,
5  you were specific---
6      MS. JAMESON:  Charles, can you tell me what page
7  please?
8      MR. GROSE:  I'm sorry.  Page 347, Line 6.
9      You were specific about there being a referral to DSS
10 and that being Greenville DSS, right?
11 A    Yes, sir.
12 Q    In your report, you made a statement about Danny
13 getting kicked out of Liberty University.
14 A    I believe so.  I believe that's information I obtained
15 from Virginia.
16 Q    And that turned out to be false, didn't it?
17 A    I didn't ever receive --
18 Q    So you're not aware---
19 A    -- that---
20 Q    You don't remember seeing his diploma on the wall when
21 you went to his house in '13?
22     MS. JAMESON:  Objection.  Relevance.
23     THE COURT:  Well---
24     MR. GROSE:  It's just another---
25     THE COURT:  It's cross-examination.  He, he has leeway.

83

Nikki Cantrell - Cross-examination
By Mr. Grose

1       MS. JAMESON:  Thank you, Your Honor.
2  A    No, sir, I don't recall seeing that.
3  Q    Okay.  You, you never followed up to determine whether
4  or not that information you got from Virginia was accurate
5  or not?
6  A    No, sir.
7       MR. GROSE:  That's all I have.  Thank you, Your Honor.
8       THE COURT:  Any redirect limited to what he went into?
9  REDIRECT EXAMINATION
10 BY MS. JAMESON:
11 Q    You were just asked if you ever saw his -- Mr. Spade's
12 diploma when he went to his house.
13      Did, did you go to his house to serve the search
14 warrants?
15 A    I did go to his house with the search warrants, but I
16 didn't stay and execute the search.  I returned back to the
17 police department to interview Daniel Spade.
18      MS. JAMESON:  No further questions, Your Honor.
19      THE COURT:  Thank you, ma'am.  You may step down.
20      State ready to call your next witness?
21      MS. JAMESON:  I believe so, yes.
22      The State would call Sean Campbell.
23      THE COURT:  Sir, just come right up here.  Place your
24 left-hand on the Bible, and raise your right-hand, and let
25 me swear you in.

84

# EXHIBIT B



**SPARTANBURG COUNTY SHERIFF'S OFFICE**
Chuck Wright, SHERIFF

December 13, 2012

In May 2011, I received a phone call from Detective R. Hyatt in reference to Spartanburg County Case 2011040592. She had received information about Danny Spade and his father. She had not verified that information at that time, which she clearly explained to me. She was going to look into it to see if there was any truth to it. Detective Hyatt did look into the allegations. She did not corroborate the allegations that Danny Spade was kicked out of college for an assault. She also did not corroborate the allegations against Rodney Spade. Therefore, those allegations were not used against Danny or Rodney in any court proceedings in South Carolina.

Detective Nicki Cantrell
Spartanburg County Sheriff's Office
(864) 503-4604  desk
 (864) 503-4689  fax

Exhibit I

Again, you should have my letter and a copy of the court stuff we have very soon. If you think of anything further you might need or that would be helpful, don't hesitate to ask

Sincerely,

Heather

On Fri, Nov 19, 2010 at 7:14 PM, Cara Lintner <caralintner@yahoo.com> wrote:
Heather and David,
    Thanks so much again for helping me out! I will be staying at this adress:
8654 Maple Glen Court
Springfield Va 22153
If you need anything let me know.........

Thanks,
  Cara

**From:** Princess Peyton <pink.princess.please@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Thu, November 18, 2010 8:41:21 PM
**Subject:** Re: Heather's Contact Info

Cara,

I thought I would email you instead of bombard you with more calls. However, Andrea let us know that you were able to get the restraining order and custody of the kids!! At least, that is what I understood her to say. I am still praying like crazy for you guys and only want the best for you.

Also, I wanted to say that I truly feel like you were sent to us as Pey's Guardian Angel as not many people would reach out and do what you have done for us. You have such a sweet heart and I know you only want to see the right actions taken here to protect everyone. That being said, I am here to do the same for you. I have asked Andrea if there is anything she can think of that we have come across in our proceedings that might help you. Hopefully I will have more information to share with you over the weekend if not the first of next week.

Do you know when you will meet w/ your lawyer again? Please keep me posted on how you all are doing and I will keep sending hugs and prayers your way

Sincerely,

Heather

Print                                                                    Page 3 of 6

I will be getting mail untill the 30 of his and mine. I will open up everything and let u know

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 19:14:55 -0500
**To:** <caralintner@yahoo.com>; Heather Jolley<heathersmithjolley@gmail.com>
**Subject:** Re: Heather's Contact Info

Cara,
I am researching things now.  I will give you everything we find.  Also - just a thought.  Danny is restricted from going to the house you have with him.  I wonder if any of his boxes have been shipped there to see if possible he is getting large shipments of steriod.  Wondering if maybe that is where the extra money may be coming from...

*trying to place me in criminal activity that didn't exist (!)*

On Mon, Nov 22, 2010 at 2:56 PM, <caralintner@yahoo.com> wrote:
I wish I knew what things cost but he's always hid sooo much from me. He just got the suv in oct and I wanna say the mustang was this past may. Bought on ebay. I think maybe 30 thousand. I'm just not positive money wise:(

Sent from my Verizon Wireless BlackBerry

**From:** Princess Peyton <pink.princess.please@gmail.com>
**Date:** Mon, 22 Nov 2010 13:16:08 -0500
**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

Hey girl,

How is everyone? I have continued to pray for you all and just know that the best is going to come out of all this craziness!! You will be getting a box from us very soon with all the info that we have promised you. If you need anything immediately, please let me know.

I do have another favor to ask of you per Ruth, my other lawyer. She needs to know (if you know) what cars Danny now has in his possesion, when they may have been bought, i.e. in the last year, what county the taxes would be in, and does he still own property in Florida, other cities, etc.? The reason we need to know is to have a proof of assets in his name to this point. I know a lot of that has changed since we first looked into this, but if you can supply us w/ any of that, it would be grealty helpful.

I wish I was smarter and knew more! I feel so tricked. I can't understand why he did this does to me or anyone. Its so discusting the more I think about how selfish and sneaky he is...

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 19:53:44 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

it was just a thought....do you have any idea where in the world he could get that money?   I know the baseball card...but that is serious cash...
I am asking Ruth for his SS# now...

On Mon, Nov 22, 2010 at 7:50 PM, <caralintner@yahoo.com> wrote:
The one u can hold stuff in. It was hollow. I took it all apart but nothing

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 19:46:19 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

It might be worth seeing if they could possibly open with a screw driver or hold anything if hollow...

On Mon, Nov 22, 2010 at 7:45 PM, <caralintner@yahoo.com> wrote:
I opened it all up and kept the reciept. I don't think they were.

Sent from my Verizon Wireless BlackBerry

---

**From:** "Jolley_David" <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 19:42:20 -0500
**To:** caralintner@yahoo.com<caralintner@yahoo.com>
**ReplyTo:** "Jolley_David" <dj.davidjolley@gmail.com>
**Subject:** Re: Heather's Contact Info

 Any idea if any of those toys could store drugs?



--DJ

---

On Nov 22, 2010 7:41 PM, caralintner@yahoo.com
<caralintner@yahoo.com> wrote:

I did just find a discusting shipment of sex toys! I couldn't believe it but

Print                                                                                                                    Page 1 of 6

| | |
|---|---|
| **Subject:** | Re: Heather's Contact Info |
| **From:** | caralintner@yahoo.com (caralintner@yahoo.com) |
| **To:** | dj.davidjolley@gmail.com; |
| **Date:** | Monday, November 22, 2010 10:04 PM |

Thank you sooo much for all your kindnes. U have been such a great help in support and some of my healing. I hope u guys get all what u deserve for peyton. U have helped me so much. I can't ever thank you enough! Cara

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 21:27:11 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

We are praying for your continued strength and happiness. Our offer stand for your trip here if you ever decide it is a good idea. p.s. Cara we will wire you money if you need some help getting started with your hearing on the 30th. Get an atty working for you now. I know you will be glad you did. DJ

On Mon, Nov 22, 2010 at 8:29 PM, <caralintner@yahoo.com> wrote:
    I called that number but something strange happened. David didn't pick up it was some man

    Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 20:21:52 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

            call david  864.270.0293

On Mon, Nov 22, 2010 at 8:19 PM, <caralintner@yahoo.com> wrote:
    10796 avondale drive manassas va 20111

    Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 20:17:23 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

    I'm getting somewhere... what was your address?

    On Mon, Nov 22, 2010 at 8:01 PM, <caralintner@yahoo.com> wrote:

Print                                                                                      Page 1 of 6

**Subject:** Re: Heather's Contact Info

**From:** caralintner@yahoo.com (caralintner@yahoo.com)

**To:** dj.davidjolley@gmail.com;

**Date:** Monday, November 22, 2010 10:04 PM

Thank you sooo much for all your kindnes. U have been such a great help in support and some of my healing. I hope u guys get all what u deserve for peyton. U have helped me so much. I can't ever thank you enough! Cara

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 21:27:11 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info



We are praying for your continued strength and happiness. Our offer stand for your trip here if you ever decide it is a good idea. p.s. Cara we will wire you money if you need some help getting started with your hearing on the 30th. Get an atty working for you now. I know you will be glad you did. DJ

*money exchange?!*

On Mon, Nov 22, 2010 at 8:29 PM, <caralintner@yahoo.c
I called that number but something strange happened. Di

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail
**Date:** Mon, 22 Nov 2010 20:21:52 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

          call david  864.270.0293

On Mon, Nov 22, 2010 at 8:19 PM, <caralintner@yaho
10796 avondale drive manassas va 20111

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 22 Nov 2010 20:17:23 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Heather's Contact Info

I'm getting somewhere... what was your address?

On Mon, Nov 22, 2010 at 8:01 PM, <caralintner@yahoo.com> wrote:

*At Family Trial, Heather & D. Jolleys testified that they switched therapists from Kim Roseborough to Middleb (who never suspected any abuse) to Meredith Thompson - Loftis due to financial reasons yet here they are offering to PAY FOR MY EX'S ATTORNEY IN VIRGINIA!*



Print                                                                 Page 1 of 2

**Subject:** Re: just checkin in....

**From:** caralintner@yahoo.com (caralintner@yahoo.com)

**To:** dj.davidjolley@gmail.com;

**Date:** Monday, November 29, 2010 8:55 PM



Thank u! I promise no one will ever see this! I have facebook. Danny isn't on it or wasn't but if u ever wanted to get a fake account and no pic I would love for u to see updates on the boys.

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 29 Nov 2010 20:28:18 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: just checkin in....

We would like for you to have it. Please don't give it to anyone...it is just within our family. David

www.jigglesnort.wordpress.com

On Mon, Nov 29, 2010 at 8:25 PM, <caralintner@yahoo.com> wrote:
Just got ur mess about the blog. No he has no idea.

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Sun, 28 Nov 2010 22:27:33 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: just checkin in....

Cara,
I found the deposition. I am going to try and scan it in for you tomorrow. Also...one question...did Danny now we had a family blog? Did he know how to get to it?

On Sun, Nov 28, 2010 at 8:49 PM, <caralintner@yahoo.com> wrote:
Hi, I just finished and moved all my stuff out finally. Hopefully he will be forced to sell. I see a lawyer tomorrow who will be there tues to represent me. I also found a lawyer that is helping me step by step who's friends with my boss. My brother and and I spoke with her today also. Its been long days full of anxiety for tues. I keep praying a lot about everything and hope we all get what we deserve. I wasn't sure if u guys sent me anything in the mail yet because I haven't gotten anything.... I will let u know what happens tues!!! Thanks again, cara

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Sun, 28 Nov 2010 18:25:16 -0500

**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** just checkin in....

How are you guys?   Did you ever get a lawyer?   Are you set for the 28th?

David is
Super interested
in Every move
Cara makes
in V.A. !!

So Much Corroboration between
Jolleys + Cara ..

Print

**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** just checkin in....

How are you guys?   Did you ever get a lawyer?   Are you set for the 28th?

| | |
|---|---|
| **Subject:** | Re: just checkin in.... |
| **From:** | caralintner@yahoo.com (caralintner@yahoo.com) |
| **To:** | dj.davidjolley@gmail.com; |
| **Date:** | Monday, November 29, 2010 8:55 PM |

Thank u! I promise no one will ever see this! I have facebook. Danny isn't on it or wasn't but if u ever wanted to get a fake account and no pic I would love for u to see updates on the boys.

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 29 Nov 2010 20:28:18 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: just checkin in....

We would like for you to have it. Please don't give it to anyone...it is just within our family.  David

www.jigglesnort.wordpress.com

On Mon, Nov 29, 2010 at 8:25 PM, <caralintner@yahoo.com> wrote:
    Just got ur mess about the blog. No he has no idea.

    Sent from my Verizon Wireless BlackBerry

    **From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
    **Date:** Sun, 28 Nov 2010 22:27:33 -0500
    **To:** <caralintner@yahoo.com>
    **Subject:** Re: just checkin in....

    Cara,
    I found the deposition.  I am going to try and scan it in for you tomorrow.  Also...one question...did Danny now we had a family blog?  Did he know how to get to it?

    On Sun, Nov 28, 2010 at 8:49 PM, <caralintner@yahoo.com> wrote:
        Hi, I just finished and moved all my stuff out finally. Hopefully he will be forced to sell. I see a lawyer tomorrow who will be there tues to represent me. I also found a lawyer that is helping me step by step who's friends with my boss. My brother and and I spoke with her today also. Its been long days full of anxiety for tues. I keep praying a lot about everything and hope we all get what we deserve. I wasn't sure if u guys sent me anything in the mail yet because I haven't gotten anything.... I will let u know what happens tues!!! Thanks again, cara

        Sent from my Verizon Wireless BlackBerry

        **From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
        **Date:** Sun, 28 Nov 2010 18:25:16 -0500

Print

**Subject:**  Re: any idea howmuch the Range Rover was?

**From:**  Cara Lintner (caralintner@yahoo.com)

**To:**  dj.davidjolley@gmail.com;

**Date:**  Sunday, December 5, 2010 11:13 AM

yes then he walked up to me pulled out a camera and took a shot of Jayden in I. Then walked off.

**From:** Jolley _David <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Sun, December 5, 2010 6:52:51 AM
**Subject:** Re: any idea howmuch the Range Rover was?

Kids get home on time?

--DJ

On Dec 4, 2010 10:52 PM, Cara Lintner <caralintner@yahoo.com> wrote:

8654 Maple Glen Court    Springfield, Virginia 22153

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** caralintner@yahoo.com
**Sent:** Sat, December 4, 2010 9:58:57 AM
**Subject:** Re: any idea howmuch the Range Rover was?

Cara,
please send me your mailing address to where you are now...

On Fri, Dec 3, 2010 at 8:15 PM, <caralintner@yahoo.com> wrote:
  He said 25
  ------Original Message------
  From: The Jolley Family Jolley
  To: Cara Lintner
  Subject: any idea howmuch the Range Rover was?
  Sent: Dec 3, 2010 7:57 PM

Sent from my Verizon Wireless BlackBerry

| | |
|---|---|
| **Subject:** | Re: you got this |
| **From:** | Cara Lintner (caralintner@yahoo.com) |
| **To:** | dj.davidjolley@gmail.com; |
| **Date:** | Monday, December 6, 2010 8:35 AM |

Danny just snapped at me a lot in front of her. It was mostly about me telling him he needs to do things with them and he would make acsuses like he worked late but came home in gym clothes or if I said he doesn't spend time with her he would just say loud "I have to work", " need to play softball". Things like that.

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Sun, December 5, 2010 8:43:13 PM
**Subject:** Re: you got this

did danny ever argue or have a fit in front of her

On Sun, Dec 5, 2010 at 8:40 PM, Cara Lintner <caralintner@yahoo.com> wrote:
   Pam Cave my lwayer and Anne Luu his lawyer came up with this visitation schedual

   Tues and Thurs. Danny gets then 12 noon untill 8pm

   He then gets them every weekend switching sat. and sun. He get's them those days 10:00 am to 8:00.

   He will get them xmas from 1:00pm overnight Sat. untill Sun at 8pm.

   So for this is the only over night.


   When Peyton came to vist for her 10 days. I brought Peyton to Dullas airport hotel along with Jayden (no Danny) to see his parents who where flying out to Yellowstone early the next morning. We stayed 45 min. Peyton did not talk once to them and hid behind me the whole time. His parents have not seen her at all at any other visits. She has never gone down with Danny. I have gone down for mostly all visits except the last two. He went by himself. When she came for 10 days in Aug. I took care of her for the last nine. I bathed her each time. Took her to burke lake on Sat. whent to puppett show. (it was about pirates). Danny might know what the puppet show was about. I took her to the pool twice. I did all these things. took off work while Danny worked. On the Sun before the week she left I took Peyton to Maryland to see Christy and her family. I spent the night there. Danny went to Nates wedding instead. He didn't come after. I called Heather that night so Peyton could talk to her with my phone. Danny was never pressent for any of this.

   Things we did there he would not know played there DS, played outside on there playground,painted there nails and put stickers on them, they ate hot dogs make and cheese for

Print                                                                 Page 1 of 1

**Subject:** Re: any idea howmuch the Range Rover was?

**From:** Cara Lintner (caralintner@yahoo.com)

**To:** dj.davidjolley@gmail.com;

**Date:** Sunday, December 5, 2010 11:13 AM

yes then he walked up to me pulled out a camera and took a shot of Jayden in I. Then walked off.

**From:** Jolley _David <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Sun, December 5, 2010 6:52:51 AM
**Subject:** Re: any idea howmuch the Range Rover was?

Kids get home on time?

--DJ

On Dec 4, 2010 10:52 PM, Cara Lintner <caralintner@yahoo.com> wrote:

8654 Maple Glen Court    Springfield, Virginia 22153

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** caralintner@yahoo.com
**Sent:** Sat, December 4, 2010 9:58:57 AM
**Subject:** Re: any idea howmuch the Range Rover was?

Cara,
please send me your mailing address to where you are now...

*more exchange of "STUFF" through mail. $$ or documents(??)*

On Fri, Dec 3, 2010 at 8:15 PM, <caralintner@yahoo.com> wrote:
He said 25
------Original Message------
From: The Jolley Family Jolley
To: Cara Lintner
Subject: any idea howmuch the Range Rover was?
Sent: Dec 3, 2010 7:57 PM

Sent from my Verizon Wireless BlackBerry

Print                                                                    Page 1 of 2

| | |
|---|---|
| **Subject:** | Fw: Heather's Letter |
| **From:** | Cara Lintner (caralintner@yahoo.com) |
| **To:** | pvlaw@aol.com; |
| **Date:** | Thursday, December 9, 2010 1:47 PM |

----- Forwarded Message ----
**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Mon, November 29, 2010 8:27:35 PM
**Subject:** Heather's Letter

Cara,

I thought I would email you as I couldn't get the letter to attach for some reason. Feel free to print this out and utilize it in any way necessary.

You can read the details more clearly in the deposition, but as of February 15th 2006 I called Danny to let him know that I was pregnant. I thought that was the right thing to do whether he wanted to be involved or not. Needless to say, he was not very comforting during that conversation. Actually, he was mad about it all. I had no idea that you even existed at that time. However, as soon as I told him I was pregnant he responded that it was an awful joke if it weren't really true. After I confirmed that I wasn't lying to him, he said he couldn't talk to me anymore and hung up. He was angry about the situation and continued to deny the fact that I could even be pregnant with his child as we were not in a serious relationship, etc.
I continued to receive harsh emails and phone calls from him not wanting to be involved, questioning me about who I had been with in the interim of my finding out I was pregnant, wanting to know how I thought she could be his, blah, blah, blah. There are definitely more details that can be read in the deposition of our case, but I can tell you that my anxiety hit the roof once I knew that he truly did not want to be involved until I could "prove" that Peyton was his. Of course, this did not happen until after she was born and even then, he didn't come to see her until she was several months old.

As for Peyton, she has always been an anxious child. However, this anxiety has been exacerpaded by Danny D's (the name Pey decided for him) visits and calls. She has never been 100% comfortable with any of the visits, especially when I am prepping her for the weekend. She continues to tell me she doesn't want to talk to him when he calls on his scheduled night to call, and doesn't want to visit w/ him when she knows that it is coming up.
He continues to be the "fun" one as he always takes her to Chuck E. Cheese and then swimming at the hotel. However, I can tell you that Peyton has recently told me that he makes her nervous when she stays with him. She stated that he doesn't give her a bath if they have gone swimming and he sleeps with is shirt off in the same bed as her. She also said that he will continuously tickle her and won't stop when she asks him to, again making her nervous (her words). She is always complaining of stomach aches, using baby talk and now experiencing panic attacks which we have had to seek counseling for.



lunch. His mom had a little gift gpr Peyton at the house when we arrived a my little poney. He won't know this stuff.

Also he won't know what pull i took them to Newington Forest at my paretns we had pizza for lunch.

---

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Sun, December 5, 2010 3:30:07 PM

**Subject:** Re: you got this

Does he get any over night visits?

On Sun, Dec 5, 2010 at 12:40 PM, The Jolley Family Jolley <dj.davidjolley@gmail.com> wrote:
got it.....

On Sun, Dec 5, 2010 at 11:54 AM, Cara Lintner <caralintner@yahoo.com> wrote:
I want a new lawyer. I'm just waiting to here back the begining of this week for the lwayer I'm going with.

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Sun, December 5, 2010 11:45:22 AM
**Subject:** Re: you got this

whatever you do, I'd hurry and make a decision and get it going.

On Sun, Dec 5, 2010 at 11:19 AM, Cara Lintner <caralintner@yahoo.com> wrote:
I talked to a new lawyer last night. I told her the situation and how my lawyer wants me to drop the appeal. She thinks I need a new lawyer. She deals with domestic violence cases herself and it looked like mine doesn't know the right questions to help me. She doesn't do cases with children though. She knows so maney lawyers that she thinks she can def. get me a new one that is good and has the experience I need for this case. She is going to do a lot of call tomorrow. She's hoping something will be good for us in your case tomorrow as well. I'm so nervous to not have this new lawyer yet but know I need one. One she talked about was 500 an hour but I said fine.

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**To:** Cara Lintner <caralintner@yahoo.com>
**Sent:** Tue, November 30, 2010 10:33:34 AM
**Subject:** you got this

We just wanted you to know we are praying for you. Your life is about to get better. Be strong and don't agree to anything. He will ask for an inch and take a yard.

Print                                                                                    Page 2 of 2

Some quick answers for you:  Danny and I first met in Atlanta through a work meeting, we started emailing through work, then talking on the phone. We saw each other again when I visited him at his condo in VA. I stayed for a long weekend there, then we continued to talk through email and weekly on the phone. (this was before you were in the picture). We met up again in FL at our annual sales conference which was in Jan. 2006. This is when I got pregnant. We had planned for him to come and visit in Feb. or March but clearly that never happened as I found out I was pregnant and unbenounced to me, he had met you. We did talk a good bit through email when I was pregnant, though most of it was fighting. I eventually asked him to quit contacting me as I felt like I was being harassed by his continued questioning of who else I had been with, how I could prove that the baby was his, etc. I was 7 or 8 months pregnant before I ever knew that you even existed. He emailed me at work letting me know that he had been seeig you, things had gotten a bit more serious as you were now his fiance and you were having a baby. Talk about feeling like you had been shot in the chest, ugh.... Not because of you, per say but b/c he had done the same thing w/ someone else and kept it from me for so long.

Danny did not stay w/ me the first time he visited. He came w/ Chrisie and they stayed at Extended Stay, which is where Danny and I both worked at the time. He was with you then as you had just had Jayden. He was talking to you most of his visit and hardly spent any time getting to know Peyton. He flew in from FL where he had been doing some renovations to the condo down there, or at least that is what he said. He had a concussion or something that weekend that he tried to explain also.

Danny's parents visited before he did. They came w/ Christie in Nov. 2006. They stayed for a day, though they didn't stay w/ me. Not much was discussed about Danny or you. Carol Ann only thanked me for choosing to have Peyton and allowing them to see her.

I don't know if any of that helps or just confuses things, but feel free to call me too if you need to. Ask me anything.

Cara, you have to know that all I ever really knew of you was what little Danny or the Spades told me and that was never greatly positive. You were one of the "bad guys" as far as I knew, wanting to make sure Danny got his way. Now I know that is not true. We all get wrapped up in our circumstances, but believe me when I say I am so glad that we have both seen the light and the truth :)

Let me know how else I can assist,

Heather

p.s.  David is sending you all our notes for our trial.



| Subject: | Re: Fwd: could we get a copy of the affidavits against us? |
|---|---|
| From: | caralintner@yahoo.com (caralintner@yahoo.com) |
| To: | heathersmithjolley@gmail.com; |
| Date: | Friday, December 10, 2010 10:32 AM |

I'm praying so hard. Each sentence in that letter was wrong! I keep going over it. Jayden had a break down with danny yest. He tried to blame that on me as well

Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Fri, 10 Dec 2010 10:19:09 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Fwd: could we get a copy of the affidavits against us?

Yeah, they are all a little off their rocker. I think most of this is just trying to help Danny not lose everything. However, he has done all of this to himself. He is so lost as a person and really needs to talk to someone about how to get his life back in order.

I don't take any of this stuff personal b/c I know that they are grasping. He is at risk of losing EVERYTHING, including the kids he knows so well and the one that he doesn't!! Keep praying hard, I know we are :)

*Praying to destroy my relationships w/ children w/ both her and SC(!)*

On Fri, Dec 10, 2010 at 9:41 AM, <caralintner@yahoo.com> wrote:
> She also testified and said I'm not worried about when danny watches the boys and when I talked to her that night I told her how scared I was and worried he was feeding him ect. He sis awmd dad were also so worried his dad drove 1 half hours to see!
>
> Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Fri, 10 Dec 2010 08:58:50 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Fwd: could we get a copy of the affidavits against us?

Believe me, I am pissed off as well!! They know nothing of her. If she didn't want to talk to us on the phone during her visit, it is b/c she is 4 and doesn't like talking on the phone anyway, urrggghhh..... Let me say that Peyton has NEVER been locked in her room by me or David. Peyton is a very stubborn child and when she gets upset or scared, she sometimes makes things up for the extra attention. This is part of what therapy is addressing w/ her as well.
I will say that we do not allow her to sleep with us or on the couch or anywhere else in the house. We have been adamant that our children sleep in their beds by themselves. That being said, Peyton knows we are always there to comfort her if she is scared for whatever reason, can't go to sleep, etc. I am only saying this stuff in the instance that she really did make that comment to you.
  As well, why did Danny stop skyping with Peyton yet he felt the need to "show her off" while he

*Wow! Completely convinced (never here to talk to toothbrush)*

was here to Christy/Josh via skype?? Wasn't the point to build a relationship w/ Peyton, not try to make a point to his family or anyone else for that matter.

Sorry for the long email, but I am so sick of this crap!!!!
On Fri, Dec 10, 2010 at 8:52 AM, <caralintner@yahoo.com> wrote:
I'm shaking I'm sooo discusted! She was never ever around! One night only! The things she had the nerve to say! Everything included danny and cara. She makes me sooo sick!

Sent from my Verizon Wireless BlackBerry

_____

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Fri, 10 Dec 2010 08:47:25 -0500
**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** Fwd: could we get a copy of the affidavits against us?

*(handwritten note: Re: my sister/family's attempts to see/keep relationship w/ my kids)*

Oh My Dang!! I am picking my mouth up off the floor. David is sick after reading these, but I have had to continue to remind him that they are grasping for straws here. They have to have someone to point a finger, ugh... Anyway, they are attached. I will call you this weekend and catch up.

Keep praying as we should hear something hopefully later today :) I will let you know.

Much love,

Heather

---------- Forwarded message ----------
From: **The Jolley Family Jolley** <dj.davidjolley@gmail.com>
Date: Fri, Dec 10, 2010 at 8:17 AM
Subject: Fwd: could we get a copy of the affidavits against us?
To: Heather Jolley <heathersmithjolley@gmail.com>, Cara Lintner <caralintner@yahoo.com>

---------- Forwarded message ----------
From: **Andrea Moore** <andreaamoore@gmail.com>
Date: Fri, Dec 10, 2010 at 8:10 AM
Subject: Re: could we get a copy of the affidavits against us?
To: The Jolley Family Jolley <dj.davidjolley@gmail.com>

Sorry about that! Don't let yourself get worked up over them. It's clear how little contact they've had with her.

On Thu, Dec 9, 2010 at 9:00 PM, The Jolley Family Jolley <dj.davidjolley@gmail.com> wrote:

--
Andrea A. Moore
(864) 237-5790

--
Heather Jolley

--
Heather Jolley

--
Heather Jolley

Print                                            Page 1 of 2

**Subject:** Re: Fwd: order

**From:** caralintner@yahoo.com (caralintner@yahoo.com)

**To:** dj.davidjolley@gmail.com;

**Date:** Monday, December 20, 2010 2:10 PM

How does the guardian decide? Does she visit peyton and the counslor or does she put dan amd peyton together and then see him fake play with her a chuck e cheese? Sorry just confused a bit. Like always lol sorry

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 20 Dec 2010 14:04:03 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: Fwd: order

no. it means she will help decide if he ever gets visitation again...

On Mon, Dec 20, 2010 at 1:29 PM, <caralintner@yahoo.com> wrote:
Does this mean that he will be with guardian peyton on visits soon? Hopefully his fam. to go on these to help!

Sent from my Verizon Wireless BlackBerry

**From:** The Jolley Family Jolley <dj.davidjolley@gmail.com>
**Date:** Mon, 20 Dec 2010 13:13:47 -0500
**To:** Cara Lintner <caralintner@yahoo.com>; Heather Jolley<heathersmithjolley@gmail.com>;
<mike.e.smith@milliken.com>
**Subject:** Fwd: order

---------- Forwarded message ----------
**From:** Andrea Moore <andreaamoore@gmail.com>
Date: Mon, Dec 20, 2010 at 1:12 PM
Subject: order
To: David Jolley <dj.davidjolley@gmail.com>

--
Andrea A. Moore
(864) 237-5790

*[Handwritten note:]* Shows this is what the Jolleys were hoping for an end to all of my visitation ( from GAL's then-pending decision on how when to resume my visitation )

**Subject:**  Fw: Making Right of Letter Previously Sent/ Inaccuracies
**From:**  Cara Lintner (caralintner@yahoo.com)
**To:**  andreaamoore@gmail.com;
**Date:**  Friday, December 24, 2010 8:18 AM

----- Forwarded Message ----
**From:** Cara Lintner <caralintner@yahoo.com>
**To:** kshabel@gc-lawfirm.com
**Sent:** Wed, December 22, 2010 1:52:05 PM
**Subject:** Making Right of Letter Previously Sent/ Inaccuracies

Ken and Andrea,

I need to make some things right that is weighing heavy on my heart. I want you both to know I only know of Danny using steriods once last year and I don't remember any side effects. The pictures I sent you and emails I have found also last year could have been taken by a hacker who also made fraudulent charges on both our credit cards at that time. I have never seen Danny on any porn sights in fact I looked after the hacker told me that he/she had met him there........and I never found him. I did take a lot of care for Peyton except the last two times. When Peyton was here Danny had to work a couple days to keep the bills paid. I have not seen ANY anxiety when Danny and Peyton were together or with me. They've always gotten along great and Peyton has always been happy around her father.

Thank You- Im' sorry for any pain or stress this has caused any

P.S. Ken please forward to Andrea as I can't find her email.

Cara Lintner

*My Ex in Virginia admitting that much of what she had sent to Jolley's was not true. It was done for revenge due to me breaking up with her. (MM)*

On Thu, Mar 10, 2011 at 9:00 AM, <caralintner@yahoo.com> wrote:
Thanks so much for understanding! I will get the to u soon.

Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Thu, 10 Mar 2011 08:14:01 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: copy of pic

I understand completely! I will make sure that Alex respects your wishes there as well. Believe me, it is all of our intentions to make sure these kids are in the best place possible. I would never do anything to put you or the kids in jeopardy further than you have already been.

Thank you so much for assisting us to this point. I am hoping we can do the same for you all as well :)

Heather

On Wed, Mar 9, 2011 at 7:57 PM, <caralintner@yahoo.com> wrote:
Hey girl. I don't mind sending u a copy for alex. I really want to make sure peyton is doing well. That's why I sent u the pic for her therapist. I just ask it be for there eyes only. I do not want it used in court or anything. I've had to deal with sooo much with danny from what he feels I've done and I can't handle that anymore. Hope u understand.

Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Wed, 9 Mar 2011 12:16:36 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: copy of pic

OK, would you mind sending us a copy of the letter the you received from the Spades as well? I hate to even ask, but Alex was curious if she might get a copy for her files as well.

On Tue, Mar 8, 2011 at 8:33 PM, <caralintner@yahoo.com> wrote:
I just sent pic to the jolley email. Alex did not reach out to me. But def. Haven't heard anything from danny about it.

Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Tue, 8 Mar 2011 20:18:52 -0500
**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** copy of pic

Hey girl,

I have a huge favor. Peyton had her session w/ her therapist (Kim) yesterday. We told her about Jayden and the pic he drew. Basically, just to support the fact that it is not just Pey having issues here. Kim wanted us to ask if you would mind sending us a copy of the pic Jayden drew so that she could have it with our files as support?

Also, we know that Danny spoke to Alex this past weekend. Alex let us know that she was going to reach out to you this week. Have you heard from her as of yet? If not, we were curious if the call was going to be set up w/ both you and Danny? I wouldn't imagine that it would be but thought it was worth asking.

We just called the child support line to verify that he still had not paid and he made his first payment of the year yesterday. Rather ironic don't you think?

Anyway, just curious about the above items. If you might let us know when you have the chance, we would greatly appreciate it!


Take care of yourself,

--
Heather and David Jolley


--
Heather Jolley


--
Heather Jolley


--
Heather Jolley


--
Heather Jolley

Print                                                                        Page 1 of 3

| | |
|---|---|
| **Subject:** | Fw: copy of pic |
| **From:** | caralintner@yahoo.com (caralintner@yahoo.com) |
| **To:** | heathersmithjolley@gmail.com; |
| **Date:** | Wednesday, March 16, 2011 6:57 PM |

Quick questin how much now is danny ordered to pay u in child support? I didn't go to work today cause I had the settlement on the home. I signed over to him plus have to pay 7 thous. In home buyer fees. It or he was pretty ugly and it was hard!

Sent from my Verizon Wireless BlackBerry

---

**From:** caralintner@yahoo.com
**Date:** Wed, 16 Mar 2011 13:56:03 +0000
**To:** Heather Jolley<heathersmithjolley@gmail.com>
**ReplyTo:** caralintner@yahoo.com
**Subject:** Fw: copy of pic

Ugh taking a break from settlement on the house. Got the worst tummy ache

Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Wed, 16 Mar 2011 09:25:11 -0400
**To:** <caralintner@yahoo.com>
**Subject:** Re: copy of pic

Sure, this is my direct efax here at work: 330-486-3722. How are things going?

On Tue, Mar 15, 2011 at 1:40 PM, <caralintner@yahoo.com> wrote:
 DoU have a fax number so I can send u letter? Haven't written letter yet I've been doing court stuff with house

 Sent from my Verizon Wireless BlackBerry

---

**From:** Heather Jolley <heathersmithjolley@gmail.com>
**Date:** Thu, 10 Mar 2011 10:51:12 -0500
**To:** <caralintner@yahoo.com>
**Subject:** Re: copy of pic

I wanted you to know that I spoke with Alex.  Nothing you give us will be shared with Danny. You are safe.  Do you think you would be willing to write us another letter soon with an update of how things are going?  How Danny is acting, How the kids are doing,etc? How Danny made you type the letter to Ken, Your worries, concerns, etc...   Alex said every bit of it will help Peyton and yet keep you out of the court stuff.

I have a huge favor. Peyton had her session w/ her therapist (Kim) yesterday. We told her about Jayden and the pic he drew. Basically, just to support the fact that it is not just Pey having issues here. Kim wanted us to ask if you would mind sending us a copy of the pic Jayden drew so that she could have it with our files as support?

Also, we know that Danny spoke to Alex this past weekend. Alex let us know that she was going to reach out to you this week. Have you heard from her as of yet? If not, we were curious if the call was going to be set up w/ both you and Danny? I wouldn't imagine that it would be but thought it was worth asking.

We just called the child support line to verify that he still had not paid and he made his first payment of the year yesterday. Rather ironic don't you think?

Anyway, just curious about the above items. If you might let us know when you have the chance, we would greatly appreciate it!


Take care of yourself,

--
Heather and David Jolley



--
Heather Jolley



--
Heather Jolley



--
Heather Jolley



--
Heather Jolley

Print                                                                      Page 1 of 1

| | |
|---|---|
| **Subject:** | IMG00217-20110308-2027.jpg |
| **From:** | caralintner@yahoo.com (caralintner@yahoo.com) |
| **To:** | dj.davidjolley@gmail.com; |
| **Date:** | Tuesday, March 8, 2011 8:29 PM |

Sent from my Verizon Wireless BlackBerry

## Attachments

- IMG00217-20110308-2027.jpg (166.41KB)

Really? How is this evidence of a distraught Child! Looks like a banana or a toy. Send to me

Please come to TOT Prescho

| | |
|---|---|
| **Subject:** | Re: Hey! |
| **From:** | caralintner@yahoo.com (caralintner@yahoo.com) |
| **To:** | dj.davidjolley@gmail.com; |
| **Date:** | Tuesday, March 22, 2011 8:47 AM |

No not at all. He probibly won't tell me either. Is the counslor allowed to tell u what they talked about?

Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family <dj.davidjolley@gmail.com>
**Date:** Tue, 22 Mar 2011 08:39:40 -0400
**To:** <caralintner@yahoo.com>
**Subject:** Re: Hey!

No problem.   Danny talked to Peyton's counselor yesterday...have you heard anything?

On Tue, Mar 22, 2011 at 8:35 AM, <caralintner@yahoo.com> wrote:
    Hey girl don't want u to think I'm ignoring u. Its been crazy here. I'm gonna write u soon promise!

    Sent from my Verizon Wireless BlackBerry

---

**From:** The Jolley Family <dj.davidjolley@gmail.com>
**Date:** Mon, 21 Mar 2011 10:16:04 -0400
**To:** Cara Lintner<caralintner@yahoo.com>
**Subject:** Hey!

Hey girl!  I was just wondering how you guys were doing?  How is Jayden?  Are his panic attacks still happening?  How is Danny working with you?  What is going on?

**Subject:**    IMG00217-20110308-2027.jpg

**From:**    caralintner@yahoo.com (caralintner@yahoo.com)

**To:**    dj.davidjolley@gmail.com;

**Date:**    Tuesday, March 8, 2011 8:29 PM

Sent from my Verizon Wireless BlackBerry

## Attachments

- IMG00217-20110308-2027.jpg (166.41KB)

Exhibit J

# CHRISTIAN COUNSELING CENTER
# OF ANNAPOLIS, INC.

### A Provider of Psychological Services

The Rev. Briton Fletcher, President
Board of Directors

David J. Kellner, M.Div., M.A., LCPC
Executive Director

February 15, 2014

TO WHOM IT MAY CONCERN:

      RE:    Daniel Spade
               DOB: 12/18/75

This letter is in follow-up to my letter of May 25, 2013 regarding Daniel Spade. I would like to confirm that Mr. Spade has been attending counseling sessions at this Center since February of last year. His preliminary diagnosis was 309.28 Adjustment Disorder With Anxiety and Depression. He is also exhibiting PTSD traits caused by the stress in his life, particularly legal difficulties which included an extended incarceration while awaiting release on bond. What was supposed to be a 2-3 week time period in jail, turned out to be more like 2-3 months. This had a devastating impact on his life and is the source of many of the symptoms with which he continues to struggle. Furthermore, there has been significant additional distress resulting from the number of times his trial has been postponed and rescheduled.

It is recommended that Mr. Spade be allowed to reside with family members during the upcoming proceedings, rather than requiring him to be subjected to further incarceration. There is no indication that he is a flight risk. In fact, he has expressed his desire to move forward with whatever is needed to affirm his innocence. In the spirit of "presumed innocent until proven guilty", I respectfully ask the Court to favorably consider this recommendation.

If further information is needed, please feel free to contact this office.

Sincerely,

John J. Nealon, Ph.D.
Licensed Counselor

<u>Notes / Documentation (SCDC Meds)</u>

Ask Ms. Berry      Christy & I called on 12/1/17
—  Whose the person on for the
   Mental [...] forward that has been ⊗
   brought against SCDC

—  No one called out to Daniel on the
   day we spoke w/ Ms. Berry —
   [...] at the hospital for evaluation
   [...] room [...] his
   meds

   Hot [...] in [...] (20 [...])
   [...] he stood in line
                    ? ? ?

   [...]  [...] - [...]

Call to Ms. Berry on 12/4/17  10:00 AM.
         We left a message for Ms. Berry
         relative to the above. The message
         machine said she would call back

         Ms. Berry called back at 11:40 A.M.
         Pharmacy informed her (after she called
         them) That Dan's meds (for) are on
         delivery to her from pharmacy are being delivered
         & Dan should receive them today. Ms.
         Berry is going to try to get his meds
         put on auto refill so this doesn't
         happen again. The [...]
         When Christy spoke w/ her on Friday she

We learned
later they are
on auto-refill —

1st, she said person in pharmacy responsible for calling meds in did NOT do so on the 19th* and did not call prescript. in until Ms. Berry intervened.

* Dan was told on that date that prescript. would be called in.

7:00 p.m.) would be called in.

1) Danny called to let us know he only received 1 of his 2 meds. This time ~~[illegible]~~ he got his trazadone sleeping pill but NOT his Zoloft!

2) He said he would call us on 12/5 (next day) to let us know if he received BOTH meds as we were told he would.

12/6 = ~~No One~~ Heard from Dan today. ~~Continuing to wait to speak to him~~ (Email to Char.)
He did get both meds last night. PTL!

13709

From Williamsbu

- 07-04-18 - tried to call Blackwell AGAIN
  in regard to D still not being called to
  medical — went IMMEDIATELY to voicemail

- tried to call (803-896-2463) ( ~~Betty Stank~~ Lee ) —
  asked to be transferred to Blackwell or
  someone on nursing staff.
  told no one could help me until tomorrow
  due to holeday

- lft message w/ Ms. Jamieson (803-896-5257)
  (voicemail)

07-05-18 - called @ 10:05 and asked for medical
  ~~Mrs~~ Mr. Blackwell answered
  GI clinic in Columbia.
  he should ask to go to medical
  Blackwell said he would call for him
  to be seen today



## TO DO

Called Operations
on 09-21-21 and
spoke to a Mr. Smith

CPAP no Air or lights
@ Monticello - this past
week - cold sleep
- little heat all last
winter

(09-27-21)
Called Shirell reg.
needed MRI that they
failed to schedule after
his app't in Feb.
- got a voicemail

- left a message    90ª
(10-08-21)    → spoke to
                Teresa

Called Shirell again
reg need for MRI
    and now his lbu 600
running out and needs
        refills for that

803-896-8547



Teresa said she would
Call Broad River & get
back to me w/ their response
in 72 hrs.

10-27-21
Called (803) 896-8547
NOT answering & mailbox is
full.

* medicalconcerns@doc.?sc.gov

Chief Med. Dir. - April T. Singleton Clarke
803-896-8184

Div. Dir. of Health - Braudelyn Brewer
803-896-8184

Div. Dir. of Health Info Tina Blakely-Haggins
803-896-2965

as of today -
no shower for 6 days
locked down almost all time
no canteen 3 weeks
now on quarantine
const. lockdown status of his dorm is
worse than Vietnam prisoner of war camp.
needs MRI - requested by orthopedics
last Feb. & @ a subseq. app't still
hasn't received it.

1111 — NO answers. All mailboxes full.
4 calls

# TO DO

still 10-27-21

called Chief Med Dir.
803-896-8184
Shannon Larkin not
ans. — mailbox full

called Div. Dir. Brewer
803-896-8184
(same mess. as above)

called Dir. Dir. Tina Huggins ^(Berkeley)
803-896-2965
not accepting calls @ this time

Also, called BR — no medical
answered

Sent email to the
medical concerns site
in attempt to get help

## Needing medicine renewal and doctor-requested testing

From: Carole Ann Spade (spadedodah@verizon.net)

To: medicalconcerns@doc.sc.gov

Date: Wednesday, October 27, 2021 at 03:33 PM EDT

To Whom It May Concern-
    I am trying to interface and intercede on behalf of my son, Daniel Spade #358974, at Broad River Correctional. Over 5 years ago, he injured his back while incarcerated and has been trying to have those issues addressed. He lives in daily pain and with a regimen of Ibuprophen as his only way to get by.
    Currently, he needs to have an MRI done. This was requested back in February after a visit to an orthopedic surgeon. When Dan was taken again to see the orthopedist, he wanted to know where the MRI results were. To this date (10-27-21) we are still waiting on SCDC to take him for an MRI.
    Also, as of this date, he has requested refills of his Ibuprophen and is just a few days from being completely out.
    I am requesting that both of these needs be addressed as soon as possible. I have tried for weeks to reach someone by phone; but, have seen no action as a result.

    Thank you for anything that you can do to help us here.

Carole Ann Spade
(mother of Daniel)-  [I am listed on his Hippa form]

RE: denied meds

From:   Brayton Hilliard (C066742) (hilliard.brayton@doc.sc.gov)

To:     spadedodah@verizon.net

Cc:     medicalconcerns@doc.sc.gov

Date:   Tuesday, January 4, 2022 at 11:53 AM EST

Good Morning,

Your concerns have been forwarded to the appropriate medical staff for review and handling.

Thank you,

Brayton Hilliard
Office of the Director
Health Services Recruiting and Employment
South Carolina Department of Corrections
Post Office Box 21787
Columbia, South Carolina 29210
(803) 896-5039
(803) 896-8555 (Director's Office)

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Monday, January 3, 2022 9:21 AM
**To:** Medical Concerns <MedicalConcerns@doc.sc.gov>
**Subject:** denied meds

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

My son was prescribed a new med to address his severe back issues- meloxicam.  After being administered for 2 days, feeling relief, it has not been administered these last 3 days.

I have called Broad River, but can never actually reach anyone in medical.

He is in the Monticello dorm. His # is

358974.

Thank you for any assistance in this.

Carole Ann Spade ( mother)

Sent from Yahoo Mail for iPhone

(803) 896-8555 (Director's Office)

---

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Tuesday, January 4, 2022 12:59 PM
**To:** Medical Concerns <MedicalConcerns@doc.sc.gov>
**Subject:** Urgent eye care

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Thank you for your response to the denied med issue. I hope it will quickly be resolved.

However I just became aware of the fact that my son's prescription glasses are no longer usable to him and he literally cannot see 10 inches in front of him without them.

Danny had been attempting for some time to try to live with them or find a remedy- but the condition of the shredding polycarbonate cannot be fixed.

I called Broad River today to be told he cannot receive anything from us (or the BJ's that filled the prescription before) w/o a trip to medical and paperwork to allow us to get new prescription glasses.  My concern is the lack of access he has to get the paperwork he needs AND the amount of time it takes for BR to give attention to these needs.

Imagine spending months being unable to see properly to do basic things.  Please help shorten this time for him.

Again, thank you for any help.

Carole Ann Spade

Sent from Yahoo Mail for iPhone

## Re: Urgent eye care

From: Brayton Hilliard (C066742) (hilliard.brayton@doc.sc.gov)

To: harris.stacy@doc.sc.gov; spadedodah@verizon.net

Date: Wednesday, January 5, 2022 at 10:57 AM EST

His name is Daniel Spade, I/M #358974. I have him entered into the spreadsheet as well, Stacy!

Thank you,
Brayton Hilliard

Get Outlook for iOS

---

**From:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Sent:** Wednesday, January 5, 2022 10:53:39 AM
**To:** Brayton Hilliard (C066742) <Hilliard.Brayton@doc.sc.gov>; Carole Ann Spade <spadedodah@verizon.net>
**Subject:** RE: Urgent eye care

What's the full name for this I/M, number?? Any more specific info? I only see Danny....

---

**From:** Brayton Hilliard (C066742) <Hilliard.Brayton@doc.sc.gov>
**Sent:** Tuesday, January 4, 2022 1:14 PM
**To:** Carole Ann Spade <spadedodah@verizon.net>
**Cc:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Subject:** RE: Urgent eye care

Good Afternoon, Carol!

I have copied Nurse Harris on this email as she will be able to assist you with these matters.

Thank you for reaching out,

Brayton Hilliard

Office of the Director

Health Services Recruiting and Employment

South Carolina Department of Corrections

Post Office Box 21787

Columbia, South Carolina 29210

(803) 896-5039

## Re: Urgent- allergic reaction

From:  Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To:     spadedodah@verizon.net

Cc:     ombudsman@doc.sc.gov

Date:  Saturday, April 16, 2022 at 12:53 PM EDT

I'm so sorry I meant to write you back last night but he was seen yesterday, and was given Benadryl and has an appointment to see the provider and discuss new medication. Nurse Harris
Sent from my iPhone

> On Apr 15, 2022, at 5:04 PM, Carole Ann Spade <spadedodah@verizon.net> wrote:
>
> **\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***
>
> Hi-
> This is an urgent request for my son, Daniel Spade- ( Broad River, Monticello dorm #358974) to receive meds ( ie. Benadryl etc.) for a severe medication reaction.  He was recently put on Lipitor and seems to be reacting to it badly.  His face- eyes, nose, skin is swollen and itchy. No breathing problems yet.
> I called BR last evening and they had a nurse look at him and say they would bring Benadryl. As of this afternoon- nothing!!!!!
> My daughter called again today and they promised to address, but we need someone to check up please.
> Thanks so much.
> Carole Ann Spade
>
>
> Sent from Yahoo Mail for iPhone

FW: Urgent- allergic reaction

From: Dayne Haile (C027588) (haile.dayne@doc.sc.gov)

To: spadedodah@verizon.net

Cc: medicalconcerns@doc.sc.gov

Date: Friday, April 15, 2022 at 05:26 PM EDT

According to Nurse Parker, Benadryl was just administered. Thank you.

N. Dayne Haile
Office of the Director
Office of the Ombudsman
Officer of Medical Concerns
Post Office 21787
Columbia, South Carolina 29221-1787
(803)896-2967

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Friday, April 15, 2022 5:05 PM
**To:** OMBUDSMAN <OMBUDSMAN@doc.sc.gov>
**Subject:** Urgent- allergic reaction

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Hi-

This is an urgent request for my son, Daniel Spade- ( Broad River, Monticello dorm #358974) to receive meds ( ie. Benadryl etc.) for a severe medication reaction. He was recently put on Lipitor and seems to be reacting to it badly. His face- eyes, nose, skin is swollen and itchy. No breathing problems yet.

I called BR last evening and they had a nurse look at him and say they would bring Benadryl. As of this afternoon-nothing!!!!!

My daughter called again today and they promised to address, but we need someone to check up please.

Thanks so much.

Carole Ann Spade

Sent from Yahoo Mail for iPhone

Thanks for letting us know. Try to enjoy your time away!

CA Spade

Sent from Yahoo Mail for iPhone

On Saturday, April 16, 2022, 12:53 PM, Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov> wrote:

> I'm so sorry I meant to write you back last night but he was seen yesterday, and was given Benadryl and has an appointment to see the provider and discuss new medication. Nurse Harris
> Sent from my iPhone
>
>
> On Apr 15, 2022, at 5:04 PM, Carole Ann Spade <spadedodah@verizon.net> wrote:
>
>
> **\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***
>
> Hi-
> This is an urgent request for my son, Daniel Spade- ( Broad River, Monticello dorm #358974) to receive meds ( ie. Benadryl etc.) for a severe medication reaction.  He was recently put on Lipitor and seems to be reacting to it badly.  His face- eyes, nose, skin is swollen and itchy. No breathing problems yet.
> I called BR last evening and they had a nurse look at him and say they would bring Benadryl. As of this afternoon- nothing!!!!!
> My daughter called again today and they promised to address, but we need someone to check up please.
> Thanks so much.
> Carole Ann Spade
>
>
> Sent from Yahoo Mail for iPhone

RE: Urgent- allergic reaction

From: Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To: spadedodah@verizon.net

Date: Tuesday, April 19, 2022 at 11:28 AM EDT

Good Morning! I see on 04/15/22, NP Emetu, the provider, wrote that Daniel was to stop the Lipitor and give any he had back to a guard or medical, and put in a sick call visit to see the provider this week, so please make sure he's put in for that when you speak with him, and I've also reached out to the provider and BRCI medical so everyone should be aware of this allergy and that he needs a new statin to try. Thanks again, Nurse S. Harris

> **From:** Carole Ann Spade <spadedodah@verizon.net>
> **Sent:** Tuesday, April 19, 2022 10:56 AM
> **To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
> **Subject:** Re: Urgent- allergic reaction
>
> **\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***
>
> Good morning, Ms.Harris-
>
>     I found out through my daughter that Daniel was given a four-day supply of Zoloft on Friday, so he would have had enough through yesterday.  I don't know whether he was given any today or not.  I surely hope the daily routine will be restored that we have been trying to navigate all these weeks.  I will let you know when next we hear from him.
>
>     On another disturbing note, however, after knowing that he has had a severe reaction to the Lipitor, he received (yesterday) a bottle of Atorvastatin (Lipitor) !!  Now, I know that he saw nursing over the weekend and they told him the swelling could actually last for a few weeks. And, as per any allergic reaction of this nature, you immediately STOP taking said medication!   He is going to have to be assessed for tolerance of a **different kind** of statin!! This is very scary to me!! We have told him to not take the Lipitor for now.  Why wasn't the day staff informed of this, if they haven't been?
>
>
> Sincerely,
>
> CA Spade
>
>
> On Monday, April 18, 2022, 02:05:51 PM EDT, Stacy Harris (C065344) <harris.stacy@doc.sc.gov> wrote:
>
>
>
> Oh wow, that's awesome, I'm so glad that was able to happen!! No hurry, just ask next time you hear from him 😊
>
> **From:** Carole Ann Spade <spadedodah@verizon.net>
> **Sent:** Monday, April 18, 2022 1:58 PM
> **To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
> **Subject:** Re: Urgent- allergic reaction

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

You won't believe this, but with all the craziness of the weekend and the issue of the reaction, I failed to ask him that when we spoke with him last evening. We will find out via email. Thanks.
By the way, for the first time in over 2 years, my daughter and her husband made a flying trip down to a short visit with him on Saturday. It was a special "sub feast" day and he was so blessed by this quick visit. It's about a 481 mi. trip one way- another reason we have been unable to visit for just an hour and a half...but this Easter season, it was so worth it. Christy said he was swollen but evidently not nearly so badly.
CASpade

On Monday, April 18, 2022, 01:41:49 PM EDT, Stacy Harris (C065344) <harris.stacy@doc.sc.gov> wrote:


Glad to hear he's feeling better. Has he been receiving his Zoloft??

---

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Monday, April 18, 2022 1:19 PM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Subject:** Re: Urgent- allergic reaction

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Yes, thankfully, it seems to have reduced swelling. I think they gave him a couple Benadryl  as they indicated it could take a while for the statin to be out of his system. Thank you for your team's swift follow-up on this. A bit scary- this reaction evidently rare.

CA Spade


On Monday, April 18, 2022, 11:51:44 AM EDT, Stacy Harris (C065344) <harris.stacy@doc.sc.gov> wrote:




Ms. Haile said she responded thankfully. Did the Benadryl help??

---

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Saturday, April 16, 2022 2:57 PM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Cc:** OMBUDSMAN <OMBUDSMAN@doc.sc.gov>
**Subject:** Re: Urgent- allergic reaction

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

I knew you were out of town and didn't want to bother you- so I just reached out to whoever was covering website. Seems there's always something these days!!

## FW: Daniel spades medicine

From: Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To: spadedodah@verizon.net

Date: Wednesday, May 4, 2022 at 04:26 PM EDT

Good afternoon Ms. Spade. This is the only refill request from Daniel for the month of April, only showing a request for refill on the Atorvastatin, so I've told him to submit another one asap so they can get that refilled for him, and to let me know if he did another one in addition to this one so we can have a date and try to track it down if so. Ms. Witherspoon is now handling all of the sick call requests and refill requests/renewals, so it is being handled much more efficiently, but she said she has not received another one from him. Thanks, Nurse S. Harris

 D. Spade 4.6.22.PNG
171kB

<u>Sent from Yahoo Mail for iPhone</u>

On Friday, May 6, 2022, 9:40 AM, Carole Ann Spade <<u>spadedodah@verizon.net</u>> wrote:

We are grateful also for your tireless work in these things.
My daughter had word that he has now received his Meloxicam!! WooHoo!
CA Spade

<u>Sent from Yahoo Mail for iPhone</u>

On Thursday, May 5, 2022, 11:42 AM, Stacy Harris (C065344) <<u>Harris.Stacy@doc.sc.gov</u>> wrote:

FYI from Head Nurse White...we are working to correct the delay by possibly putting boxes in each of the lock down dorms for Inmates to submit their refill requests with someone assigned to checked those daily to help with any delay in medication refills, so we are working on this and I appreciate you and Mr. Spade for continuing to give valuable information and your patience as we improve our practices at SCDC. Have a great day, Nurse S. Harris

**From:** Deandra White (C065685) <<u>White.Deandra@doc.sc.gov</u>>
**Sent:** Wednesday, May 4, 2022 4:46 PM
**To:** Stacy Harris (C065344) <<u>Harris.Stacy@doc.sc.gov</u>>; Dayne Haile (C027588) <<u>Haile.Dayne@doc.sc.gov</u>>
**Cc:** Charles Caine (C067642) <<u>Caine.Charles@doc.sc.gov</u>>; Deasia Witherspoon (C065721) <<u>Witherspoon.Deasia@doc.sc.gov</u>>
**Subject:** RE: Daniel spades medicine

Good Afternoon All:

Please be advised that we have received the Meloxicam for I/M Spade, Daniel #358974 and it will be delivered to his dorm today. I/M Spade is currently housed in a lock-down dorm which can delay delivery of refill request forms to medical. Hope this helps!

*Have a great day!*

DeAndra White-Frierson *RN, BSN, HCA*
South Carolina Department of Corrections
HEALTHCARE AUTHORITY-BRCI
4460 Broad River Rd. Columbia, SC 29210
Office: (803)896-2195
Cell: (803)315-5727
Email: <u>white.deandra@doc.sc.gov</u>



SOUTH CAROLINA
DEPARTMENT OF CORRECTIONS
*Safety, Service, and Stewardship*

## RE: Daniel spades medicine

From:  Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To:  spadedodah@verizon.net

Date:  Friday, May 20, 2022 at 03:34 PM EDT

Good Morning! I've forwarded your concerns regarding the AC Unit to our ombudsmans office to send to the proper personnel to handle that. As far as Daniel's glasses, I thought he had gotten his glasses? I asked before and was told they were "at his bedside", so I've reached out again asking the HCA and Warden Nelsen to verify what you've told me about the outside form and how to get the prescription to you. Thanks, Nurse S. Harris

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Friday, May 20, 2022 3:25 PM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Subject:** Re: Daniel spades medicine

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Ms. Harris-

I thought I saw a response pop up on my phone; but I cannot find it to preview. If you tried to reach me could you please resend.

Thanks

CA Spade

Sent from Yahoo Mail for iPhone

On Friday, May 20, 2022, 9:18 AM, Carole Ann Spade <spadedodah@verizon.net> wrote:

Good morning, Ms. Harris-
    I spoke to our son, Daniel last evening. [BR, Monticello dorm].  I had spoken to the warden's secretary last week who told me that parents ARE allowed to send glasses to a LO and she said she would see he got the needed form. I shared what the warden had told you and asked her to check with him first; but she seemed sure of her info.  Anyway, Dan now has a form to receive a package. What we don't have is his eye prescription. Can it be sent directly to me, or does he have to ask for it and then send.  It has been almost 5 months now we have been trying to get glasses to him.
    One other thing- the dorm that he is in is suffering terribly from the heat and the AC not getting into the cells. It is evidently all okay out in the pod (Rock) - but not getting to the cells. Perhaps a blower issue?? I know this is not strictly a medical issue; though for some it could definitely become one. If you cannot help here, could you please forward someone that I can talk to.
Thanks again.
Carole Ann Spade

## Re: Meds denied

From: Carole Ann Spade (spadedodah@verizon.net)

To: harris.stacy@doc.sc.gov

Date: Wednesday, May 25, 2022, 02:35 PM EDT

Hi again-
    I received your email of just a bit ago and was able to screen shot it before I inadvertently deleted it!! Technology and Me- not a winning combination!!
    Anyway, I was able to save the information to relay to my son. It is true, due to no job forthcoming and on-going lock down conditions in the Monticello dorm, he chooses to sleep late and stay awake late when it is quieter. It hasn't been an issue before; however, I will let him know about the need to allow window to remain open. It is probably the best solution to deliver the sertraline in the evenings as they are considering.
    Again, our family's thank you for interceding in this. I am hoping that he obtains his Zoloft this evening.

CA Spade

On Tuesday, May 24, 2022, 11:12:14 PM EDT, Stacy Harris (C065344) <harris.stacy@doc.sc.gov> wrote:

Good evening Ms Spade. Daniel reached out to me as well so I've been working on this today and hope to have an update for you tomorrow. Thanks, Nurse Harris

Sent from my iPhone

On May 24, 2022, at 5:35 PM, Carole Ann Spade <spadedodah@verizon.net> wrote:

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

My son reported today that he has not received his MH med, Zoloft, for the last 5days! His name is Daniel Spade, #358974, BROAD RIVER- Monticello dorm. This has been at issue recently and took much time to resolve. I had thought we had gotten it satisfied. Please look into what is happening now for me please.
I am his mother and am on his medical file for contact.
Thank you.
Carole Ann Spade

Sent from Yahoo Mail for iPhone

## medication not being received

From:  Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To:    spadedodah@verizon.net

Date:  Wednesday, May 25, 2022, 02:03 PM EDT

Good afternoon Ms. Spade. This is the response I received from the new head nurse at BRCI when I asked about Daniel's Zoloft:

I have been looking into this matter, I have an incident report from Nurse Obinna that Mr. Harris has not been presenting to his door to take his medicine in the morning. The incident report also states that windows and flaps are being covered and the nurse is unable to see inside the cell. Mr. Spade is not the only person. I personally distributed Monticello's medication this morning and the window in cell 264, Mr. Spade's cell, was covered. The flap was open, however, according to policy the inmate is to be present, show ID, and take the medicine in front of the nurse. It is not possible to visualize the inmate taking his medication with a covered window. Failure to abide by security policies constitutes a refusal. That being said, I knocked on his door and there was no answer. I have verified that his medication is present and properly packed. I will be including NP Myers in this thread with a request that the sertraline be rescheduled to the evening to ensure that Mr. Spade will be awake to remove his window coverings and take his medicine. Thank you all as we strive to improve BRCI.

Stacy U. Harris, RN

Medical Concerns Response Team

South Carolina Department of Corrections

4444 Broad River Road

Columbia, SC 29210

Cell: 803-748-5495

Harris.stacy@doc.sc.gov

## FW: glasses

From: Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To: spadedodah@verizon.net

Date: Monday, June 6, 2022 at 02:04 PM EDT

Good afternoon Ms. Spade. This is the email I sent today to the warden, BRCI medical, Head Nurse Chudd, and director Stirling's admin asst and my boss Daye Haile regarding his glasses. I'll keep you posted. Thanks, Nurse Harris

**From:** Stacy Harris (C065344)
**Sent:** Monday, June 6, 2022 2:03 PM
**To:** David Chudd (C059203) <Chudd.David@doc.sc.gov>; Kenneth Nelsen (C061690) <Nelsen.Kenneth@doc.sc.gov>
**Cc:** Dayne Haile (C027588) <Haile.Dayne@doc.sc.gov>; Broad River Medical <BroadRiverMedical@doc.sc.gov>
**Subject:** FW: glasses

Good afternoon. This is the mother of I/M Daniel Spade. She has been asking about glasses for him for several months now. They're asking for his prescription so she can get him glasses because "the warden's secretary said his parent's are allowed to order shipment of them". I emailed regarding this on 01/5/22, 01/28/22, 02/4/22, 02/14/22, 03/22/22, 04/03/22, 05/20/22, and now today. Can someone please check on this and see if the form has been received to get the prescription to his mother who is listed on his ROI?? Thank you so much, Stacy

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Monday, June 6, 2022 10:57 AM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Subject:** Re: Meds denied

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Good Morning, Ms. Harris-
   A couple weeks ago I reached out to the BRCI institution's Warden and spoke to his secretary regarding Daniel's long need for glasses. She told me that as his parents we were allowed to order shipment of such and promised to see that Dan received the form he needed to submit for receiving product into the institution.  Dan filled out the form with an attached request to be given his prescription about 2 weeks ago.  However, nothing yet has been forthcoming.  It is now at least 5 months and counting that he has been without his regular glasses.  If you have time, would you mind checking on this.  If there is a more direct way of sending the prescription directly to me, that would be even better.
   Thanks.

Carole Ann Spade

On Thursday, May 26, 2022, 01:52:57 PM EDT, Stacy Harris (C065344) <harris.stacy@doc.sc.gov> wrote:


Yes, ma'am, happy to help any way I can. Thanks for relaying the message, I also sent it to him. Have a great day, Nurse S. Harris

FW: glasses

From: Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To: spadedodah@verizon.net

Date: Wednesday, June 8, 2022 at 02:52 PM EDT

Good afternoon, following back up regarding Mr. Spade's glasses. I've asked if you'll be able to get a copy of the prescription as well as us, so I'll keep you posted. Nurse Harris

**From:** Latrise Lowery (C061149) <Lowery.Latrise@doc.sc.gov>
**Sent:** Wednesday, June 8, 2022 10:29 AM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Cc:** Deasia Witherspoon (C065721) <Witherspoon.Deasia@doc.sc.gov>; Shenae Salley (C066562) <Salley.Shenae@doc.sc.gov>
**Subject:** RE: glasses

Good Morning,

Just to follow up and give a status update.. I was able to locate a copy of Mr. Spade's analytical eye record, but not a copy of the FEA order form.  I have sent the analytical eye record to Dr. Lemon and asked that he rewrite the prescription.  As soon as I get that back from him, I will get a copy over to you all.

Thank you!

# Latrise L. Lowery

Administrative Coordinator
Medical Services – COA



**SOUTH CAROLINA**
DEPARTMENT OF CORRECTIONS
*Safety, Service, and Stewardship*

**From:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Sent:** Monday, June 6, 2022 2:36 PM
**To:** Latrise Lowery (C061149) <Lowery.Latrise@doc.sc.gov>
**Subject:** FW: glasses

Ms. Lowery, can you please check on the I/M's glasses as Ms. Witherspoon said state issued glasses are handled through specialty clinic?? Thanks, Stacy

**From:** Deasia Witherspoon (C065721) <Witherspoon.Deasia@doc.sc.gov>
**Sent:** Monday, June 6, 2022 2:16 PM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Cc:** Dayne Haile (C027588) <Haile.Dayne@doc.sc.gov>; Broad River Medical <BroadRiverMedical@doc.sc.gov>;

David Chudd (C059203) <Chudd.David@doc.sc.gov>; Kenneth Nelsen (C061690) <Nelsen.Kenneth@doc.sc.gov>
**Subject:** RE: glasses

Good afternoon,

I received inmate Spade's request for his prescription. I have submitted an email to Specialty Clinic at COA (see the attached) and have not gotten a response back yet. I am not sure why inmate Spade has not received his state issued glasses as this process is handled by Specialty Clinic. Please contact them with any other questions regarding inmate Spade's eyeglasses and/or prescription. Thanks!

Respectfully,
**DeAsia Witherspoon**
*Office of Medical Services*
P: 803-896-2872
Witherspoon.Deasia@doc.sc.gov



**SOUTH CAROLINA**
DEPARTMENT OF CORRECTIONS
*Safety, Service, and Stewardship*

---

**From:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Sent:** Monday, June 6, 2022 2:03 PM
**To:** David Chudd (C059203) <Chudd.David@doc.sc.gov>; Kenneth Nelsen (C061690) <Nelsen.Kenneth@doc.sc.gov>
**Cc:** Dayne Haile (C027588) <Haile.Dayne@doc.sc.gov>; Broad River Medical <BroadRiverMedical@doc.sc.gov>
**Subject:** FW: glasses

Good afternoon. This is the mother of I/M Daniel Spade. She has been asking about glasses for him for several months now. They're asking for his prescription so she can get him glasses because "the warden's secretary said his parent's are allowed to order shipment of them". I emailed regarding this on 01/5/22, 01/28/22, 02/4/22, 02/14/22, 03/22/22, 04/03/22, 05/20/22, and now today. Can someone please check on this and see if the form has been received to get the prescription to his mother who is listed on his ROI?? Thank you so much, Stacy

---

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Monday, June 6, 2022 10:57 AM
**To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
**Subject:** Re: Meds denied

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Good Morning, Ms. Harris-
    A couple weeks ago I reached out to the BRCI institution's Warden and spoke to his secretary regarding Daniel's long need for glasses. She told me that as his parents we were allowed to order shipment of such and promised to see that Dan received the form he needed to submit for receiving product into the institution. Dan filled out the form with an attached request to be given his prescription about 2 weeks ago. However, nothing yet has been forthcoming. It is now at least 5 months and counting that he has been without his regular glasses. If you have time, would you mind checking on this. If there is a more direct way of sending the prescription directly to me, that would be even better.
    Thanks.

Carole Ann Spade

## RE: Urgent meds

From: Brayton Hilliard (C066742) (hilliard.brayton@doc.sc.gov)

To: spadedodah@verizon.net

Cc: ombudsman@doc.sc.gov; medicalconcerns@doc.sc.gov

Date: Monday, December 11, 2023 at 09:12 AM EST

Good morning, Ms. Spade,

Your concern has been forwarded to Nurse Harris with the Medical Concerns Team as well as Ms. Labrador, Division Director of Men's Mental Health Services, for review and handling. You will be updated accordingly.

Thank you,

Brayton Hilliard (she/her/hers)
Office of the Ombudsman
South Carolina Department of Corrections
P.O. Box 21787
Columbia, South Carolina 29221-1787
(803) 896-9630
(803) 896-9409 (Ombudsman Office)

---

**From:** Carole Ann Spade <spadedodah@verizon.net>
**Sent:** Monday, December 11, 2023 9:08 AM
**To:** Brayton Hilliard (C066742) <Hilliard.Brayton@doc.sc.gov>
**Cc:** OMBUDSMAN <OMBUDSMAN@doc.sc.gov>
**Subject:** Urgent meds

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Good morning-

My son, Daniel Spade #358974, was unexpectedly transferred last week to Turbeville. Unfortunately, he was evidently also placed into a dorm which sees little time out and Broad River kept his tablet, which we pay for faithfully and is our means of contact with him. He was able to get word to us that his mental health med, Zoloft, has now been denied for the last 9 days (5 at BR,and 4 at Turbeville as of yesterday). This absolutely breaks my heart for him. The side effects of this and the danger of going off said regimen 'cold turkey" are well known. He feels the high tension of this, yet today is expected to enter into a phone hearing on a legal matter.

Please, Ms. Hilliard, if you can help see these meds reach him today, I would be very grateful. Also, his Meloxicam (for a painful back issue) needs a prescription renewal.

Thank you so much for however you can intercede.

I think his dorm is RA 250.

Sincerely,

Carole Ann Spade


PS. I do have the paperwork in place to liaison for him in medical affairs.

## RE: Urgent request regarding D.Spade

From: Stacy Harris (C065344) (harris.stacy@doc.sc.gov)

To:   spadedodah@verizon.net

Cc:   burns.elaine@doc.sc.gov

Date: Monday, December 11, 2023 at 02:49 PM EST

Happy to help as always! I spoke to the pill room nurse at Turbeville and she said no meds came with Mr. Spade, and they called that very same day to have meds sent to them interoffice mail. She said she does see today that his Zoloft expired on 12/11 and was renewed today. She said they will open the pharmacy tote today when it comes to see if it is in there and he will get them. If not in there today, definitely should be tomorrow. Thanks, Nurse S. Harris, medical concerns team

> **From:** Carole Ann Spade <spadedodah@verizon.net>
> **Sent:** Monday, December 11, 2023 11:29 AM
> **To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
> **Subject:** Re: Urgent request regarding D.Spade
>
> **\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***
>
> Thank you again, Stacy, for always being there to intercede. We are so lucky to have a listening ear … and someone who seems to care.  Dan has no tablet yet, as mentioned, to reach me. I wonder if you could check his status for me later on (even tomorrow) to see if Turbeville has followed through.
>
> Thank you again. I hope you have a wonderful holiday season.
>
> CA Spade
>
> Sent from Yahoo Mail for iPhone
>
> On Monday, December 11, 2023, 11:22 AM, Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov> wrote:
>
>> Good Morning Ms. Spade. I am still with the medical concerns team. Thanks for reaching out. I did speak with your son on Friday and let him know there was a note on 12/6/23 in his electronic medical record they had reached out to BRCI asking for his medications to be sent to Turbeville. I see a note today that Mr. Spade asked to have his Zoloft and Trazadone taken together at night as that is what he's been used to, so I am hopeful he received his medicine, but I've reached out to Turbeville pill nurse to just make sure and I'll let you know for sure once I receive word back. Thanks, Nurse S. Harris, medical concerns team
>>
>> **From:** Carole Ann Spade <spadedodah@verizon.net>
>> **Sent:** Sunday, December 10, 2023 3:25 PM
>> **To:** Stacy Harris (C065344) <Harris.Stacy@doc.sc.gov>
>> **Subject:** Urgent request regarding D.Spade

**\*\*\* This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source. \*\*\***

Dear Stacy-

It has been a long time since I have needed to reach out to you myself to intervene regarding my son's medications, etc.  I am not even sure if you are still with the ombudsmen group.  But I still have our prior correspondence so I thought that I would start here.  If you are no longer active with these things, could you pass along to the proper person, please.

My son, Daniel Spade,  #358974, was transferred unexpectedly out of Broad River into Turbeville in the middle of last week.  He is in a notoriously difficult dorm, without access to his tablet (which Broad River kept), so we are unable to have much in the way of contact.  He did get through to us today and relayed that he has been without his Zoloft now for 9 days ( 5 at Broad River and now 4 at Turbeville).  He feels the increase in tension and we could sense it in his voice as well.  He is a mental health patient so going off of these meds is dangerous.. Plus, he is due to have a phone hearing tomorrow and this affects his ability to think and speak clearly and calmly.  Would you be able to reach out to someone there at Turbeville.  He also needs a refill put forth for his Meloxicam.  His ability to intervene for himself is almost nil as the dorm is locked down and he is on a wait list for a tablet.

You were so very helpful to me before in trying to navigate our way through to getting help for Dan, and I am very grateful.  Please let me know if there are other contacts that I should be using to try to intercede for him.


With thanks,

Carole Ann Spade

**SOUTH CAROLINA DEPARTMENT OF CORRECTIONS**
**REQUEST TO STAFF MEMBER**

| TO:   NAME: TITLE: Head of Lee Mental Health Dept. | DATE: 5/23/19 |
|---|---|
| INMATE'S NAME: Daniel Spade | SCDC #: 358974 |
| INSTITUTION: Lee | LIVING QUARTERS: F6B-1228 |

This is a documented follow-up to a Mental Health-related incident that took place between the dates of Tuesday, May 14th and Monday, May 20th. On Tuesday the 14th I was transported to Spartanburg County Jail for what had been long-docketed for a 2 or 3-day PCR Hearing. The PCR ended up being extended and I was forced to stay there 7 days. My understanding was that SCDC Policy was that an inmate's mental health medication should be forwarded *with* him to the County Jail *by Lee C.I.* Upon booking into Spartanburg Jail, I spoke with Medical + conveyed to them my daily mental health meds/doses + the urgency that I receive them that night + every day thereafter. to avoid the side effects that come with being suddenly dropped off them "cold turkey". The nurse provided me with no help or even clarification on the status or whereabouts of the medicine and that night, on the eve of the most critical Court Hearing in my Life(!), I abruptly was taken off my medication. (attached to →

DISPOSITION BY STAFF MEMBER:

| DATE: | SIGNATURE: |
|---|---|

SCDC FORM 19-11 (REV.FEB 2001)

this grievance is a copy of a grievance made at Spartanburg
Jail documenting some of what then occurred in the days thereafter.)
The psychological and corresponding physical side effects were
brutal. I want to get to the bottom of "how" and "why"
this avoidable situation happened, especially given the fact
SCDC is already under terms of suit due specifically to lapses
of proper mental health treatment such as this, and most
importantly what needs to be changed/updated in policy
to insure this doesn't happen to any other Mental Health
patients sent out on *multi-day PCR's* again.

Thank You

URGENT

## SOUTH CAROLINA DEPARTMENT OF CORRECTIONS
### REQUEST TO STAFF MEMBER

TO: NAME: **NPR**    TITLE: Medical    DATE: 12/10/23

INMATE'S NAME: Daniel Spade    SCDC #: 358974

INSTITUTION: Turbeville    LIVING QUARTERS: RA-250

To On-staff Nurse Practitioner:

I just transferred here last week from Broad River C.I. I have been suffering from Spondalysis (sp?), slipped discs, (L3/L4) and arthritis in my lower back since an injury at Lee C.I. in 2017. It went misdiagnosed for (3) Years until staff at Broad River properly read the x-rays & an MRI was done. They only gave me a total of one, 45-minute physical therapy session in the last (5) Years while at Broad River. I had two cortisone shots in 2021 and 2022 but neither helped. After my last shot, the medical staff/ Doctor completely dropped me from receiving any further care (?) I didn't even receive a follow-up appt. with the Back Doctor after the last shot. My condition has grown worse. I've been forced to simply take large doses of Tylenol & Meloxicam just to cope with the pain. Please help... and confirm back below what happened (?) Thank You and what care you can offer me here.

DISPOSITION BY STAFF MEMBER:

Been Added to SIC

RECEIVED

TURBEVILLE C.I.
MEDICAL

DATE: 12/20/23    SIGNATURE:

SCDC FORM/19-11 (REV.FEB 2001)

# Exhibit K

THE STATE OF SOUTH CAROLINA
In The Supreme Court

**RECEIVED**

**Apr 12 2022**

S.C. SUPREME COURT

APPEAL FROM SPARTANBURG COUNTY
Court of Common Pleas
J. Mark Hayes, II, Circuit Court Judge

Appellate Case No. 2022-000434

Daniel W. Spade ........................................................................ Petitioner,

v.

State of South Carolina, ........................................................... Respondent.

## MOTION FOR APPEAL BOND

Pursuant to Rule 243(k), SCACR, Daniel W. Spade moves this Court for an order granting him an appeal bond while the State seeks to appeal the Circuit Court's order granting him Post-Conviction Relief ("PCR").

### I.    PROCEDURAL AND FACTUAL BACKGROUND.

On June 29 and 30, 2009, the Honorable Georgia C. Anderson convened a hearing in the Family Court for Spartanburg County regarding Heather and David Jolley's petition to terminate Dany Spade's parental rights. This action was not successful. Judge Anderson issued a final order on January 13, 2010. This order was supplemented on June 29, 2010. Heather Jolley filed another Family Court Action on November 23, 2010.

On May 3, 2011, Spartanburg County Sheriff's Office Investigator Nikki Cantrell, assisted by officers of the Prince William County Police Department, arrested Mr. Spade in Virginia, charging him in Spartanburg County with first-degree criminal sexual conduct

with a minor involving his daughter. On January 9, 2012, the Jolleys amended the November 2010 complaint to petition to terminate Mr. Spade's parental rights and to allow David Jolley to adopt the child. Beginning on October 15, 2012, the Honorable James F. Fraley, Jr. convened a hearing in the Family Court for Spartanburg County. Judge Fraley ultimately terminated Mr. Spade's parental rights and allowed Mr. Jolley to adopt the child. Mr. Spade's Rule 60, SCRCP Motion for Relief from Judgment is still pending in the Spartanburg County Family Court.

From February 24-26, 2014, the State tried Mr. Spade before the Honorable R. Keith Kelly and a jury. Solicitor Barry J. Barnett, Assistant Solicitor Jennifer A.J. Jordan, Assistant Solicitor Kimberly L. Leskanic, and Special Prosecutor N. Douglas Brannon[1] represented the State. Kenneth P. Shabel and Shawn M. Campbell represented Mr. Spade. On February 26, 2014, the jurors found Mr. Spade guilty of first-degree criminal sexual conduct with a minor. Judge Kelly sentenced Mr. Spade to thirty-five years imprisonment.

Mr. Spade appealed to the Court of Appeals. C. Rauch Wise and Mr. Shabel represented Mr. Spade. On February 11, 2016, the Court of Appeals convened an oral argument. While the decision was still pending, Mr. Shabel joined Mr. Brannon's law firm and, accordingly, moved to be relieved as counsel by petition dated March 11, 2016. On July 6, 2016, the Court of Appeals affirmed Mr. Spade's conviction and sentence. *State v. Spade*, Unpublished Op. No. 2016-UP-352 (Filed July 6, 2016). On August 18, 2016, the Court of Appeals denied Mr. Spade's petition for rehearing.

---

[1] Mr. Brannon represented the Jolleys in the successful termination of parental rights case. After Mr. Spade's jury trial, Mr. Shabel joined Mr. Brannon's law firm. "[D]espite the concurrent conflict of interest due to the employment of" Mr. Shabel, Mr. Brannon continued to represent the Jolleys in the Family Court. *Matter of Brannon*, 428 S.C. 644, 648, 837 S.E.2d 488, 490 (2019).

On October 6, 2016, Mr. Spade filed a petition for writ of *certiorari* in this Court. Mr. Wise represented Mr. Spade. On June 16, 2017, this Court denied Mr. Spade's petition for a writ of *certiorari*.

On July 13, 2017, Mr. Spade filed a *pro se* PCR application. With the assistance of undersigned counsel, Mr. Spade amended his PCR application on October 2, 2017, December 24, 2018, and May 14, 2019. From May 15-21, 2019, the Honorable J. Mark Hayes, II convened an evidentiary hearing.

By Form 4 Order dated May 7, 2020, the PCR Court announced its intentions to deny Mr. Spade's PCR application and instructed the Attorney General's Office to prepare a proposed order, consistent with the PCR court's findings of fact. On June 8, 2020, the Attorney General submitted the State's proposed order. On July 7, 2020, Mr. Spade objected to the State's proposed order. *Fishburne v. State*, 427 S.C. 505, 516, 832 S.E.2d 584, 589 (2019) ("Opposing counsel should promptly review the proposed order and alert preparing counsel and the PCR court as to any deficiencies in the proposed order."). On October 8, 2020, the PCR court dismissed Mr. Spade's PCR application. On October 19, 2020, Mr. Spade served his Rule 59(e), SCRCP motion. The State responded on January 13, 2021, and Mr. Spade replied on March 19, 2021. On March 29, 2021, the PCR court convened a hearing on the motion.

On November 12, 2021, the PCR Court issued an order modifying, in part, the order of dismissal dated October 8, 2020 and granting Mr. Spade a new trial "find[ing] that Special Prosecutor's [closing] argument was improper and trial counsel erred by not objecting." Order (11/12/21), at 19. Based on the evidentiary hearing testimony, the PCR court expressly found the Special Prosecutor "motive in making this type of argument was

to appeal to the jury's sympathies" and "emotions." *Id.*, at 20-21. The PCR court further found and concluded, "The objectionable statements made by Special Counsel were unconstitutional, even without knowing Special Counsel's intent, because they shifted the role of the jury away from being fair and impartial arbitrators of the facts" and "the statements were crafted to have the jury view the evidence through an unconstitutional lens." *Id.*, at 21-23 (citing *Vasquez v. State*, 388 S.C. 447, 698 S.E.2d 561 (2010), *State v. Northcutt*, 372 S.C. 207, 641 S.E.2d 873 (2007), *Simmons v. State*, 331 S.C. 333, 503 S.E.2d 164 (1998), and *State v. Linder*, 276 S.C. 304, 278 S.E.2d 335 (1981)).

The PCR court additionally analyzed the prejudice prong of *Strickland*,[2] applying this Court's precedent in *Smalls v. State,* 422 S.C. 174, 810 S.E.2d 836 (2018) and *Thompson v. State*, 423 S.C. 235, 814 S.E.2d 487 (2018). *Id.*, at 23-27. "Not finding 'overwhelming' evidence of guilt in the trial record," the PCR Court found "that trial counsel's failure to object to the solicitor's improper closing was prejudicial to [Mr. Spade] and there exists a reasonable probability the trial would have been different without counsel's error" and "counsel's error undermines confidence in the outcome of the trial." *Id.*, at 25.

On November 29, 2021, the State served a Rule 59(e), SCRCP motion. On January 24, 2022, Mr. Spade responded. On March 11, 2022, the PCR Court denied the State's motion. On April 11, 2022, the State filed a notice of appeal. Subsequently, on April 11, 2022, Mr. Spade filed a notice of cross-appeal.[3]

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

[3] Concurrent with the notices of appeal, both parties filed with this Court copies of the orders dated October 8, 2020, November 11, 2021, and March 3, 2022.

4

## II.    RELEVANT LEGAL PRINCIPLES.

> A post-conviction relief applicant may be admitted to bail after the service of the notice of appeal by either the applicant or the State. Where the sentence originally imposed did not exceed imprisonment for ten (10) years, the petition for bail shall be made to the lower court. In all other cases, the petition for bail shall be made to the Supreme Court.

Rule 243(k), SCACR. The factors to be considered in admitting a person to bail pending appeal in PCR cases include the probability of prevailing on appellate review, the seriousness of the crime involved, the potential danger the person may pose to the community if released, the risk of flight, and the character and circumstances of the person. *Id.; see also In re Michael H.,* 360 S.C. 540, 553, 602 S.E.2d 729, 736 (2004) (citing *Nichols v. Patterson,* 202 S.C. 352, 25 S.E.2d 155 (1943)).

### A.  Probability of Prevailing on Appellate Review.

For at least three reasons, there is a strong probability Mr. Spade will prevail on the merits. The first reason relates to the relief granted by the PCR court. The second and third reasons relate to matters Mr. Spade will raise on the cross-appeal.

First, the PCR court ruled in Mr. Spade's favor regarding the Special Prosecutor's closing argument. This ruling included credibility findings regarding the testimony of the Special Prosecutor, which are entitled to difference on appeal.[4] *Mangal v. State,* 421 S.C.

---

[4] In one of the factual findings, the PCR Court found:

In the State's [Rule 59(e)] motion pp. 19-20, a portion of the PCR hearing testimony is quoted in an effort to explain the State's disagreement with this Court's finding that the argument made at trial was not unconstitutional. [sic]. Having witnessed and heard this testimony of the Special Counsel during the PCR hearing, the more reasonable and accurate conclusion of the of the quoted testimony is that, being a private attorney, Special Counsel incorrectly viewed the role of zealous advocacy of a private attorney in a criminal trial as constitutionally the same as the role of a solicitor.

85, 91, 805 S.E.2d 568, 571 (2017) (This Court "defer[s] to a PCR court's findings of fact and will uphold them if there is any evidence in the record to support them."). The PCR court's order on this issue is well reasoned and, as seen above, consistent with this Court's precedent. As noted by the PCR court, "the State did not challenge [the PCR court's] finding that the Special Prosecutor's motivation for his closing argument was to appeal to the jury's sympathies." Order (3/11/22), at 5-6. The PCR court further noted the State's Rule 59(e) motion was inadequate regarding the finding of *Strickland* prejudice on this issue. During the hearing on Mr. Spade's Rule 59(e) motion, the State "agree[d] that *Smalls* is the appropriate analysis" to assess *Strickland* prejudice, but the State's Rule 59(e) "motion is void of any reference to *Smalls* or the requested *Smalls* analysis." *Id.* The State, accordingly, is foreclosed from challenging the *Smalls* prejudice analysis on appeal. *See, e.g., Burgess v. State*, 402 S.C. 92, 738 S.E.2d 264 (Ct. App. 2013) (State failed to preserve for appellate review its claim that PCR court failed to undertake prejudice analysis with respect to petitioner's ineffective assistance claim).

Second, Mr. Spade's PCR application raised issues of improper bolstering, which the court below addressed in the final order. Order (11/11/22), at 14-17. Regarding the deficient performance prong of *Strickland*, he PCR court concluded:

> This Court's opinion is that trial counsel was not constitutionally deficient based on South Carolina jurisprudence that existed at the time of his trial for not objecting to the testimony [Mr. Spade] asserts. Our Supreme Court has made it clear, trial counsel should object to this type of testimony when it is presented before a jury as a means to indirectly bolster testimony. *State v. Anderson* was not decided until 2015. 413 S.C. 212, 776 S.E.2d. *State v. Anderson*, set for better practice to be used by prosecutors. The better practice is not to have the individual who treated the alleged victim testify, but rather to call an independent "blind" expert. Also, *see State v. Makin*, 343 S.C. 949, 860 S.E.2d 666 (2021) where the Supreme Court explained

_____

Order (3/11/22), at 6, n. 8.

6

that an expert who testifies as a treating expert and an expert as to general characteristics of abuse is not per se improper. However, the Supreme Court warns against this practice.

*Id.*, at 17. The PCR court, however, noted:

> As in the *Makin* case, the present PCR is a close call on the bolstering issue. *Id.* at 17-18, n. 18. In the event this Court's decision on this issue is reversed, based upon *State v. Douglas*, 380 S.C. 499, 505 671 S.E.2d 606, 610 (2009) (Pleicones, J., dissent) and *Infra* the *Smalls* analysis . . ., trial counsel's failure to object to improper bolstering would meet the Strickland standard of prejudice. Again, this Court nots that no physical evidence was presented to establish guilt.

*Id.*, at 17-18, n. 18. Although unclear whether the State raised a second issue in its Rule 59(e) motion, the PCR court observed the State requested footnote 18 be removed from the order dated November 11, 2021. Order (3/11/22), at 3, n. 5. The PCR court reaffirmed footnote 18, reminded the "issue of bolstering [as to two of the State's witnesses at trial] is a close call," and observed, "For clarity purposes, [the PCR] Court found prejudice existed in the event [the PCR] court was incorrect that Trial Counsel should have objected to the presentation of either or both of these witnesses." *Id.*

Returning to the deficient performance prong of *Strickland*, Mr. Spade's Rule 59(e) motion noted the order dated October 8, 2020 concluded, "This Court can find no error for PCR purposes by trial counsel *under the South Carolina jurisprudence that existed at the time of the trial* in the manner in which he objected." Exhibit A, at 16 (emphasis added). Mr. Spade argued:

> This statement implies a finding of fact that trial counsel failed to object to improper bolstering based on South Carolina current jurisprudence regarding improper vouching. Perhaps this Court reached this conclusion because our Supreme Court decided *State v. Anderson*, 413 S.C. 212, 776 S.E.2d 76 (2015) after Mr. Spade's jury trial—which appears to be incorporated into the order of dismissal, at 43-44. If so, then this Court overlooked *State v. Kromah*, 401 S.C. 340, 37 S.E.2d, (2013), *State v. Jennings*, 394 S.C. 473, 716 S.E.2d 91 (2011), *Smith v. State*, 386 S.C. 562,

> 689 S.E.2d 629 (2010), *State v. Douglas*, 380 S.C. 499, 671 S.E.2d 606 (2009), and *Dawkins v. State*, 346 S.C. 151, 551 S.E.2d 260 (2001). *See also* [*Briggs v. State*, 421 S.C. 316, 325, 806 S.E.2d 713, 718 (2017) and *Thompson v. State*, 423 S.C. 235, 243, 814 S.E.2d 487, 491 (2018)].

*Id.* (footnote omitted). Mr. Spade, accordingly, believes he will prevail on the merits of the deficient performance prong of *Strickland* regarding the improper bolstering issue.

Third, Mr. Spade's PCR application raises trial counsel's failure to object to the trial judge instructing—and trial counsel arguing—the jurors should "search for the truth." The PCR court agreed with Mr. Spade "that 'the trial court's statement and his attorney's statement crossed into the [*State v.* Beaty, 423 S.C. 26, 813 S.E.2d 502 (2018)] sphere of improper statements'" because "these statements 'shifted the jury's focus away from the State's obligation of meeting its burden of proof.'" Order (11/12/21), at 12-13. The PCR court denied Mr. Spade relief because *Beaty* was not decided at the time of his jury trial. *Id.* This Court, however, decided *State v. Daniels*, 401 S.C. 251, 737 S.E.2d 473 (2103) prior to Mr. Spades jury trial. *See also Teamer v. State*, 416 S.C. 171, 182-83, 786 S.E.2d 109, 114-15 (2016) (recognizing *Daniels* decided this issue). The PCR court further concluded, "[B]ecause trial counsel failed to object to the trial court's use of a 'search for the truth' terminology and because trial counsel erred in using the same terminology when explaining the purpose of a criminal trial, the significance or weight of the Special Prosecutor's improper closing argument when performing a *Smalls* analysis, increased the prejudicial effect of the improper closing argument." *Id.*, at 13, n. 14. The PCR court ultimately found and concluded, "[T]he presentation of evidence in the trial was 'bookended' with unconstitutional statements that altered the jury's role from being an impartial factfinder when determining if the State had met its constitutional obligations of

proving guilt." *Id.*, at 27. Mr. Spade, accordingly, believes he will prevail on the merits of this issue.

### B. The Seriousness of the Crime Involved.

Although the alleged crime is very serious, the PCR court determined there was not overwhelming evidence of Mr. Spade's guilt when performing the prejudice analysis under *Smalls*. Order (11/11/21), at 23-27. In doing so, the PCR court expressly found, "At trial, the only evidence of [Mr. Spade's] guilt was the testimony of the minor." *Id.*, at 24. As noted above, the State did not challenge the PCR court's *Smalls* analysis in its Rule 59(e) motion. The PCR court also noted the "bitterly fought private Family Court [custody] dispute." *Id.*, at 1.

### C. The Possibility of Escape and Character of Mr. Spade.

Mr. Spade, who does not have a prior criminal history, has consistently maintained his innocence and, therefore, has a vested interest in appearing at his new trial. On July 15, 2011, the Court of General Sessions released Mr. Spade on a $75,000.00 surety bond that allowed him to live with his family in Maryland. Exhibit B, C, and D. Mr. Spade appeared for his jury trial. Mr. Spade's parents, Rodney and Carole Ann Spade, and his sister and brother-in-law, Joshua and Christine Trumpower, are willing to provide Mr. Spade a place to live and ensure his compliance with the conditions of bond. Exhibits C and D. Mr. Spade's parents and the Trumpowers live near each other. *Id.* Undersigned counsel is informed and believed they live in the same neighborhood.

During his confinement, Mr. Spade earned his certification as a paralegal and served as a law clerk in the law libraries at Lee Correctional Institution and Broad River Correctional Institution. Mr. Spade, accordingly, has a skill that will allow him to seek

employment if released on bond. Additionally, during his confinement, Mr. Spade voluntarily instructed fellow inmates and helped them obtain their GEDs.

During his initial confinement post-arrest, Mr. Spade was denied seeing the birth of his youngest child. During the pendency of his appeal and five-year PCR proceedings, Mr. Spade lost his closest uncle, two aunts, another close uncle, and his favorite cousin. Not being able to attend their funerals or be with his parents during their loss/struggles has been very difficult on him. Also, Mr. Spade's father is recovering from triple bypass surgery, and Mr. Spade could assist his family care for his father.

## III.     CONCLUSION.

For the foregoing reasons, this Court should grant Daniel Spade an appeal bond with appropriate conditions.

Respectfully Submitted,

By s/*E. Charles Grose, Jr*

E. Charles Grose, Jr.
S.C. Bar Number 66063
The Grose Law Firm, LLC
404 Main Street
Greenwood, SC 29646
(864) 538-4466
(864) 538-4405 (fax)
Email:  charles@groselawfirm.com

*Attorney for Daniel W. Spade*

April 12, 2022
Greenwood, South Carolina

STATE OF MARYLAND )
                                          ) AFFIDAVIT OF RODNEY E. SPADE &
                                          ) CAROLE ANN SPADE
COUNTY OF ST. MARY'S )

Rodney E. Spade and Carole Ann Spade, being first duly sworn, swears and affirms that the following is true to the best of our knowledge:

1) We are the parents of Daniel Spade. We live at 45892 Kristi Lynn Ct., Lexington Park, Maryland.

2) We are retired from the pastorate (Rodney) here in our county. Carole Ann retired from over 25 years teaching in our local Christian school. We have been residents of St. Mary's Co. since 1988. Though retired, we still do some part-time work to pay monthly expenses.

3) Our purpose is to request your consideration to bond our son, Daniel Spade, into our care in Maryland. We are willing to accept this this responsibility and ensure Daniel complies with any bond conditions set by the Court.

3) As his parents, we are both in our seventies and find traveling long distances increasingly challenging. Our daughter, Christy Trumpower lives nearby, and our homes would provide needed accommodation for Daniel.

4) In addition, Daniel has some significant health needs needing to be addressed. We have already begun an avenue here to help provide financial provision for this to be done.

5) We have no relatives in South Carolina to provide either housing or long-term care for Daniel. If he is remanded to remain in-state, we would certainly comply, but it would be at great hardship for us to do so.

6) Prior to his trial, the Court of General Sessions for Spartanburg County released Daniel on bond and allowed him to live in Maryland. Daniel's original bond to Maryland was

carried out faithfully, and he appeared for his jury trial. We will do so again, should you entrust our son's care into hands.

7)    Thus, we fervently ask for your thoughtful mercy to this end.

**Further affiants sayeth naught.**

*Rodney E. Spade*
Rodney E. Spade

Sworn to and subscribed before me

this __11__ day of __April__ , 2022

*Melva Ahill*
NOTARY PUBLIC FOR MARYLAND
My Commission Expires: __11-14-2023__

*Carole Ann Spade*
Carole Ann Spade

Sworn to and subscribed before me

this __11__ day of __April__ , 2022

*Melva Ahill*
NOTARY PUBLIC FOR MARYLAND
My Commission Expires: __11-14-2023__

STATE OF MARYLAND          )
                           )    AFFIDAVIT OF JOSHUA P. TRUMPOWER &
                           )    CHRISTINE E. TRUMPOWER
COUNTY OF ST.MARY'S        )

Joshua P. Trumpower and Christine E. Trumpower, being first duly sworn, swears and affirms that the following is true to the best of my knowledge:

1)    We are the sister and brother-in-law of Daniel Spade. We live at 45968 Rolling Road, Lexington Park, Maryland.

2)    Joshua is an employee of the Department of the Navy at the Patuxent River Naval Air Station where he has worked for 19 years. This is located in Lexington Park Md. Christine is a stay-at-home mom but does part-time work at Faith Bible Church in Mechanicsville, Md.

3)    Our purpose is to request your consideration to bond our brother, Daniel Spade, into our care in Maryland. We are willing to accept this responsibility and ensure Daniel complies with any bond conditions set by the Court.

4)    As his siblings, we can provide a healthy, supportive, and loving environment for Danny to reside. We will be able to provide for his physical, emotional, and spiritual needs. We gladly accept responsibility in making sure Danny makes all court appearances as needed in South Carolina

5)    In addition, Daniel has some significant health needs needing to be addressed, such as PTSD and back injury, we will provide the transportation to get him to mental health appointments to help him to process, deal and heal.

6)    We have no relatives in South Carolina to provide either housing or long-term care for Daniel. If he is remanded to remain in-state, we would certainly comply, but it would be at great hardship for us to do so.

7)      Prior to his trial, the Court of General Sessions for Spartanburg County released Daniel on bond and allowed him to live in Maryland. Daniel's original bond to Maryland was carried out faithfully, and he appeared for his jury trial. We will do so again, should you entrust our loved one's care into our hands.

8)      Thus, we fervently ask for your thoughtful mercy to this end.


**Further affiants sayeth naught.**

*Joshua P. Trumpower*
Joshua P. Trumpower

Sworn to and subscribed before me

this 11th day of April ____, 2022

*Celeste Dimitra Pullias*
NOTARY PUBLIC FOR MARYLAND
My Commission Expires: August 5, 2023

CELESTE DIMITRA PULLIAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires August 5, 2023

*Christine E. Trumpower*
Christine E. Trumpower

Sworn to and subscribed before me

this 11th day of April ____, 2022

*Celeste Dimitra Pullias*
NOTARY PUBLIC FOR MARYLAND
My Commission Expires: August 5, 2023

CELESTE DIMITRA PULLIAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires August 5, 2023

2

Exhibit L

Exhibit M

April 1, 2023

Jenny Abbott Kitchings
Clerk of Court, SC Court of Appeals
1220 Senate Street
Columbia, SC. 29201

RECEIVED

APR 17 2023

SC Court of Appeals

H. Bruce Williams
Chief Judge, SC Court of Appeals
1220 Senate Street
Columbia, SC. 29201

**Re: Concerns with Extensive Appellate Backlog (PCR Cases) AND Consideration of likely Due Process Infringement upon the Special Class of Cases Within the Docket**

Dear Honorable Clerk Kitchings and Judge Williams:

I hope this letter finds you both well– ministering and delivering justice. We are concerned citizens. Over the last year, we've become intimately aware of the large backlog of PCR-related appellate cases sitting in a seeming state of legal oblivion within the Court of Appeals' docket and for egregious lengths of time. With a closer examination, it appears that forcing an appellant to wait a year, even year-and-a-half, is not the maximum delay in adjudication of an inmate appellant case but the very *minimum*. Many litigants have/continue to be forced to wait **two, three, even an astounding four even five years** for appeal/writ of cert adjudication(!) This is especially disturbing given the Supreme Court of South Carolina has long held that inmate appellants have a <u>right</u> to a *speedy* appeal. *Maner v. Maner*, 278 S. C. 377 (1982) (holding the right to a speedy remedy includes the right to a speedy appeal).

We are concerned for the rights of every appellant stuck in such an egregiously long backlog, but it is even more personally frustrating– and disturbing– because we have a loved one who has already lingered in the docket for an entire year with meager movement "up" the docket queue. And the "disturbing" facet to this situation for his entire family is that he looks to be facing, if this situation isn't expeditiously addressed, another two or three harrowing years in a violent Max Security prison *despite* a Circuit Court in 2021 having **overturned** his conviction due to *intentional* prosecutorial misconduct(!) I realize that it is easy to get numb to a daily (and continually revolving) rotation of names and numbers moved across your respective desks but I pray this Court never forgets that there are truly innocent people trapped in this system at no fault of their own. Given the premise that "justice delayed is justice denied", every single additional day they are forced to endure confinement– let alone due to administrative backlogs– is an injustice. In this vein, it seems unconscionable that any man or woman whom a competent

Court of this State has explicitly found to have been <u>intentionally</u> denied a fair trial due to misconduct by the State should then be forced to remain in extremely violent and oppressive prisons for **several more years** of their already-destroyed lives. (Potentially subject to death-by-inmate–or even suicide– every *single* day)[1] Upon the signature of the Circuit Court Judge's Order of a New Trial, is not that overturned conviction– which means **no conviction at all–** the law of the case?

      Given the above, we humbly ask the following pertinent questions:

- Are there any additional measures being or going to be taken to address the extensive present backlog?

- Regardless of the above, has there been any serious consideration (or would this Honorable Court consider)– possibly via order of Chief Justice Beatty– following the example of other state appellate courts who have confronted similar backlogs/delays and consider expediting the case docketing of those inmate litigants who have been found by the Circuit Courts to have been **Wrongfully Convicted**?[2]

      In closing, please know that your work is greatly appreciated and your efforts in improving this system of justice are so very important! Thank you for your attention and consideration of these matters involving the protection of the fundamental rights of inmate appellants– a percentage of whom are tragically innocent but placed upon a path through hell on earth. There is no greater tragedy within this system. And if there is *anything* that can be done to minimize the **length** of the plight of the wrongfully convicted, it must be done. The public cares, we're watching and we're duly invested. We will anxiously await your reply and feedback.

Respectfully,

*Joshua Trumpower* , *Christine E. Trumpower*

Joshua and Christine Trumpower


cc: Chief Justice Donald Beatty
     File

---

[1] Our wrongfully convicted loved one was there at Lee Prison in 2018 when bodies were stacked up like firewood. He has witnessed multiple fellow inmates killed right in front of him while at Broad River. He has been kept safe– thus far– by the Grace of God.

[2] Notably, the State of Kentucky recognized the due process issues (and compounded injustice) within these very class of cases stuck in the very situation discussed below and simply adopted a procedure within the Clerk's Office of *expediting* appeals where the State is the petitioner.



Josh & Christy Trumpower
45968 Rolling Rd.
Lexington Park, MD 20653-4330

CAPITAL DISTRICT 208
12 APR 2023 PM 1 L

RECEIVED
APR 17 2023
SC Court of Appeals

H. Bruce Williams
Chief Judge, S.C. Court of Appeals
1220 Senate Street
Columbia, S.C.
29201

29201-376999



Josh E Christey Trumpower
45548 Rolling Rd.
Lexington Park, MD 20653-6330

CAPITAL DISTRICT 208
12 APR 2023 PM 1 L

RECEIVED
APR 17 2023
SC Court of Appeals

Jenny Abbott Kitchings
Clerk of Court, S.C. Court of Appeals
1220 Senate Street
Columbia, S.C.
29201

29201-376999





*Personal follow-up in 2023 (late '23) from Family's Letter re: expediting in 2022*

# The South Carolina Court of Appeals

JENNY ABBOTT KITCHINGS
CLERK

CATHERINE S. HARRISON
CHIEF DEPUTY CLERK

POST OFFICE BOX 11629
COLUMBIA, SOUTH CAROLINA 29211
1220 SENATE STREET
COLUMBIA, SOUTH CAROLINA 29201
TELEPHONE: (803) 734-1890
FAX: (803) 734-1839
www.sccourts.org

September 22, 2023

Daniel William Spade, 358974
Broad River Correctional Institution
4460 Broad River Road
Columbia SC 29210

Re:   Daniel Spade v. State
      Appellate Case No.  2022-000434

Dear Mr. Spade:

This will acknowledge receipt of your letter we received on September 20, 2023, regarding the status of the above case on appeal.

Please be advised that your case was transferred to the South Carolina Court of Appeals by order of the South Carolina Supreme Court on November 15, 2022.

Your case is still pending in this Court and is being processed in the normal fashion.  It is difficult to predict when a case will be decided by the Court because of the many variables that affect the decision making process of any given case. When a final decision has been made on your case, you and your attorney will be immediately notified.

Very truly yours,

*Catherine Harrison, deputy*

CLERK

cc:   E. Charles Grose, Jr., Esquire
      Donald J. Zelenka, Esquire

Exhibit N

RECEIVED

**May 08 2023**

SC Court of Appeals

THE STATE OF SOUTH CAROLINA
In The Supreme Court

APPEAL FROM SPARTANBURG COUNTY
Court of Common Pleas
J. Mark Hayes, II, Circuit Court Judge

Appellate Case No. 2022-000434

Daniel W. Spade ...............................................................Respondent-Petitioner,

v.

State of South Carolina, ......................................................Petitioner-Respondent.

**PETITION FOR A SPEEDY APPEAL**

Pursuant to Article I, Section 9 of the South Carolina Constitution, Daniel Spade moves this Court for a speedy appeal of the State's appeal of the grant of post-conviction relief ("PCR").

## I. PROCEDURAL HISTORY.

Following a hearing on June 29-30, 2009, the Honorable Georgia C. Anderson dismissed Heather and David Jolley's Family Court petition to terminate Dany Spade's parental rights on January 13, 2010 and issued a supplemental order on June 29, 2010. Heather Jolley filed another Family Court Action on November 23, 2010.

On May 3, 2011, Investigator Nikki Cantrell and officers of the Prince William County Police Department arrested Mr. Spade at his home in Virginia, charging him with first-degree criminal sexual conduct with a minor involving his daughter ("child").

On January 9, 2012, the Jolleys amended the November 2010 Family Court complaint to petition to terminate Mr. Spade's parental rights and to allow David Jolley to adopt the child. N.

Douglas Brannon represented the Jolleys. Kenneth P. Shabel represented Mr. Spade. Alexandria Wolf was the guardian ad litem. Beginning on October 15, 2012, the Honorable James F. Farley, Jr. convened a hearing in the Family Court for Spartanburg County. Judge Farley ultimately terminated Mr. Spade's parental rights and allowed Mr. Jolley to adopt the child.[1] A. 2256-2447.

The State tried Mr. Spade before the Honorable R. Keith Kelly and a jury on February 24-26, 2014. A. 1-346. Barry J. Barnett, Jennifer A.J. Jordan, Kimberly L. Leskanic, and Mr. Brannon represented the State. Mr. Shabel and Shawn M. Campbell represented Mr. Spade. On February 26, 2014, the jurors found Mr. Spade guilty of first-degree criminal sexual conduct with a minor. A. 342. Judge Kelly sentenced Mr. Spade to thirty-five years imprisonment. A. 345.

Mr. Spade appealed to the Court of Appeals. A. 421-1003. C. Rauch Wise and Mr. Shabel represented Mr. Spade. On February 11, 2016, the Court of Appeals convened an oral argument.[2] On July 6, 2016, the Court of Appeals affirmed Mr. Spade's conviction and sentence. *State v. Spade*, (S.C.Ct.App. Op. No. 2016-UP-352) (Filed July 6, 2016). A. 984-32. On August 18, 2016, the Court of Appeals denied Mr. Spade's petition for rehearing. A. 993-1003. On October 6, 2016, Mr. Spade filed a petition for writ of *certiorari* in the South Carolina Supreme Court. A. 1004-33. Mr. Wise represented Mr. Spade. On June 16, 2017, the Supreme Court denied Mr. Spade's petition for a writ of *certiorari*. A. 1062.

---

[1] Proceedings on Mr. Spade's Rule 60, SCRCP motion are still pending in the Family Court Mr. Spade filed the Rule 60 Motion *pro se*. Undersigned counsel subsequently entered an appearance. Mr. Brannon continued to represent the Jolleys but subsequently withdrew because of a conflict of interest. *Matter of Brannon*, 428 S.C. 644, 837 S.E.2d 488 (2019). Scott F. Talley currently represents the Jolleys. A hearing was held on January *, 2023, but no order has issued.

[2] While the decision was still pending, Mr. Shabel joined Mr. Brannon's law firm and, accordingly, moved to be relieved as counsel, because of the conflict of interest, by petition dated March 11, 2016.

On July 13, 2017, Mr. Spade filed a *pro se* PCR application. A. 1064-73. With the assistance of undersigned counsel, Mr. Spade amended his PCR application on October 2, 2017 (A. 1084-94), December 24, 2018 (A. 1067-78), and May 14, 2019 (A. 1079-89). From May 15-20, 2019, the Honorable J. Mark Hayes, II Court convened an evidentiary hearing. A. 1241-72). By written order dated May 20, 2019, Judge Hayes ordered the South Carolina Department of Social Services ("DSS") provide the Court with "a complete copy of the DSS file regarding [the child], Daniel W. Spade (father), and Heather Smith a/k/a Heather Smith Jolley." A. 2678-79. Judge Hayes released a copy of the DSS file to the parties by written order dated August 16, 2019. A. 2688-89.

By written order dated May 7, 2020, Judge Hayes made findings of fact, denied Mr. Spade post-conviction relief, and instructed the Attorney General's Office to prepare a formal order. A. 2755-64. On July 7, 2020, Mr. Spade served his objections to the Attorney General's proposed order and proffered a copy of the Attorney General's proposed order. A. 2830-3027. By written Order dated October 8, 2020, the Court dismissed Mr. Spade's PCR application. A. 3028-91. On October 19, 2020, Mr. Spade filed his 59(e), SCRCP motion. A. 3092-3111. The State responded on January13, 2021. A. 3112-47, and Mr. Spade replied on March 30, 2021. A. 3148-67. Following a hearing on March 29, 2021 (A. 3168-3263), Judge Hayes issued an order granting Mr. Spade post-conviction relief, in part, and ordering a new trial. A. 3263-90. On November 29, 2021, the State filed a Rule 59(e), SCRCP motion. A. 3291-3318. On January 24, 2022, Mr. Spade responded. A. 3318-22. On March 11, 2022, Judge Hayes denied the State's motion. A. 3323-28.

On April 11, 2022, the State noticed this appeal. Subsequently, on April 11, 2022, Mr. Spade noticed the cross-appeal. By November 8, 2022, the partied filed all cert-stage pleadings. On November 15, 2022, the Supreme Court transferred this matter to this Court.

## II.    LEGAL ARGUMENT.

"All courts shall be public, and every person shall have speedy remedy therein for wrongs sustained." S.C. Const. art. I, § 9. This "right to a speedy remedy includes the right to a speedy appeal." *Maner v. Maner*, 278 S.C. 377, 380, 296 S.E.2d 533, 535 (1982). Although Article I, Section 9 applies to civil cases, *State v. Lagerquist*, 254 S.C. 501, 176 S.E.2d 141 (1970), PCR cases are civil matters. S.C. Code Ann. § 17-27-80. *See also Hiott v. State*, 381 S.C. 622, 674 S.E.2d 491 (2009); Rule 71.1, SCRCP.

At the time of the filing of this motion, 206 PCR cases were pending before this Court. Ex. 1. Based on oldest to newest case number, the State's appeal of Mr. Spade's case ranks 171 of these 206 cases, even though it has been almost six months since the Supreme Court transferred this appeal to this Court and over a year since the State noticed this appeal. The first 59 cases have 2017, 2018, and 2019 case numbers. It is not uncommon for this Court to take over two years to consider a case after transfer from the Supreme Court.[3]

## III.    CONCLUSION.

For the foregoing reasons, this Court should grant Mr. Spade a speedy appeal.[4]

(signature on next page)

---

[3] *See, e.g., Ard v. State*, Appellate Case No. 2019-001925, where the State's appeal of an order granting a new trial was transferred to this Court on October 27, 2020. This Court denied the State's petition for a writ of certiorari on March 3, 2023, amended the order denying the State's Petition for a writ of certiorari on April 10, 2023, and issued the Remittitur on April 26, 2023.

[4] Alternatively, this Court could grant Mr. Spade an appeal bond, which would reduce but not necessarily eliminate, the prejudice from a delayed appeal. Mr. Spade fully complied with the conditions of bond in the three years prior to his jury trial.

Respectfully Submitted,

By s/*E. Charles Grose, Jr*

  E. Charles Grose, Jr.
  S.C. Bar Number 66063
  The Grose Law Firm, LLC
  404 Main Street
  Greenwood, SC 29646
  (864) 538-4466
  (864) 538-4405 (fax)
  Email: charles@groselawfirm.com

  ***Attorney for Daniel W. Spade***

May 8, 2023
Greenwood, South Carolina



RECEIVED

**May 08 2023**

SC Court of Appeals

THE STATE OF SOUTH CAROLINA
In The Supreme Court

APPEAL FROM SPARTANBURG COUNTY
Court of Common Pleas
J. Mark Hayes, II, Circuit Court Judge

Appellate Case No. 2022-000434

Daniel W. Spade ..................................................................Respondent-Petitioner,

v.

State of South Carolina, ......................................................Petitioner-Respondent.

**Certificate of Service**

I certify that I served this pleading on the State of South Carolina, by email, using counsel's primary email address listed in the Attorney Information System (AIS), as reflected below, on the date reflected below:

Megan Harrigan Jameson, Esquire
S.C. Attorney General's Office
PO Box 11549
Columbia, SC 29211
mjameson@scag.gov
(803) 734-3737

By s/*E. Charles Grose, Jr.*
E. Charles Grose, Jr.
The Grose Law Firm, LLC
404 Main Street
Greenwood, SC 29646
(864) 538-4466

May 8, 2023
Greenwood, South Carolina

# The South Carolina Court of Appeals

Daniel Spade, Respondent-Petitioner,

v.

State of South Carolina, Petitioner-Respondent

Appellate Case No. 2022-000434

---

## ORDER

---

Respondent-Petitioner has filed a motion requesting expedited review of the cross-petitions for certiorari. After careful consideration, the motion is denied.

_____ J.

FOR THE COURT

Columbia, South Carolina

cc:
E. Charles Grose, Jr., Esquire
Megan Harrigan Jameson, Esquire

**FILED**
**May 17 2023**